**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| C. L., an individual,<br>*Plaintiff-Appellant,*<br><br>v.<br><br>DEL AMO HOSPITAL, INC., a<br>California corporation; DOES, 1–10,<br>inclusive,<br>*Defendants-Appellees.* | No. 19-56074<br><br>D.C. No.<br>8:18-cv-00475-<br>DOC-DFM<br><br>OPINION |

Appeal from the United States District Court
for the Central District of California
David O. Carter, District Judge, Presiding

Argued and Submitted December 11, 2020
Pasadena, California

Filed March 30, 2021

Before:  Ronald M. Gould and Ryan D. Nelson, Circuit
Judges, and Brian M. Cogan,[*] District Judge.

Opinion by Judge Gould

---

[*] The Honorable Brian M. Cogan, United States District Judge for
the Eastern District of New York, sitting by designation.

## SUMMARY[**]

### Americans with Disabilities Act

The panel vacated the district court's judgment, after a bench trial, in favor of the defendant in an action seeking injunctive relief under Title III of the Americans with Disabilities Act ("ADA"), which prohibits discrimination in "places of public accommodations," including hospitals.

Plaintiff C.L., who has been diagnosed with post-traumatic stress disorder and other conditions, obtained a dog named Aspen, intending it to be her service dog. Because enrolling in a full training course to provide Aspen with formal certification was not a viable option for C.L., she began self-training the dog.  C.L. sought inpatient treatment at Del Amo Hospital's National Treatment Center. When she asked the Center if she could bring Aspen with her as a service dog, Del Amo denied the dog admission.  The district court entered judgment in favor of Del Amo on the ground that Aspen did not qualify as a service animal under the ADA.

The panel held that the district court erred as a matter of law by effectively imposing a certification requirement for C.L.'s dog to be qualified as a service animal.  The panel held that the ADA prohibits certification requirements for qualifying service dogs for three reasons:  (1) the ADA defines a service dog functionally, without reference to specific training requirements; (2) Department of Justice regulations, rulemaking commentary, and guidance have

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

consistently rejected a formal certification requirement; and (3) allowing a person with a disability to self-train a service animal furthers the stated goals of the ADA, for other training could be prohibitively expensive.

The panel remanded for the district court to consider whether C.L.'s testimony regarding her self-training of Aspen, coupled with expert testimony, was sufficient to show that Aspen was more likely than not a qualified service dog at the time of trial.

## COUNSEL

Christopher H. Knauf (argued) and Alexandra M. Robertson, Disability Rights Legal Center, Los Angeles, California; Jennifer E. Mathis, Bazelon Center for Mental Health Law, Washington, D.C.; Celia McGuinness and Anthony E. Goldsmith, Derby McGuinness & Goldsmith LLP, Oakland, California; for Plaintiff-Appellant.

Raul L. Martinez (argued), Lewis Brisbois Bisgaard & Smith LLP, Los Angeles, California; Scott D. Buchholz and Moira S. Brennan, San Diego, California; for Defendants-Appellees.

Gina F. Elliott (argued), Adam R. Lawton, and Brian J. Springer, Munger Tolles & Olson LLP, Los Angeles, California, for Amici Curiae National Disability Rights Network, American Association of People With Disabilities, Autistic Self Advocacy Network, Disability Rights California, Mental Health America, National Council on Independent Living, and Psychiatric Service Dog Partners.

**OPINION**

GOULD, Circuit Judge:

In 1990, Congress enacted the Americans with
Disabilities Act ("ADA") to eliminate the discrimination
that persons with disabilities faced in essential facets of
everyday life. 42 U.S.C. § 12101. Title III of the ADA
prohibits discrimination in "places of public
accommodations," including hospitals. *Id.* §§ 12181–
12182. Plaintiff-Appellant C.L. ("C.L."), who survived
years of abuse at the hands of her family and a romantic
partner, has been diagnosed with post-traumatic stress
disorder ("PTSD"), dissociative identity disorder ("DID"),
anxiety, and depression. As a result of these conditions, C.L.
experiences hypervigilance, PTSD-related nightmares and
flashbacks, severe anxiety in public spaces and while
bathing, and has difficulty remaining focused and engaged
in daily tasks. To mitigate the symptoms of her disability,
C.L. obtained Aspen, a 16-pound bichon-poodle mix,
intending Aspen to be her service dog. Because enrolling in
a full training course to provide Aspen with formal
certification was not a viable option for C.L., she began self-
training Aspen to perform specific tasks she thought would
ameliorate her disability and decrease her isolation.

Before and after obtaining Aspen, C.L. sought inpatient
treatment at Defendant-Appellee Del Amo Hospital's ("Del
Amo") National Treatment Center. When C.L. asked the
Center if she could bring Aspen with her as her service dog,
Del Amo denied Aspen admission, concluding that the dog's
presence would interfere with C.L.'s therapy. In the
underlying suit, C.L. challenged Del Amo's practice of
denying admission to Aspen as a violation of Title III of the
ADA and California's Unruh Civil Rights Act. C.L. is
undisputedly a person with a disability, and Del Amo is a

place of public accommodation.  After a bench trial, the district court determined that Aspen does not qualify as a service dog under the ADA.  In this appeal, C.L. challenges the district court's judgment in favor of Del Amo.  We have jurisdiction under 28 U.S.C. § 1291, and we vacate and remand.

We hold that the district court erred by effectively imposing a certification requirement for C.L.'s dog to be qualified as a service animal under the ADA.  We vacate and remand for the district court to reconsider whether Aspen was a qualified service dog at the time of trial, and if Aspen is a service dog, whether Del Amo has proved its affirmative defense of fundamental alteration.

# I

C.L. is a speech-language pathologist with a master's degree in Speech and Language Pathology and a Ph.D. in Education.  As a child, C.L. endured years of physical, psychological, and sexual abuse.  She escaped her family's abuse at age 17, but then experienced a 10-year abusive relationship before escaping and starting therapy in 1995.  By 1996, she had been diagnosed with PTSD and DID, and started taking medication.   Since then, C.L. has been diagnosed with anxiety and depression.

C.L.'s psychiatric condition limits major life activities, such as interacting with others, self-care, and sleeping.  As a result of her PTSD, C.L. has a heightened startle response and hypervigilance—she continually checks whether things in her environment are dangerous and finds it difficult to remain focused and engaged in daily tasks.  Additionally, having people unexpectedly in her presence induces anxiety. Taking a shower is particularly challenging due to her history of abuse while bathing.  C.L. has PTSD-related

nightmares and flashbacks that are sometimes so severe that
she tries not to sleep at all to avoid them.

In 2011, after an event triggered a traumatic memory,
C.L.'s mental health deteriorated and her flashbacks,
anxiety, and depression increased.   C.L. felt suicidal.
Dr. Michael Foust, C.L.'s therapist, encouraged C.L. to
obtain a service dog to manage her symptoms of PTSD and
decrease her isolation.

C.L. began researching the possibility of obtaining a
service dog.  First, she purchased a book called *Training
Your Own Psychiatric Service Dog*, by a service dog trainer
named Katie Gonzalez, to help her understand the tasks
performed by psychiatric service dogs and whether one
could meet her needs.  Katie Gonzalez is the director of Little
Angels Service Dogs ("Little Angels"), a nonprofit service
dog training organization.   Gonzalez has trained service
dogs, including psychiatric service dogs, for twenty years,
and has published several books on training service dogs.
Through her research, C.L. learned that because she was
living on Supplemental Security Income, she could not
afford to pay for a trained dog.  A trained dog would cost at
least  $15,000.[1]   C.L. conducted further research and
conferred with a service dog training agency about what dog
breed might best meet her needs.

In August 2013, C.L. obtained Aspen—a 16-pound
bichon-poodle mix that was then 8 weeks old—to be her

---

[1] Little Angels fundraises $38,000 to cover the cost to train each
service dog and then provides the trained service animal to an approved
applicant with a disability on its waiting list for a comparatively minimal
deposit of at least $500.   At the time of trial, the waiting list was
approximately 180–200 approved applicants, and the estimated time for
an approved applicant to receive a trained service dog was ten years.

service dog.  At that time, she did not yet know what tasks she would want Aspen to perform.  She took several dog-training classes at a general dog-training facility, Wags & Wiggles, where she learned how to train Aspen for general socialization and good behavior in public.**[2]**  C.L. used the methods she learned at the dog-training facility and Katie Gonzalez's service dog-training book to begin training Aspen to perform specific tasks.  C.L.'s method, as taught by the classes, included positive reinforcement and verbal acknowledgement of successfully performed tasks, while extinguishing inaccurate or inappropriate behavior.  C.L. also used a clicker as a positive reinforcement tool.

In 2013, C.L. trained Aspen to perform specific tasks to mitigate symptoms of her disability:

1.  ***Waking from Nightmares***: C.L. trained Aspen to wake her from nightmares by standing on her or licking her face.  This task interrupted the nightmares, thereby improving her sleep and reducing the amount of distress she experienced following a nightmare.  C.L. testified that by the end of 2013, Aspen was consistently performing the task of waking C.L. from nightmares and not waking her for any other purpose.

2.  ***Grounding***: C.L. experiences flashbacks and anxiety.  C.L. trained Aspen to place herself in a particular position on C.L.'s lap and apply deep pressure while facing forward.  This "grounds" C.L. in the present.  C.L. testified that Aspen was

---

**[2]** C.L. continued to attend classes periodically at Wags & Wiggles through the spring of 2019.  Wags & Wiggles is certified in dog training, but not service dog training.

performing this task consistently by the end of 2013.

3. ***Alert for People Approaching***: C.L. trained Aspen to alert her that someone is approaching outside her sightline, alleviating C.L.'s symptoms of hypervigilance and improving her ability to focus on tasks at hand.

In 2014, C.L. attended a two-day seminar at Little Angels Service Dogs' facility in San Diego. The seminar was the first course in a three-seminar series, where C.L. learned about how to select an appropriate service dog, the laws and regulations related to having a service dog, and basic training concepts. Specifically, C.L. learned additional techniques for using positive reinforcement and correcting unwanted behaviors such as the "leash tug" and an approach that involved tapping the dog in the hind area. Later that year, Little Angels offered two additional seminars for training one's own service dog. C.L. says she did not attend them because they offered training in tasks that she did not need her dog to perform, such as turning on a light or opening a door. Moreover, she could not afford the tuition or the cost of traveling from her home in Santa Ana to San Diego. Nevertheless, she continued to communicate with Little Angels trainers via email and telephone to discuss Aspen's progress, receive feedback, and get her training questions answered as she continued training.

C.L. testified to training Aspen to accomplish the following additional tasks in 2014 and 2015:

1. ***Interrupt Self-Injurious Behavior***: C.L. trained Aspen to interrupt behaviors such as cutting and banging her head against a wall. For example, when C.L. is banging her head against a wall,

Aspen places herself between C.L. and the wall. Although C.L.'s therapist also proposed strategies for interrupting self-injurious behavior, including use of ice or a rubber band to safely provide a sensory distraction, C.L. testified that Aspen is much more effective than these strategies.

2. ***Cornering***: C.L. trained Aspen to go around a corner ahead of C.L. and alert her if someone is approaching.  Being alerted to the presence of people before she sees them alleviates C.L.'s anxiety and hypervigilance.

3. ***Boundary Control***: C.L. trained Aspen to create a boundary with her body between C.L. and other people, enabling her to spend more time in public.

4. ***Alert for Medication***: C.L. trained Aspen to alert her when her anxiety is increasing, even before C.L. becomes conscious of it herself.

5. ***Standing Guard by the Shower***: C.L. has difficulty showering due to past sexual abuse, so she trained Aspen to sit in a specific location outside the bathroom door and to come get her if someone approaches.

On thirteen separate occasions, C.L. sought inpatient treatment at Del Amo's National Treatment Center.  Only seven of those admissions, which took place between September 2015 and August 2017, were the subject of C.L.'s claims in her initial complaint.  The National Treatment Center program specializes in treatment of patients who have experienced trauma.  During those seven admissions, Del

Amo denied C.L.'s request to bring Aspen with her.  The
hospital denied C.L.'s request because Del Amo clinicians
determined that Aspen's presence in the Center would
interfere with C.L.'s therapy by allowing her to rely on
Aspen rather than learn coping skills.

On March 23, 2018, C.L. filed a complaint in the Central
District of California challenging Del Amo's practice of
denying admission to Aspen on the seven previous occasions
as well as the ongoing denials of admission to Aspen.  C.L.
filed suit under Title III of the ADA, 42 U.S.C. § 12182(a),
and California's Unruh Civil Rights Act, Cal. Civ. Code
§ 51(b).   The parties filed cross-motions for summary
judgment.

In its order on summary judgment, the district court
found that Del Amo did not dispute that C.L. is a "person
with a disability" within the meaning of the ADA.  The court
denied Del Amo's motion in its entirety and granted C.L.'s
motion in part, holding that Del Amo is a "place of public
accommodation" under Title III of the ADA.  The court
denied C.L.'s pre-trial motion *in limine* requesting
adjudication of whether Aspen was, in fact, a service dog.
The district court initially rejected C.L.'s request for a bench
trial, but it then acquiesced when C.L. waived any claim for
damages and stated that she would be pursuing only
injunctive relief at trial.

A bench trial took place from July 23 to 26, 2019.  Two
issues were presented at trial: (1) whether Aspen was a
service dog, and (2) whether allowing Aspen to participate
in C.L.'s hospitalization would "fundamentally alter" the
psychiatric services that were being offered to C.L. during
those hospitalizations under 42 U.S.C. § 12182(b)(2)(A).

At trial, C.L. testified to training Aspen to perform the specific tasks outlined above. Because C.L. trained Aspen in these tasks herself, there was no other witness to testify to the details of her training and how Aspen helped her manage her disability from 2015 to 2017.

Katie Gonzalez testified as an expert in the training of service dogs, the use of service dogs for psychiatric disabilities, and the laws and regulations for service dogs as applied to the work service dogs perform. Gonzalez testified that interrupting nightmares, alerting for people approaching, grounding, interrupting self-harm, cornering, boundary control, alerting for medication, and standing guard in particular places are typical tasks for psychiatric service dogs.

Gonzalez also testified to observing Aspen and C.L. as a dog-handler unit in June 2019. Gonzalez testified that Aspen was a fully trained service dog at the time she observed C.L. and Aspen in June 2019. Gonzalez observed C.L. with Aspen at multiple locations, a restaurant and a shopping center, and the meeting lasted one to one-and-a-half hours. She instructed C.L. to demonstrate some of Aspen's trained tasks and examined how the dog reacted to people and its disposition. She also considered Aspen's breed and size to evaluate appropriateness for the tasks Aspen was trained to perform. Gonzalez also considered the methods by which C.L. trained Aspen. She testified that the techniques C.L. described using to train Aspen are the same techniques that she and Little Angels' trainers teach in the seminars, and as described in the *Training Your Own Psychiatric Service Dog* book and the Little Angels Seminar Booklet. Gonzalez interviewed C.L. regarding how C.L. trained Aspen and concluded that Aspen's tasks were trained tasks, rather than mere behaviors.

Relevant to this appeal, Gonzalez testified that Little
Angels offers a "certification" for service dogs, based in part
on protocols developed by Assistance Dogs International
("ADI").   ADI is a private, nonprofit organization of
professional service dog trainers.   ADI developed the
protocols for service dog training as best practices by its
members.   Gonzalez emphasized, however, that the legal
standard for determining whether a dog is a service dog
under the ADA is different and more basic than the Little
Angels certification or the ADI protocols.  A company like
Little Angels can of course set its standards for certifying a
service dog at a level that is more rigorous than that required
by the ADA.

Gonzalez testified that she could not certify Aspen under
ADI's protocols because further steps would be required for
her to do so, *e.g.*, submitting the dog's veterinary records,
remaining in contact with Gonzalez every month, and
completing all of Little Angels' seminars and assessments.
Gonzalez observed C.L. and Aspen working together and
concluded that the unit exhibited both classical and operant
conditioning—forms of training that are common in the
industry and used by Little Angels' trainers.  Based on the
foregoing, Gonzalez testified that even though C.L. did not
complete the steps required for Little Angels certification,
C.L. had successfully trained Aspen as a service dog.

On Del Amo's fundamental alteration defense, Del
Amo's psychiatrist expert, Dr. Anna Solt, testified that
having the dog present during hospitalization would make it
"too tempting for her to try to utilize the service dog instead
of implementing tools that are taught within the program."
Dr. Solt also testified that there is "no scientific way to know
that someone is having a nightmare."

After the four-day bench trial, the district court entered judgment in favor of Del Amo on the grounds that C.L. had not shown Aspen was or is a service dog.  The court did not reach the question of whether Del Amo had proved its affirmative defense of "fundamental alteration."  C.L. timely appealed.

While this appeal was pending, on February 7, 2020, several organizations moved pursuant to Federal Rule of Appellate Procedure 29(a) for leave to file an *amicus curiae* brief in support of C.L.  The organizations are recognized authorities in the field of disability rights.  We granted the motion, and the amicus brief was filed on November 6, 2020.[3]

## II

We first address the proper standard of review for C.L.'s claims.  We review *de novo* questions of law or mixed questions of law and fact.  *See OneBeacon Ins. Co. v. Has Inds., Inc.*, 634 F.3d 1092, 1096 (9th Cir. 2011); *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir. 2000).  We review a district court's findings of fact for clear error.  Fed. R. Civ. Proc. 52(a)(6); *Anderson v. Bessemer City*, 470 U.S. 564, 566 (1985).

C.L. frames the issues on appeal as two legal errors by the district court: (1) imposing a service dog "certification" requirement that the ADA prohibits, and (2) concluding incorrectly that C.L.'s uncontroverted and unimpeached testimony requires corroboration to satisfy the ADA.  C.L. contends that these erroneous legal rulings were the sole bases for the district court's finding that Aspen does not

---

[3] The court thanks the amicus parties for their views.

qualify as a service dog. Del Amo disputes this
characterization, contending that the issue before us is
"whether Aspen was a trained service dog and whether
Aspen could perform tasks directly related to C.L.'s
disability," a factual finding resting exclusively on the
district court's "Findings of Fact." According to Del Amo,
the district court based its factual conclusion that Aspen is
not a service dog on credibility grounds.

Based on our reading of the district court's Findings of
Fact and Conclusions of Law, we frame the certification
issue as presented by C.L. and review the claim *de novo*. The
plain language of the district court's decision suggests that it
relied on Katie Gonzalez's inability to "certify" Aspen under
Little Angels' standards to reject C.L.'s claim that Aspen is
a service dog.

Del Amo contends that even though the district court
relied on the fact that Aspen was not and could not have been
certified under Little Angels standards, the court also relied
on proper grounds, *i.e.*, credibility. This contention is belied
by the district court order. First, the court repeatedly
emphasized certification standards in its judgment. Second,
in laying out its conclusions of law, the court stated:
"Gonzalez testified that she believes Aspen is a service
animal as of June 2019," but that testimony was
"contradicted" because Gonzalez "is still not willing to
certify C.L. and Aspen as a service dog and handler team."
The court then concluded: "Accordingly, the Court finds that
Plaintiff has not met her burden to show . . . that Aspen is
currently a trained service dog." In other words, Gonzalez's
expert testimony that Aspen was a trained service dog as of
June 2019—the only expert testimony implicating service
dog training—was not accepted by the court because
Gonzalez's inability to certify Aspen necessarily

contradicted that claim.  If the inability to certify Aspen "contradicts" an opinion that Aspen is a trained service dog, as the district court opined, then the court improperly considered certification to be a legally necessary standard for assessing whether Aspen was a trained service dog.  Because the court declined to give weight to C.L.'s testimony on its own and considered her testimony uncorroborated, the court's conclusion that Aspen was not a trained service dog hinged on the supposed contradiction in Gonzalez's testimony.

Contrary to Del Amo's contentions, the court did not challenge or raise questions about C.L.'s credibility, and it made no findings of fact whatsoever on the substance of C.L.'s testimony, her demeanor at trial, or any impeaching evidence.  Nor did the court make credibility findings as to Gonzalez, other than noting—apparently based on the court's conflation of the standard for a service dog under the ADA and Little Angels' certification standards—that her testimony contradicted itself.  Del Amo points to portions of C.L.'s testimony it believes are inconsistent or not credible, but because these contentions are post-hoc rationalizations of the district court decision—rather than an accurate representation of the district court's express findings and conclusions—we decline to affirm on credibility grounds and review C.L.'s claim as legal error.  *See Alpha Distrib. Co. v. Jack Daniel Distillery*, 454 F.2d 442, 452–53 (9th Cir. 1972) (declining to decide contested factual claim where the district court's findings of fact were unclear); Fed. R. Civ. Proc. 52(a)(6).[4]

---

[4] Rule 52(a) requires: "In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  The Rule "requires the district court's

We next address the scope of C.L.'s requested relief. Because she requests only injunctive relief,[5] the relevant question is whether Aspen was a trained service dog at the time of trial: 2019.

### III

We next address what appears to be a question of first impression for our Circuit[6]—whether it is a misinterpretation of the ADA to effectively require a service dog to meet formal certification requirements. We hold that the ADA prohibits certification requirements for qualifying service dogs for three reasons: (1) the ADA defines a service dog functionally, without reference to specific training requirements, (2) Department of Justice ("DOJ") regulations, rulemaking commentary, and guidance have consistently rejected a formal certification requirement, and (3) allowing a person with a disability to self-train a service animal furthers the stated goals of the ADA, for other training could be prohibitively expensive. Thus, the district

---

findings to 'be explicit enough to give the appellate court a clear understanding of the basis of the trial court's decision, and to enable it to determine the ground on which the trial court reached its decision.'" *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1090 (9th Cir. 2002) (quoting *Alpha Distrib.*, 454 F.2d at 453).

[5] C.L.'s initial complaint requested damages, but at the time of trial, C.L. had waived any claim for damages and was pursuing only injunctive relief. Though Del Amo devotes much of its answering brief to Aspen's status as a service dog from 2014 to 2018, that evidence is not dispositive as to whether Aspen is *currently* a trained service dog that should be allowed to accompany C.L. to Del Amo during future admissions.

[6] Even outside of our Circuit, the case law in this area is sparse and primarily exists at the district court level.

court erred by imposing a heightened requirement on Aspen
that is inconsistent with the ADA.

### A

The ADA's implementing regulations define a service
animal as "any dog that is individually trained to do work or
perform tasks for the benefit of an individual with a
disability," including a psychiatric disability, where the
work or tasks are "directly related to the individual's
disability."  28 CFR § 36.104.  The regulations do not
specify by whom the dog must be trained.  Rather, the statute
defines a service dog by the outcome of training—what the
dog is capable of doing to ameliorate an individual's
disability.  The language also makes clear that the dog's
capabilities must be trained for that purpose; a well-trained
companion animal that happens to alleviate a person's
anxiety would not suffice, *see id.*, but a dog trained by the
individual to perform certain tasks to alleviate that anxiety
would.  Our view is consistent with district courts that have
considered the question and found that the ADA does not
require a service dog to perform a particular number of
trained tasks or amount of work.  *See, e.g.*, *Green v. Hous.
Auth. of Clackamas Cnty.*, 994 F. Supp. 1253, 1256 (D. Or.
1998) ("[T]here is no requirement as to the amount or type
of work a service animal must provide for the benefit of the
[person with a disability].").  There must be some evidence
of individual training to distinguish the service animal from
the ordinary pet.  For example, a dog may naturally jump up
in its owner's lap, which would constitute a behavior—
however, if the owner trains the dog to sit in her lap in a
particular position and only in response to certain triggers
related to the owner's disability, then the dog has been
trained and has ceased to merely behave in a way that dogs
naturally do.  Here, Gonzalez, an expert in service dog

training, explained that the process of training a dog to
mitigate symptoms of disability may involve reinforcing
some natural behaviors and extinguishing other behaviors
until the dog is consistently performing the desired task.
And Aspen had been trained to perform several tasks well
beyond the normal behavior of a pet, such as licking C.L.'s
face to wake her from a nightmare, interrupting self-
injurious behavior, cornering, boundary control and other
specific trained tasks.

## B

The DOJ has consistently stated—in regulations,
rulemaking commentary, and official department
guidance—that a service animal within the meaning of the
ADA must be individually trained to perform tasks related
to an individual's disability, but the animal need not be
formally certified.  The test is a functional one: can the dog
consistently help the person with a disability meet the
challenges of life by assisting in the person's activities of
daily living?

In enacting the ADA, Congress explained that one
purpose is "to ensure that the Federal Government plays a
central role in enforcing the standards established in this
chapter."  42 U.S.C. § 12101(b)(3).  To that end, Congress
gave the Attorney General the responsibility to promulgate
regulations implementing the provisions of Title III of the
ADA.  42 U.S.C. § 12186(b).  "To flesh out the details of
[Title III's] general rule, Congress charged the Attorney
General with the task of promulgating regulations clarifying
how public accommodations must meet these statutory
obligations."  *United States v. AMC Ent., Inc.*, 549 F.3d 760,
763 (9th Cir. 2008).

DOJ regulations and commentary make clear that individuals may self-train service animals without obtaining formal certification. The DOJ's administrative guidance regarding the "public accommodations" provision is "entitled to deference." *Bragdon v. Abbott*, 524 U.S. 624, 646 (1998) (citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)). The current regulations were made final after the DOJ published a notice of proposed rulemaking in June 2008. *See* Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, 73 Fed. Reg. 34508, 34515 (proposed June 17, 2008). With regard to qualifying service animals, the DOJ wished to amend the definition of "service animal" to exclude some species (such as rabbits) and to exclude emotional support animals, but it also sought to formalize the agency's longstanding position that people with psychiatric and mental disabilities can use service animals. *Id.* at 34515–16, 34521. After receiving comments, the DOJ issued its final regulations in September 2010, and the regulations took effect in March 2011. *See* Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities ("Final Rule"), 75 Fed. Reg. 56236, 56237 (Sept. 15, 2010); 76 Fed. Reg. 13286, 13288 (Mar. 11, 2011) (making technical corrections).

The district court's ruling that Aspen was not a service animal in part because she could not be certified under ADI standards is contrary to multiple aspects of the 2010 regulations. First, the regulations state that a person with a "psychiatric . . . or other mental disability" may benefit from the use of service animals. 28 C.F.R. § 36.104. Trained tasks can include "preventing or interrupting impulsive or destructive behaviors." *Id.* As other courts have noted, a dog can be trained to aid a person with a disability without

formal schooling. *See Bronk v. Ineichen*, 54 F.3d 425, 430–
31 (7th Cir. 1995) (holding that the district court erred as a
matter of law by providing a jury instruction from which the
"jury could logically infer . . . that without school training, a
dog cannot be a reasonable accommodation," where a
reasonable accommodation is defined by statute as
"facilitat[ing] a [person with a disability's] ability to
function"); *Green*, 994 F. Supp. at 1256.

The DOJ's commentary accompanying its rulemaking
confirms that persons with disabilities need not secure
formal training and may self-train their animals. In fact, the
DOJ considered but specifically rejected a recommendation
submitted by multiple commenters to adopt "formal training
requirements for service animals." Final Rule, 75 Fed. Reg.
at 56272 (rejecting this approach and concluding that DOJ
"will not impose any type of formal training requirements or
certification process"). The DOJ justified its decision by
noting that a certification requirement would increase the
cost of acquiring a service animal, thus limiting access to
such animals for individuals with limited financial
resources, and that suggested training standards were too
"lengthy and detailed." *Id.* The DOJ also expressed an
intention not to "unnecessarily impede individual choice" in
light of "the diverse needs and preferences of individuals
with disabilities." *Id.* at 56266. Declining to impose any
kind of rigid training requirement, the DOJ emphasized that
"individuals with disabilities may be capable of training, and
some have trained, their service animal to perform tasks or
do work to accommodate their disability." *Id.* Thus, the
district court's conclusion that Aspen's failure to receive
certification weighed against her claim for relief cannot be
reconciled with the permissive approach adopted by the
DOJ. It is enough if a service dog had been trained to
perform specific tasks that will consistently aid a person with

a disability by making them more able to perform necessary
tasks and enjoy activities of daily living.

The district court's decision also creates tension with a
related regulation. Section 36.302 specifies the
arrangements that public accommodations must make for
service animals. *See* 28 C.F.R. § 36.302. Subsection (c)(6)
permits public accommodations to ask only two questions to
determine whether an animal is a service animal: (1) whether
"the animal is required because of a disability," and
(2) "what work or task the animal has been trained to
perform." 28 C.F.R. § 36.302(c)(6). The public
accommodation is expressly prohibited from "requir[ing]
documentation, such as proof that the animal has been
certified, trained, or licensed as a service animal." *Id.*[7] The
DOJ observed that requiring individuals with disabilities to
carry around documentation "would be unnecessary,
burdensome, and contrary to the spirit, intent, and mandates
of the ADA." *See* Final Rule, 75 Fed. Reg. at 56272. We
conclude that the district court's implicit rule creates a
mismatch between the information a public accommodation
may request and the conditions that a service animal must
satisfy to be qualified.

Consistent with the clear language of the regulations and
commentary, many district court decisions both within and
outside our Circuit have declined to apply a certification
obligation. *See Green*, 994 F. Supp. at 1255–56; *Riley v. Bd.
of Comm'rs of Tippecanoe Cnty.*, No. 14-CV-00063, 2017

---

[7] Del Amo contends that this provision of the regulations is a
"different question" from the one presented here, because the issue here
is not that C.L. did not have proper documentation for Aspen. True
enough, but as C.L. points out, it would be nonsensical for the ADA to
effectively require certification when public accommodations are
prohibited from asking for proof of it.

WL 4181143, at *5 (N.D. Ind. Sept. 21, 2017); *Cordoves v. Miami-Dade County*, 92 F. Supp. 3d 1221, 1230 (S.D. Fla. 2015); *Rose v. Springfield–Greene Cnty. Health Dep't*, 668 F. Supp. 2d 1206, 1214–15 (W.D. Mo. 2009) ("There are no requirements as to the amount or type of training that a service animal must undergo, nor the type of work or assistance that a service animal must provide, but the animal be trained to perform tasks or do work for the benefit of a [person with a disability]."); *see also Prindable v. Ass'n of Apartment Owners of 2987 Kalakaua*, 304 F.Supp.2d 1245, 1256 (D. Haw. 2003) (noting that "there are no federally-mandated animal training standards").

The DOJ has conveyed the same views in its technical assistance manual and other guidance documents. Such materials may properly serve as authoritative sources of interpretive guidance. *See, e.g.*, *Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725, 732 n.11 (9th Cir. 1999) (stating that DOJ's ADA Technical Assistance Manual "must also be given substantial deference and will be disregarded only if 'plainly erroneous or inconsistent with the regulation'" (citation omitted)). The DOJ Technical Assistance Manual on the ADA defines service animals by the tasks they are able to perform, and not by reference to a particular training protocol. *See* U.S. Dep't of Justice, Technical Assistance Manual on the ADA (1994), available at https://www.ada.gov/taman3.html. Though the manual identifies that "[a] number of States have programs to certify service animals," it instructs that private entities "may not insist on proof of State certification before permitting the entry of a service animal to a place of public accommodation." *Id.* Similarly, the DOJ's document titled "Frequently Asked Questions about Service Animals and the ADA," which provides guidance on the service animal provisions, makes clear that the ADA considers self-training

to be a viable option.  *See* U.S. Dep't of Justice, "Frequently
Asked Questions about Service Animals and the ADA"
(2015), available at https://www.ada.gov/regs2010/service_
animal_qa.pdf.

## C

Finally, we conclude that the district court erred because
effectively requiring certification would hinder the goals of
the ADA.

The ADA was signed into law on July 26, 1990.
Congress sought to eliminate the discrimination faced by
people with disabilities in essential facets of everyday life,
including at public accommodations.    42 U.S.C.
§ 12101(a)(2)–(3).  Accordingly, one of the ADA's goals
was "to provide a clear and comprehensive national mandate
for the elimination of discrimination against individuals with
disabilities."  *Id.* at § 12101(b)(1).  The flexibility to self-
train a service animal for an individual's specific needs
furthers the ADA's goal of helping people with disabilities
live with "equality of opportunity, full participation,
independent living, and economic self-sufficiency."  *Id.*
at § 12101(a)(7).

A certification requirement would have negative
consequences for persons with psychiatric disabilities who
rely on service animals.  Research shows the significant
impact service animals can have on the quality of life of
persons with such disabilities.  *See* Anne Ruff & Adriana
Fortune, *Emerging Duties Under Unsettled Disability Law:
Web Access and Service Animals in Health Care*, 11 J.
Health & Life Sci. L. 80, 100 (2017) (recognizing that
service animals are increasingly being used to assist persons
with psychiatric disabilities rather than physical disabilities).
Specifically, service animals have been shown to help

"individuals with autism, post-traumatic stress disorder, and
anxiety." *Id.* Service *dogs* in particular have been
"associated with clinically significant reductions in [PTSD]
symptoms" compared to usual care alone. *See* Marguerite
E. O'Haire & Kerri E. Rodriguez, *Preliminary Efficacy of
Service Dogs as a Complementary Treatment for
Posttraumatic Stress Disorder in Military Members and
Veterans*, 86 J. Consulting & Clinical Psychol. 179, 184
(2018); *see also* Terry K. Crowe et al., *Veterans
Transitioning from Isolation to Integration: A Look at
Veteran/Service Dog Partnerships*, 40 Disability &
Rehabilitation 2953, 2956 (2018) (finding that service dogs
decrease isolation because they "were alerted to the
veterans' anxiety," and the animals would "nudge[] or alert[]
(cue[]) the veterans to leave the store").

C.L.'s case illustrates the benefits a trained service dog
can provide to an individual with PTSD. C.L. testified that
she is able to go into public "much, much more" because of
Aspen's training in alerting her to the presence of other
people. She also feels comfortable going grocery shopping
with Aspen's assistance, which she was not able to do
before. Enrolling in a training course to obtain a certification
is not always a viable option for persons like C.L., who had
not been able to work before obtaining Aspen. The district
court placed great weight on the fact that Gonzalez would
not certify Aspen as a service dog under standards set by
Assistance Dogs International, a private trade association,
but Gonzalez explained that she could not certify Aspen
under this standard unless C.L. attended three seminars and
provided proof of disability from a medical provider. Those
burdens were in addition to the $900 tuition, plus any travel
or other expenses that may be required to attend multiple-
day sessions. Moreover, C.L. testified that she did not attend
all three sessions of Little Angels' seminar in part because

they were focused on tasks she did not require Aspen to perform.  Importantly, the DOJ declined to adopt formal training requirements *precisely because* the needs of each individual with a disability vary greatly.  See 73 Fed. Reg. at 34524.

Thus, a ruling that service animals cannot be qualified under the ADA if an expert is not able to certify the animal based on the standards of a private organization would have the effect of denying legally protected access to public accommodations for persons who—like C.L.—need service animals to mitigate the effects of their disabilities in these spaces.   And from a pragmatic standpoint, there is no industry-wide consensus on the proper certification standards.   For example, Gonzalez testified that her organization starts with the general certification framework of another organization, but then adds additional standards.  It is unclear how a person like C.L. could reliably choose between these various standards, none of which the DOJ endorses, to ensure the "certification" will be judicially recognized.  Importing a certification requirement would not create certainty for whether a dog is truly a service animal.  Instead, it would multiply litigation over which certifications are judicially valid.  Under the ADA, the proper focus is on whether a service animal will consistently and reliably help a person with a disability in performing activities of daily living.

## IV

Because we hold that the district court erred as a matter of law by imposing a certification requirement, we need not delve deeply into C.L.'s second claim of legal error— whether corroboration is required if a person self-training their service dog gives unrebutted testimony.  According to C.L., the district court discounted C.L.'s testimony

regarding Aspen's training without giving explicit reasons for doing so.  The court stated: "*Other than C.L.'s assertions*, there is no evidence in the record as accepted by the Court that Aspen was trained to perform, and could perform, the outlined [service dog] tasks"; and "The *sole evidence* Plaintiff put forth that Aspen was a service animal during this time period is her own testimony that she trained Aspen to perform tasks." (emphasis added).  Read plainly, these statements imply that the court had accepted C.L.'s testimony, but without additional accepted testimony, C.L.'s own assertions were insufficient to show that Aspen was a trained service dog.

But because the district court erred by improperly discounting Gonzalez's testimony on certification grounds, and Gonzalez's expert testimony that Aspen was a "service dog" corroborated C.L.'s testimony and thus provided "additional accepted testimony," we need not decide whether unimpeached testimony is necessarily insufficient to prove that a dog is a service animal.  We remand for the district court to consider whether C.L.'s testimony regarding her self-training of Aspen, coupled with Katie Gonzalez's expert testimony, was sufficient to show that Aspen was "more likely than not" a qualified service dog at the time of trial.  *See Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996) (describing the preponderance standard for establishing a fact as "more likely than not").

## V

For these reasons, we hold that the district court erred by requiring Aspen to meet formal certification standards to qualify as a service dog, because such a requirement is inconsistent with the ADA.  We remand for the district court to reconsider C.L.'s claims consistent with what we have said in this opinion.

**VACATED AND REMANDED.**[8]

---

[8] Pursuant to General Order 4.5(e), Del Amo Hospital shall bear the costs of this appeal.

# Americans with Disabilities Act

# ADA Title III Technical Assistance Manual

# Covering Public Accommodations and Commercial Facilities

Introduction

This technical assistance manual addresses the requirements of title III of the Americans with Disabilities Act, which applies to public accommodations, commercial facilities, and private entities offering certain examinations and courses. It is one of a series of publications issued by Federal agencies under section 506 of the ADA to assist individuals and entities in understanding their rights and duties under the Act.

This manual is part of a broader program of technical assistance conducted by the Department of Justice to promote voluntary compliance with the requirements not only of title III, but also of title II of the ADA, which applies to the operations of State and local governments.

The purpose of this technical assistance manual is to present the ADA's title III requirements in a format that will be useful to the widest possible audience. The guidance provided in the Department's regulations and accompanying preambles has been carefully reorganized to provide a focused, systematic description of the ADA's requirements. The manual attempts to avoid an overly legalistic style without sacrificing completeness. In order to promote readability and understanding, the text makes liberal use of questions and answers and illustrations.

The manual is divided into nine major subject matter headings with numerous numbered subheadings. Each numbered heading and subheading is listed in a quick reference table of contents at the beginning of the manual.

Contents

**III-1.0000 COVERAGE**

III-1.1000 General.
III-1.2000 Public accommodations.
III-1.3000 Commercial facilities.
III-1.3100 Exceptions.
III-1.4000 Examinations and courses.
III-1.5000 Religious entities.
III-1.5100 Definition.
III-1.5200 Scope of exemption.
III-1.6000 Private clubs.
III-1.7000 Relationship to title II.
III-1.8000 Relationship to other laws.
III-1.8100 Rehabilitation Act.
III-1.8200 Other Federal and State laws.

**III-2.0000 INDIVIDUALS WITH DISABILITIES**

III-2.1000 General.
III-2.2000 Physical or mental impairments.
III-2.3000 Drug addiction as an impairment.
III-2.4000 Substantial limitation of a major life activity.
III-2.5000 Record of a physical or mental impairment that substantially limited a major life activity.

cited in C.L. v. Del Amo Hospital, Inc.
No. 19-56074 archived on March 24, 2021

III-2.6000 "Regarded as."
III-2.7000 Exclusions.

**III-3.0000 GENERAL REQUIREMENTS**

III-3.1000 General.
III-3.2000 Denial of participation.
III-3.3000 Equality in participation/benefits.
III-3.4000 Separate benefit/integrated setting.
III-3.4100 Separate programs.
III-3.4200 Right to participate in the regular program.
III-3.4300 Modifications in the regular program.
III-3.5000 Discrimination on the basis of association.
III-3.6000 Retaliation or coercion.
III-3.7000 Maintenance of accessible features.
III-3.8000 Direct threat.
III-3.9000 Illegal use of drugs.
III-3.10000 Smoking.
III-3.11000 Insurance.
III-3.12000 Places of public accommodation located in private residences.

**III-4.0000 SPECIFIC REQUIREMENTS**

III-4.1000 Eligibility criteria
III-4.1100 General.
III-4.1200 Safety.
III-4.1300 Unnecessary inquiries.
III-4.1400 Surcharges.
III-4.2000 Reasonable modifications.
III-4.2100 General.
III-4.2200 Specialties.
III-4.2300 Service animals.
III-4.2400 Check-out aisles.
III-4.2500 Accessible or special goods.
III-4.2600 Personal services and devices.
III-4.3000 Auxiliary aids
III-4.3100 General.
III-4.3200 Effective communication.
III-4.3300 Examples of auxiliary aids and services.
III-4.3400 Telecommunication devices for the deaf (TDD's).
III-4.3410 Calls incident to business operations.
III-4.3420 Outgoing calls by customers, clients, patients, or participants.
III-4.3500 Closed caption decoders.
III-4.3600 Limitations and alternatives.
III-4.4000 Removal of barriers
III-4.4100 General.
III-4.4200 Readily achievable barrier removal.
III-4.4300 Standards to apply.
III-4.4400 Continuing obligation.
III-4.4500 Priorities for barrier removal.
III-4.4600 Seating in assembly areas.
III-4.4700 Transportation barriers.
III-4.5000 Alternatives to barrier removal
III-4.5100 General.
III-4.5200 Multiscreen cinemas.
III-4.6000 Examinations and courses.

Cited in C.L. v. Del Amo Hospital, Inc. No. 19-56074 archived on March 24, 2021

III-4.6100 Examinations.
III-4.6200 Courses.

**III-5.0000 NEW CONSTRUCTION**

III-5.1000 General.
III-5.2000 Commercial facilities in a home.
III-5.3000 Application of ADAAG.
III-5.4000 Elevator exemption.
III-5.4100 Shopping center or mall.
III-5.4200 Professional office of a health care provider.
III-5.4300 Transportation terminals.

**III-6.0000 ALTERATIONS**

III-6.1000 General.
III-6.2000 Alterations: Path of travel.
III-6.3000 Alterations: Elevator exemption.
III-6.4000 Alterations: Historic preservation.

**III-7.0000 THE AMERICANS WITH DISABILITIES ACT ACCESSIBILITY GUIDELINES (ADAAG)**

III-7.1000 General.
III-7.2000 General requirements/definitions
III-7.2100 Equivalent facilitation.
III-7.3000 Accessible elements and spaces: Scoping and technical requirements.
III-7.3100 Application.
III-7.3110 Work areas.
III-7.3120 Temporary structures.
III-7.3130 General exceptions.
III-7.4000 Sites and exterior facilities.
III-7.4100 General.
III-7.4200 Accessible route.
III-7.4300 Parking.
III- 7.4400 Signage.
III-7.5000 Buildings: New construction.
III-7.5100 General.
III-7.5105 Accessible route.
III-7.5110 Stairs.
III-7.5115 Elevators and platform lifts.
III-7.5120 Windows.
III-7.5125 Doors.
III-7.5130 Entrances.
III-7.5135 Areas of rescue assistance.
III-7.5140 Drinking fountains.
III-7.5145 Bathrooms.
III-7.5150 Storage, shelving, and display units.
III-7.5155 Controls and operating mechanisms.
III-7.5160 Alarms.
III-7.5161 Detectable Warnings
III-7.5165 Signage.
III-7.5170 Telephones.
III-7.5175 Fixed seating.
III-7.5180 Assembly areas.
III-7.5185 Automated teller machines.
III-7.5190 Dressing and fitting rooms.

cited: C.L. v. Del Amo Hospital, Inc. No. 19-56014 archived on March 24, 2021

III-7.6000 Additions.
III-7.7000 Alterations.
III-7.8000 Special facility types
III-7.8100 Historic preservation.
III-7.8200 Restaurants and cafeterias.
III-7.8300 Medical care facilities.
III-7.8400 Business and mercantile.
III-7.8500 Libraries.
III-7.8600 Transient lodging.
III-7.8700 Transportation facilities.

**III-8.0000 ENFORCEMENT**

III-8.1000 General.
III-8.2000 Private suits.
III-8.3000 Investigations and compliance reviews.
III-8.4000 Suit by the Attorney General.
III-8.5000 Attorney's fees.
III-8.6000 Alternative means of dispute resolution.
III-8.7000 Technical assistance.
III-8.8000 Effective date.

**III-9.0000 CERTIFICATION**

III-9.1000 General.
III-9.2000 Relationship to State and local enforcement efforts.
III-9.3000 Procedure: Application and preliminary review.
III-9.4000 Preliminary determination.
III-9.5000 Procedure following preliminary determination of equivalency.
III-9.6000 Procedure following preliminary denial of certification.
III-9.7000 Effect of certification.
III-9.8000 Certification and barrier removal in existing facilities.
III-9.9000 Review of model codes.

INDEX

# III-1.0000 COVERAGE

Regulatory references: 28 CFR 36.102-36.104.

**III-1.1000 General**. Title III of the ADA covers --

　1) Places of public accommodation;

　2) Commercial facilities; and

　3) Examinations and courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes.

The obligations of title III only extend to private entities. State and local government entities are public entities covered by title II of the ADA, not by title III.

Title III also covers private entities primarily engaged in transporting people. The Department of Transportation has issued regulations implementing that section of title III.

Is the Federal Government covered by title III because it is not a "public entity" under title II? The operations of the executive branch of the Federal Government are not covered by title III of the ADA.

cited here: Emily Du-Amo Hospital, Inc.
NO: 18-56074 archived March 24, 2021

They are covered, however, by sections 501 and 504 of the Rehabilitation Act of 1973, as amended, which prohibit disability discrimination in programs and activities conducted by Federal Executive agencies or the United States Postal Service, and by the Architectural Barriers Act, which requires that the design, construction, and alteration of Federal buildings be done in an accessible manner. The activities of the legislative branch, including Congress, on the other hand, are covered under title V of the ADA.

Are places of public accommodation and commercial facilities subject to the same requirements? No. Both places of public accommodation and commercial facilities (which include many facilities that are not places of public accommodation) are subject to the title III requirements for new construction and alterations. In addition to these requirements, places of public accommodation must be operated in accordance with the full range of title III requirements, such as nondiscriminatory eligibility criteria; reasonable modifications in policies, practices, and procedures; provision of auxiliary aids; and removal of barriers in existing facilities.

**III-1.2000 Public accommodations.** The broad range of title III obligations relating to "places of public accommodation" must be met by entities that the Department of Justice regulation labels as "public accommodations. " In order to be considered a public accommodation with title III obligations, an entity must be private and it must --

> Own;
>
> Lease;
>
> Lease to; or
>
> Operate

a place of public accommodation.

What is a place of public accommodation? A place of public accommodation is a facility whose operations --

Affect commerce; and

Fall within at least one of the following 12 categories:

> 1) Places of lodging (e.g. , inns, hotels, motels) (except for owner-occupied establishments renting fewer than six rooms);
>
> 2) Establishments serving food or drink (e.g. , restaurants and bars);
>
> 3) Places of exhibition or entertainment (e.g. , motion picture houses, theaters, concert halls, stadiums);
>
> 4) Places of public gathering (e.g. , auditoriums, convention centers, lecture halls);
>
> 5) Sales or rental establishments (e.g. , bakeries, grocery stores, hardware stores, shopping centers);
>
> 6) Service establishments (e.g. , laundromats, dry-cleaners, banks, barber shops, beauty shops, travel services, shoe repair services, funeral parlors, gas stations, offices of accountants or lawyers, pharmacies, insurance offices, professional offices of health care providers, hospitals);
>
> 7) Public transportation terminals, depots, or stations (not including facilities relating to air transportation);
>
> 8) Places of public display or collection (e.g. , museums, libraries, galleries);

cited in C.L. v. Del Amo Hospital, Inc.
No. 19-56074 archived on March 24, 2021

9) Places of recreation (e.g. , parks, zoos, amusement parks);

10) Places of education (e.g. , nursery schools, elementary, secondary,
undergraduate, or postgraduate private schools);

11) Social service center establishments (e.g. , day care centers, senior citizen
centers, homeless shelters, food banks, adoption agencies); and

12) Places of exercise or recreation (e.g. , gymnasiums, health spas, bowling
alleys, golf courses).

Can a facility be considered a place of public accommodation if it does not fall under one of these 12
categories? No, the 12 categories are an exhaustive list. However, within each category the examples
given are just illustrations. For example, the category "sales or rental establishments" would include many
facilities other than those specifically listed, such as video stores, carpet showrooms, and athletic
equipment stores.

What if a private entity operates, or leases space to, many different types of facilities, of which only
relatively few are places of public accommodation? Is the whole private entity still a public
accommodation? The entire private entity is, legally speaking, a public accommodation, but it only has
ADA title III obligations with respect to the operations of the places of public accommodation.

ILLUSTRATION: ZZ Oil Company owns a wide range of production and processing
facilities that are not places of public accommodation. It also operates a large number of retail
service stations that are places of public accommodation. In this case, ZZ Oil Company
would be a public accommodation. However, only its operations relating to the retail service
stations are subject to the broad title III requirements for public accommodations. The other
facilities, however, are commercial facilities and would be subject only to the requirements
for new construction and alterations.

Do both a landlord who leases space in a building to a tenant and the tenant who operates a place of public
accommodation have responsibilities under the ADA? Both the landlord and the tenant are public
accommodations and have full responsibility for complying with all ADA title III requirements applicable
to that place of public accommodation. The title III regulation permits the landlord and the tenant to
allocate responsibility, in the lease, for complying with particular provisions of the regulation. However,
any allocation made in a lease or other contract is only effective as between the parties, and both landlord
and tenant remain fully liable for compliance with all provisions of the ADA relating to that place of
public accommodation.

ILLUSTRATION: ABC Company leases space in a shopping center it owns to XYZ
Boutique. In their lease, the parties have allocated to XYZ Boutique the responsibility for
complying with the barrier removal requirements of title III within that store. In this situation,
if XYZ Boutique fails to remove barriers, both ABC Company (the landlord) and XYZ
Boutique (the tenant) would be liable for violating the ADA and could be sued by an XYZ
customer. Of course, in the lease, ABC could require XYZ to indemnify it against all losses
caused by XYZ's failure to comply with its obligations under the lease, but again, such
matters would be between the parties and would not affect their liability under the ADA.

Is a bank that acquires ownership of a place of public accommodation through foreclosure subject to title
III? Yes. Any owner of a place of public accommodation is covered as a public accommodation regardless
of the intended or actual duration of its ownership.

Can a place of public accommodation be covered by both the ADA and the Fair Housing Act (FHA)? Yes.
The analysis for determining whether a facility is covered by title III is entirely separate and independent
from the analysis used to determine coverage under the FHA. A facility can be a residential dwelling
under the FHA and still fall in whole or in part under at least one of the 12 categories of places of public
accommodation. ILLUSTRATION: LM, Inc. , a private, nonsectarian, nonprofit organization operates a
homeless shelter permitting stays ranging from overnight to those of sufficient length to result in coverage

Web: G.L. v. Del Amo Hospital, Inc.
No. 15-56014, argued on March 24, 2021

as a dwelling under the FHA. Because it permits short-term, overnight stays, the shelter may also be considered a place of public accommodation as a "place of lodging," and covered by title III of the ADA. In addition, if the shelter provides a significant enough level of social services, such as medical care, meals, counseling, transportation, or training, it may also be covered under title III as a "social service center establishment. "

Does title III apply to common areas within residential facilities? Although title III does not apply to strictly residential facilities, it covers places of public accommodation within residential facilities. Thus, areas within multifamily residential facilities that qualify as places of public accommodation are covered by the ADA if use of the areas is not limited exclusively to owners, residents, and their guests.

> ILLUSTRATION 1: A private residential apartment complex includes a swimming pool for use by apartment tenants and their guests. The complex also sells pool "memberships" generally to the public. The pool qualifies as a place of public accommodation.

> ILLUSTRATION 2: A residential condominium association maintains a longstanding policy of restricting use of its party room to owners, residents, and their guests. Consistent with that policy, it refuses to rent the room to local businesses and community organizations as a meeting place for educational seminars. The party room is not a place of public accommodation.

> ILLUSTRATION 3: A private residential apartment complex contains a rental office. The rental office is a place of public accommodation.

Are model homes places of public accommodation? Generally, no. A model home does not fall under one of the 12 categories of places of public accommodation. If, however, the sales office for a residential housing development were located in a model home, the area used for the sales office would be considered a place of public accommodation. Although model homes are not covered, the Department encourages developers to voluntarily provide at least a minimal level of access to model homes for potential homebuyers with disabilities. For example, a developer could provide physical access (via ramp or lift) to the primary level of one of several model homes and make photographs of other levels within the home as well as of other models available to the customer.

Can a vacation timeshare property be a place of public accommodation? Yes. Whether a particular timeshare property is a place of public accommodation depends upon how much the timeshare operation resembles that of a hotel or other typical place of lodging. Among the factors to be considered in this determination are --

> 1) Whether the timeshare offers short-term ownership interests (for instance, stays of one week or less are considered short term);

> 2) The nature of the ownership interest conveyed (e.g. , fee simple);

> 3) The degree of restrictions placed on the ownership (e.g. , whether the timeshare owner has the right to occupy, alter, or exercise control over a particular unit over a period of time);

> 4) The extent to which the operations resemble those of a hotel, motel, or inn (e.g. , reservations, central registration, meals, laundry service).

If a public accommodation operating two geographically separate facilities serves clients or customers at one location and has only administrative offices at another, are both sites places of public accommodation? No. Only the facility in which clients or customers are served is covered as a place of public accommodation. The geographically separate, employees-only facility is a commercial facility, but any activities undertaken in that facility that affect the operations of the place of public accommodation are subject to the title III requirements for public accommodations.

> ILLUSTRATION: A medical care provider owns one building in which patients are seen, and another building in a different location that contains only administrative offices. At the

Def. Aml. Hospital, Inc.'s
cited Ex. 4 filed March 24, 2021
No. 19-560A-71

building housing the administrative offices, no services are provided (no patients go there,
only employees). The building where patients are treated is a place of public accommodation.
The geographically separate administrative offices are a commercial facility, not a place of
public accommodation. However, any policies or decisions made in the administrative offices
that affect the treatment of patients would be subject to the requirements for public
accommodations. For example, a protocol for the provision of auxiliary aids that is issued as
a directive to medical staff by the administrative office must comply with the effective
communication requirements for public accommodations.

BUT: If patients receive medical services in the same building where the administrative
offices are located, the entire building is a place of public accommodation, even if one or
more floors are reserved for the exclusive use of employees.

**III-1.3000 Commercial facilities.** The requirements of title III for new construction and alterations cover
commercial facilities, which include nonresidential facilities, such as office buildings, factories, and
warehouses, whose operations affect commerce. This category sweeps under ADA coverage a large
number of potential places of employment that are not covered as places of public accommodation. A
building may contain both commercial facilities and places of public accommodation.

**III-1.3100 Exceptions.** Commercial facilities do not include rail vehicles or any facility covered by the
Fair Housing Act. Residential dwelling units, therefore, are not commercial facilities. In addition,
facilities that are expressly exempted from coverage under the Fair Housing Act are also not considered to
be commercial facilities. For example, owner-occupied rooming houses providing living quarters for four
or fewer families, which are exempt from the Fair Housing Act, would not be commercial facilities.

Even though private air terminals are not considered to be places of public accommodation, are airports
covered as commercial facilities? Yes, private air terminals are commercial facilities and, therefore, would
be subject to the new construction and alterations requirements of title III. Moreover, while a private air
terminal, itself, may not be a place of public accommodation (because the ADA statutory language
exempts air transportation), the retail stores and service establishments located within a private airport
would be places of public accommodation. (In addition, private airports that receive Federal financial
assistance are subject to the requirements of section 504 of the Rehabilitation Act of 1973, which
prohibits discrimination on the basis of disability in programs and activities of recipients of Federal funds.
Airline operations at private airports may also be subject to the nondiscrimination requirements of the Air
Carrier Access Act.) Air terminals operated by public entities would be covered by title II of the ADA,
not title III; but any private retail stores operated within the terminal would be places of public
accommodation covered by title III.

**III-1.4000 Examinations and courses.** Private entities offering examinations or courses covered by title
III are subject to the requirements discussed in III-4.6000 of this manual. If the private entity is also a
public accommodation or has responsibility for a commercial facility, it would be subject to other
applicable title III requirements as well.

**III-1.5000 Religious entities.** Religious entities are exempt from the requirements of title III of the ADA.
A religious entity, however, would be subject to the employment obligations of title I if it has enough
employees to meet the requirements for coverage.

**III-1.5100 Definition.** A religious entity is a religious organization or an entity controlled by a religious
organization, including a place of worship.

If an organization has a lay board, is it automatically ineligible for the religious exemption? No. The
exemption is intended to have broad application. For example, a parochial school that teaches religious
doctrine and is sponsored by a religious order could be exempt, even if it has a lay board.

**III-1.5200 Scope of exemption.** The exemption covers all of the activities of a religious entity, whether
religious or secular.

ILLUSTRATION: A religious congregation operates a day care center and a private elementary school for members and nonmembers alike. Even though the congregation is operating facilities that would otherwise be places of public accommodation, its operations are exempt from title III requirements.

What if the congregation rents to a private day care center or elementary school? Is the tenant organization also exempt? The private entity that rents the congregation's facilities to operate a place of public accommodation is not exempt, unless it is also a religious entity. If it is not a religious entity, then its activities would be covered by title III. The congregation, however, would remain exempt, even if its tenant is covered. That is, the obligations of a landlord for a place of public accommodation do not apply if the landlord is a religious entity.

If a nonreligious entity operates a community theater or other place of public accommodation in donated space on the congregation's premises, is the nonreligious entity covered by title III? No. A nonreligious entity running a place of public accommodation in space donated by a religious entity is exempt from title III's requirements. The nonreligious tenant entity is subject to title III only if a lease exists under which rent or other consideration is paid.

**III-1.6000 Private clubs.** The obligations of title III do not apply to any "private club. " An entity is a private club for purposes of the ADA if it is a private club under title II of the Civil Rights Act of 1964, which prohibits discrimination on the basis of race, color, and national origin by public accommodations.

Courts have been most inclined to find private club status in cases where --

1) Members exercise a high degree of control over club operations.

2) The membership selection process is highly selective.

3) Substantial membership fees are charged.

4) The entity is operated on a nonprofit basis.

5) The club was not founded specifically to avoid compliance with Federal civil rights laws.

Facilities of a private club lose their exemption to the extent that they are made available for use by nonmembers as places of public accommodation.

ILLUSTRATION: A private country club that would be considered a "private club" for ADA purposes rents space to a private day care center that is also open to the children of nonmembers. Although the private club would maintain its exemption for its other operations, it would have title III obligations with respect to the operation of the day care center.

**III-1.7000 Relationship to title II.** Public entities, by definition, can never be subject to title III of the ADA, which covers only private entities. Conversely, private entities cannot be covered by title II. There are many situations, however, in which public entities stand in very close relation to private entities that are covered by title III, with the result that certain activities may be affected, at least indirectly, by both titles.

ILLUSTRATION 1: A State department of parks provides a restaurant in one of its State parks. The restaurant is operated by X Corporation under a concession agreement. As a public accommodation, X Corporation is subject to title III of the ADA. The State department of parks, a public entity, is subject to title II. The parks department is obligated to ensure by contract that the restaurant will be operated in a manner that enables the parks department to meet its title II obligations, even though the restaurant is not directly subject to title II.

ILLUSTRATION 2: The City of W owns a downtown office building occupied by W's Department of Human Resources. The first floor is leased as commercial space to a

restaurant, a newsstand, and a travel agency. The City of W, as a public entity, is subject to title II in its role as landlord of the office building. As a public entity, it cannot be subject to title III, even though its tenants are public accommodations that are covered by title III.

ILLUSTRATION 3: A private, nonprofit corporation operates a number of group homes under contract with a State agency for the benefit of individuals with mental disabilities. These particular homes provide a significant enough level of social services to be considered places of public accommodation under title III. The State agency must ensure that its contracts are carried out in accordance with title II, and the private entity must ensure that the homes comply with title III.

Where public and private entities act jointly, the public entity must ensure that the relevant requirements of title II are met; and the private entity must ensure compliance with title III.

ILLUSTRATION: The City of W engages in a joint venture with T Corporation to build a new professional football stadium. The new stadium would have to be built in compliance with the accessibility guidelines of both titles II and III. In cases where the standards differ, the stadium would have to meet the standard that provides the highest degree of access to individuals with disabilities.

**III-1.8000 Relationship to other laws**

**III-1.8100 Rehabilitation Act.** Title III is intended to provide protection to individuals with disabilities that is at least as great as that provided under title V of the Rehabilitation Act. Title V includes such provisions as section 504, which covers all the operations of Federal Executive agencies and programs receiving Federal financial assistance. Title III may not be interpreted to provide a lesser degree of protection to individuals with disabilities than is provided under section 504.

**III-1.8200 Other Federal and State laws.** Title III does not disturb other Federal laws or any State law that provides protection for individuals with disabilities at a level greater or equal to that provided by the ADA. It does, however, prevail over any conflicting State laws.

**III-2.0000 INDIVIDUALS WITH DISABILITIES**

Regulatory references: 28 CFR 36.104.

**III-2.1000 General.** Title III of the ADA prohibits discrimination against any "individual with a disability. " People commonly refer to disabilities or disabling conditions in a broad sense. For example, poverty or lack of education may impose real limitations on an individual's opportunities. Likewise, being only five feet in height may prove to be an insurmountable barrier to an individual whose ambition is to play professional basketball. Although one might loosely characterize these conditions as "disabilities" in relation to the aspirations of the particular individual, the disabilities reached by title III are limited to those that meet the ADA's legal definition -- those that place substantial limitations on an individual's major life activities.

Title III protects three categories of individuals with disabilities:

1) Individuals who have a physical or mental impairment that substantially limits one or more major life activities;

2) Individuals who have a record of a physical or mental impairment that substantially limited one or more of the individual's major life activities; and

3) Individuals who are regarded as having such an impairment, whether they have the impairment or not.

**III-2.2000 Physical or mental impairments.** The first category of persons covered by the definition of an individual with a disability is restricted to those with "physical or mental impairments. " Physical

cited in Del amo Hospital, Inc.
No. 19-56074 argued on March 24, 2021

impairments include --

    1) Physiological disorders or conditions;

    2) Cosmetic disfigurement; or

    3) Anatomical loss

affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs (which would include speech organs that are not respiratory such as vocal cords, soft palate, tongue, etc.); respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine.

Specific examples of physical impairments include orthopedic, visual, speech, and hearing impairments, cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, HIV disease (symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.

Mental impairments include mental or psychological disorders, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

Simple physical characteristics such as the color of one's eyes, hair, or skin; baldness; left-handedness; or age do not constitute physical impairments. Similarly, disadvantages attributable to environmental, cultural, or economic factors are not the type of impairments covered by title III. Moreover, the definition does not include common personality traits such as poor judgment or a quick temper, where these are not symptoms of a mental or psychological disorder.

Does title III prohibit discrimination against individuals based on their sexual orientation? No. The phrase "physical or mental impairment" does not include homosexuality or bisexuality.

**III-2.3000 Drug addiction as an impairment.** Drug addiction is an impairment under the ADA. A public accommodation generally, however, may base a decision to withhold services or benefits in most cases on the fact that an addict is engaged in the current and illegal use of drugs.

What is "illegal use of drugs"? Illegal use of drugs means the use of one or more drugs, the possession or distribution of which is unlawful under the Controlled Substances Act. It does not include use of controlled substances pursuant to a valid prescription or other uses that are authorized by the Controlled Substances Act or other Federal law. Alcohol is not a "controlled substance," but alcoholism is a disability.

What is "current use"? "Current use" is the illegal use of controlled substances that occurred recently enough to justify a reasonable belief that a person's drug use is current or that continuing use is a real and ongoing problem. Therefore, a private entity should review carefully all the facts surrounding its belief that an individual is currently taking illegal drugs to ensure that its belief is a reasonable one.

Does title III protect drug addicts who no longer take controlled substances? Yes. Title III prohibits discrimination against drug addicts based solely on the fact that they previously illegally used controlled substances. Protected individuals include persons who have successfully completed a supervised drug rehabilitation program or have otherwise been rehabilitated successfully and who are not engaging in current illegal use of drugs. Additionally, discrimination is prohibited against an individual who is currently participating in a supervised rehabilitation program and is not engaging in current illegal use of drugs. Finally, a person who is erroneously regarded as engaging in current illegal use of drugs is protected.

Is drug testing permitted under the ADA? Yes. Public accommodations may utilize reasonable policies or procedures, including but not limited to drug testing, designed to ensure that an individual who formerly engaged in the illegal use of drugs is not now engaging in current illegal use of drugs.

**III-2.4000 Substantial limitation of a major life activity.** To constitute a "disability," a condition must substantially limit a major life activity. Major life activities include such activities as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

When does an impairment "substantially limit" a major life activity? There is no absolute standard for determining when an impairment is a substantial limitation. Some impairments obviously or by their nature substantially limit the ability of an individual to engage in a major life activity.

> ILLUSTRATION 1: A person who is deaf is substantially limited in the major life activity of hearing. A person with a minor hearing impairment, on the other hand, may not be substantially limited.

> ILLUSTRATION 2: A person with traumatic brain injury may be substantially limited in the major life activities of caring for one's self, learning, and working because of memory deficit, confusion, contextual difficulties, and inability to reason appropriately.

An impairment substantially interferes with the accomplishment of a major life activity when the individual's important life activities are restricted as to the conditions, manner, or duration under which they can be performed in comparison to most people.

> ILLUSTRATION 1: A person with a minor vision impairment, such as 20/40 vision, does not have a substantial impairment of the major life activity of seeing.

> ILLUSTRATION 2: A person who can walk for 10 miles continuously is not substantially limited in walking merely because, on the eleventh mile, he or she begins to experience pain, because most people would not be able to walk eleven miles without experiencing some discomfort.

Are "temporary" mental or physical impairments covered by title III? Yes, if the impairment substantially limits a major life activity. The issue of whether a temporary impairment is significant enough to be a disability must be resolved on a case-by-case basis, taking into consideration both the duration (or expected duration) of the impairment and the extent to which it actually limits a major life activity of the affected individual.

> ILLUSTRATION: During a house fire, M received burns affecting his hands and arms. While it is expected that, with treatment, M will eventually recover full use of his hands, in the meantime he is substantially limited in performing basic tasks required to care for himself such as eating and dressing. Because M's burns are expected to substantially limit a major life activity (caring for one's self) for a significant period of time, M would be considered to have a disability covered by title III.

If a person's impairment is greatly lessened or eliminated through the use of aids or devices, would the person still be considered an individual with a disability? Whether a person has a disability is determined without regard to the availability of mitigating measures, such as reasonable modifications, auxiliary aids and services, services or devices of a personal nature, or medication. For example, a person with severe hearing loss is substantially limited in the major life activity of hearing, even though the loss may be improved through the use of a hearing aid. Likewise, persons with impairments, such as epilepsy or diabetes, that, if untreated, would substantially limit a major life activity, are still individuals with disabilities under the ADA, even if the debilitating consequences of the impairment are controlled by medication.

**III-2.5000 Record of a physical or mental impairment that substantially limited a major life activity.** The ADA protects not only those individuals with disabilities who actually have a physical or mental impairment that substantially limits a major life activity, but also those with a record of such an impairment.

This protected group includes --

Cited in Del Amo Hospital, Inc. v. OCR, March 24, 2021 No. 19-56074

1) A person who has a history of an impairment that substantially limited a major life activity but who has recovered from the impairment. Examples of individuals who have a history of an impairment are persons who have histories of mental or emotional illness, drug addiction, alcoholism, heart disease, or cancer.

2) Persons who have been misclassified as having an impairment. Examples include persons who have been erroneously diagnosed as mentally retarded or mentally ill.

**III-2.6000 "Regarded as. "** The ADA also protects certain persons who are regarded by a public entity as having a physical or mental impairment that substantially limits a major life activity, whether or not that person actually has an impairment. Three typical situations are covered by this category:

1) An individual who has a physical or mental impairment that does not substantially limit major life activities, but who is treated as if the impairment does substantially limit a major life activity;

> ILLUSTRATION: A, an individual with mild diabetes controlled by medication, is barred by the staff of a private summer camp from participation in certain sports because of her diabetes. Even though A does not actually have an impairment that substantially limits a major life activity, she is protected under the ADA because she is treated as though she does.

2) An individual who has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others towards the impairment;

> ILLUSTRATION: B, a three-year old child born with a prominent facial disfigurement, has been refused admittance to a private day care program on the grounds that her presence in the program might upset the other children. B is an individual with a physical impairment that substantially limits her major life activities only as the result of the attitudes of others toward her impairment.

3) An individual who has no impairments but who is treated by a public accommodation as having an impairment that substantially limits a major life activity.

> ILLUSTRATION: C is excluded from a private elementary school because the principal believes rumors that C is infected with the HIV virus. Even though these rumors are untrue, C is protected under the ADA, because he is being subjected to discrimination by the school based on the belief that he has an impairment that substantially limits major life activities (i.e. , the belief that he is infected with HIV).

**III-2.7000 Exclusions.** The following conditions are specifically excluded from the definition of "disability": transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, other sexual behavior disorders, compulsive gambling, kleptomania, pyromania, and psychoactive substance use disorders resulting from current illegal use of drugs.

## III-3.0000 GENERAL REQUIREMENTS

Regulatory references: 28 CFR 36.201-36.213.

**III-3.1000 General.** A public accommodation may not discriminate against an individual with a disability in the operation of a place of public accommodation. Individuals with disabilities may not be denied full and equal enjoyment of the "goods, services, facilities, privileges, advantages, or accommodations" offered by a place of public accommodation. The phrase "goods, services, facilities, privileges, advantages, or accommodations" applies to whatever type of good or service a public accommodation provides to its customers or clients. In other words, a public accommodation must ensure equal opportunity for individuals with disabilities.

Cited in C.L. v. Del Amo Hospital, Inc.
No. 19-56074, archived on March 24, 2021

Several broad principles underlie the nondiscrimination requirements of title III. These include --

1) Equal opportunity to participate;

2) Equal opportunity to benefit; and

3) Receipt of benefits in the most integrated setting appropriate.

The specific requirements discussed below in III-4.0000 are all designed to effectuate the general requirements. The specific provisions furnish guidance on how a public accommodation can meet its obligations in particular situations and establish standards for determining when the general requirement has been violated. Where a specific requirement applies, it controls over the general requirement.

ILLUSTRATION: Public accommodations are only required to remove architectural barriers in existing facilities if removal is "readily achievable" (see III-4.4200). If making the main entrance to a place of public accommodation accessible is not readily achievable, the public accommodation can provide access to the facility through another entrance, even though use of the alternative entrance for individuals with disabilities would not be the most integrated setting appropriate.

**III-3.2000 Denial of participation.** The ADA prohibits discriminatory denial of services or benefits to individuals with disabilities. Just as under the Civil Rights Act of 1964 a restaurant cannot refuse to admit an individual because of his or her race under the ADA, it cannot refuse to admit an individual merely because he or she has a disability.

ILLUSTRATION: A theater cannot refuse to admit an individual with mental retardation to a performance merely because of the individual's mental disability.

**III-3.3000 Equality in participation/benefits.** The ADA mandates an equal opportunity to participate in or benefit from the goods and services offered by a place of public accommodation, but does not guarantee that an individual with a disability must achieve an identical result or level of achievement as persons without disabilities.

ILLUSTRATION 1: Persons with disabilities must not be limited to certain performances at a theater.

ILLUSTRATION 2: An individual who uses a wheelchair may not be excluded from an exercise class at a health club because he or she cannot do all of the exercises and derive the same result from the class as persons without disabilities.

**III-3.4000 Separate benefit/integrated setting.** A primary goal of the ADA is the equal participation of individuals with disabilities in the "mainstream" of American society. The major principles of mainstreaming include the following:

1) Individuals with disabilities must be integrated to the maximum extent appropriate.

2) Separate programs are permitted where necessary to ensure equal opportunity. A separate program must be appropriate to the particular individual.

3) Individuals with disabilities cannot be excluded from the regular program, or required to accept special services or benefits.

**III-3.4100 Separate programs.** A public accommodation may offer separate or special programs necessary to provide individuals with disabilities an equal opportunity to benefit from the programs. Such programs must, however, be specifically designed to meet the needs of the individuals with disabilities for whom they are provided.

ILLUSTRATION 1: Museums generally do not allow visitors to touch exhibits because handling can cause damage to the objects. A municipal museum may offer a special tour for

Cited in C.D. v. Natividad Hospital, Inc.
No. 19-56074 archived on March 24, 2021

individuals with vision impairments during which they are permitted to touch and handle specific objects on a limited basis. (It cannot, however, exclude a blind person from the standard museum tour.)

     ILLUSTRATION 2: A private athletic facility may sponsor a separate basketball league for individuals who use wheelchairs.

**III-3.4200 Right to participate in the regular program.** Even if a separate or special program for individuals with disabilities is offered, a public accommodation cannot deny an individual with a disability participation in its regular program, unless some other limitation on the obligation to provide services applies. See, e.g. , III-3.8000 (direct threat); III-4.1000 (eligibility criteria).

     ILLUSTRATION: An individual who uses a wheelchair may be excluded from playing in a basketball league, if the recreation center can demonstrate that the exclusion is necessary for safe operation.

Individuals with disabilities are entitled to participate in regular programs, even if the public accommodation could reasonably believe that they cannot benefit from the regular program.

     ILLUSTRATION: A museum cannot exclude a person who is blind from a tour because of assumptions about his or her inability to appreciate and benefit from the tour experience. Similarly, a deaf person may not be excluded from a museum concert because of a belief that deaf persons cannot enjoy the music.

The fact that a public accommodation offers special programs does not affect the right of an individual with a disability to participate in regular programs. The requirements for providing access to the regular program still apply.

     ILLUSTRATION: A public accommodation cannot exclude a person who is blind from a standard museum tour, where touching objects is not permitted, if he or she prefers the standard tour.

Individuals with disabilities may not be required to accept special "benefits" if they choose not to do so.

     ILLUSTRATION: ABC theater offers reduced rate tickets for individuals with disabilities and requires appropriate documentation for eligibility for the reduced rates. ABC cannot require an individual who qualifies for the reduced rate to present documentation or accept the reduced rate, if he or she chooses to pay the full price.

**III-3.4300 Modifications in the regular program.** When a public accommodation offers a special program for individuals with a particular disability, but an individual with that disability elects to participate in the regular program rather than in the separate program, the public accommodation may still have obligations to provide an opportunity for that individual to benefit from the regular program. The fact that a separate program is offered may be a factor in determining the extent of the obligations under the regular program, but only if the separate program is appropriate to the needs of the particular individual with a disability.

     ILLUSTRATION: If a museum provides a sign language interpreter for one of its regularly scheduled tours, the availability of the signed tour may be a factor in determining whether it would be an undue burden to provide an interpreter for a deaf person who wants to take the tour at a different time.

     BUT: The availability of the signed tour would not affect the museum's obligation to provide an interpreter for a different tour, or the museum's obligation to provide a different auxiliary aid, such as an assistive listening device, for an individual with impaired hearing who does not use sign language.

cited in C.L. v. Del Amo Hospital, Inc., No. 19-56074 archived on March 24, 2021

**III-3.5000 Discrimination on the basis of association.** A public accommodation may not discriminate against individuals or entities because of their known relationship or association with persons who have disabilities.

> ILLUSTRATION: A day care center cannot refuse to admit a child because his or her brother is infected with HIV, even though the child seeking admission does not have a disability.

This prohibition applies to cases where the public accommodation has knowledge of both the individual's disability and his or her relationship to another individual or entity. In addition to familial relationships, the prohibition covers any type of association between the individual or entity that is discriminated against and the individual or individuals with disabilities, if the discrimination is actually based on the disability.

> ILLUSTRATION 1: The owner of a building may not refuse to lease space to a medical facility because the facility specializes in treatment of individuals with HIV disease.

> ILLUSTRATION 2: If a theater refuses to admit K, an individual with cerebral palsy, as well as L (his brother) because K has cerebral palsy, the theater would be illegally discriminating against L on the basis of his association with K.

**III-3.6000 Retaliation or coercion.** Individuals who exercise their rights under the ADA, or assist others in exercising their rights, are protected from retaliation. The prohibition against retaliation or coercion applies broadly to any individual or entity that seeks to prevent an individual from exercising his or her rights or to retaliate against him or her for having exercised those rights.

> ILLUSTRATION: A restaurant may not refuse to serve a customer because he or she filed an ADA complaint against the restaurant or against another public accommodation.

Protection is extended to those who assist others in exercising their rights.

> ILLUSTRATION: A dry cleaner may not refuse to serve an individual because he encouraged another individual to file a complaint, or because he testified for that individual in a proceeding to enforce the ADA.

Any form of retaliation or coercion, including threats, intimidation, or interference, is prohibited if it is intended to interfere with the exercise of rights under the ADA.

> ILLUSTRATION: It would be a violation for a restaurant customer to harass or intimidate an individual with a disability in an effort to prevent that individual from patronizing the restaurant.

**III-3.7000 Maintenance of accessible features.** Public accommodations must maintain in working order equipment and features of facilities that are required to provide ready access to individuals with disabilities. Isolated or temporary interruptions in access due to maintenance and repair of accessible features are not prohibited.

Where a public accommodation must provide an accessible route, the route must remain accessible and not blocked by obstacles such as furniture, filing cabinets, or potted plants. Similarly, accessible doors must be unlocked when the place of public accommodation is open for business.

> ILLUSTRATION 1: Placing a vending machine on the accessible route to an accessible restroom in a bowling alley would be a violation if it obstructed the accessible route.

> ILLUSTRATION 2: Placing ornamental plants in an elevator lobby may be a violation if they block the approach to the elevator call buttons or obstruct access to the elevator cars.

> ILLUSTRATION 3: Using an accessible route for storage of supplies would also be a violation, if it made the route inaccessible.

Case 8:18-cv-00475-DOC-DFM Document 208 Filed 03/30/21 Page 44 of 101 Page ID #:5748

BUT: An isolated instance of placement of an object on an accessible route would not be a violation, if the object is promptly removed.

Although it is recognized that mechanical failures in equipment such as elevators or automatic doors will occur from time to time, the obligation to ensure that facilities are readily accessible to and usable by individuals with disabilities would be violated, if repairs are not made promptly or if improper or inadequate maintenance causes repeated and persistent failures. Inoperable or "out of service" equipment does not meet the requirements for providing access to a place of public accommodation.

> ILLUSTRATION 1: It would be a violation for a building manager of a three-story building to turn off an elevator during business hours in order to save energy.

> ILLUSTRATION 2: Deactivating accessible automatic doors because of inclement weather would not be permitted.

**III-3.8000 Direct threat.** A public accommodation may exclude an individual with a disability from participation in an activity, if that individual's participation would result in a direct threat to the health or safety of others. The public accommodation must determine that there is a significant risk to others that cannot be eliminated or reduced to an acceptable level by reasonable modifications to the public accommodation's policies, practices, or procedures or by the provision of appropriate auxiliary aids or services. The determination that a person poses a direct threat to the health or safety of others may not be based on generalizations or stereotypes about the effects of a particular disability; it must be based on an individual assessment that considers the particular activity and the actual abilities and disabilities of the individual.

The individual assessment must be based on reasonable judgment that relies on current medical evidence, or on the best available objective evidence, to determine --

> 1) The nature, duration, and severity of the risk;

> 2) The probability that the potential injury will actually occur; and

> 3) Whether reasonable modifications of policies, practices, or procedures will mitigate or eliminate the risk.

Such an inquiry is essential to protect individuals with disabilities from discrimination based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to legitimate concerns, such as the need to avoid exposing others to significant health and safety risks. Making this assessment will not usually require the services of a physician. Sources for medical knowledge include public health authorities, such as the U.S. Public Health Service, the Centers for Disease Control, and the National Institutes of Health, including the National Institute of Mental Health.

> ILLUSTRATION: Refusal to admit an individual to a restaurant because he or she is infected with HIV would be a violation, because the HIV virus cannot be transmitted through casual contact, such as that among restaurant patrons.

**III-3.9000 Illegal use of drugs.** Discrimination based on an individual's current illegal use of drugs is not prohibited (see III-2.3000). Although individuals currently using illegal drugs are not protected from discrimination, the ADA does prohibit denial of health services, or services provided in connection with drug rehabilitation, to an individual on the basis of current illegal use of drugs, if the individual is otherwise entitled to such services.

> ILLUSTRATION 1: A hospital emergency room may not refuse to provide emergency services to an individual because the individual is illegally using drugs.

> ILLUSTRATION 2: A medical facility that specializes in care of burn patients may not refuse to treat an individual's burns on the grounds that the individual is illegally using drugs.

Because abstention from the use of drugs is an essential condition for participation in some drug rehabilitation programs, and may be a necessary requirement in inpatient or residential settings, a drug rehabilitation or treatment program may deny participation to individuals who use drugs while they are in the program.

> ILLUSTRATION: A residential drug and alcohol treatment program may expel an individual for using drugs in a treatment center.

**III-3.10000 Smoking.** A public accommodation may prohibit smoking, or may impose restrictions on smoking, in places of public accommodation.

**III-3.11000 Insurance.** Insurance offices are places of public accommodation and, as such, may not discriminate on the basis of disability in the sale of insurance contracts or in the terms or conditions of the insurance contracts they offer. Because of the nature of the insurance business, however, consideration of disability in the sale of insurance contracts does not always constitute "discrimination. " An insurer or other public accommodation may underwrite, classify, or administer risks that are based on or not inconsistent with State law, provided that such practices are not used to evade the purposes of the ADA.

Thus, a public accommodation may offer a plan that limits certain kinds of coverage based on classification of risk, but may not refuse to insure, or refuse to continue to insure, or limit the amount, extent, or kind of coverage available to an individual, or charge a different rate for the same coverage solely because of a physical or mental impairment, except where the refusal, limitation, or rate differential is based on sound actuarial principles or is related to actual or reasonably anticipated experience. The ADA, therefore, does not prohibit use of legitimate actuarial considerations to justify differential treatment of individuals with disabilities in insurance.

> ILLUSTRATION: A person who has cerebral palsy may not be denied coverage based on disability independent of actuarial risk classification.

Can a group health insurance policy have a pre-existing condition exclusion? Yes. An individual with a pre-existing condition may be denied coverage for that condition for the period specified in the policy. However, the individual cannot be denied coverage for illness or injuries unrelated to the pre-existing condition.

Can an insurance policy limit coverage for certain procedures or treatments? Yes, but it may not entirely deny coverage to a person with a disability.

Does the ADA require insurance companies to provide a copy of the actuarial data on which its actions are based at the request of the applicant? The ADA does not require it. Under some State regulatory schemes, however, insurers may have to file such actuarial information with the State regulatory agency, and this information may be obtainable at the State level.

Does the ADA apply only to life and health insurance? No. Although life and health insurance are the areas where the ADA will have its greatest application, the ADA applies equally to unjustified discrimination in all types of insurance, including property and casualty insurance, provided by public accommodations.

> ILLUSTRATION: Differential treatment of individuals with disabilities, including individuals who have been treated for alcoholism, applying for automobile insurance would have to be justified by legitimate actuarial considerations.

BUT: An individual's driving record, including any alcohol-related violations, may be considered.

May a public accommodation refuse to serve an individual with a disability because of limitations on coverage or rates in its insurance policies? No. A public accommodation may not rely on such limitations to justify exclusion of individuals with disabilities. Any exclusion must be based on legitimate safety concerns (see III-4.1200), rather than on the terms of the insurance contract.

Del Amo Hospital, Inc. cited/archived March 24, 2021 No. 19-56074

ILLUSTRATION: An amusement park requires individuals to meet a minimum height requirement that excludes some individuals with disabilities for certain rides because of a limitation in its liability insurance coverage. The limitation in insurance coverage is not a permissible basis for the exclusion.

BUT: The minimum height requirement would be a permissible safety criterion, if it is necessary for the safe operation of the ride.

### III-3.12000 Places of public accommodation located in private residences.

When a place of public accommodation is located in a home, the portions of the home used as a place of public accommodation are covered by title III, even if those portions are also used for residential purposes.

Coverage extends not only to those portions but also includes an accessible route from the sidewalk, through the doorway, through the hallway and other portions of the home, such as restrooms, used by clients and customers of the public accommodation.

ILLUSTRATION: J, a family day care provider, is having a new home built. J intends to use two of the rooms as a family day care center. In addition, the children will be using the master bathroom. Even though the two rooms and bathroom will be used for residential purposes when the children are not present, all three rooms are covered by the title III new construction requirements, because the rooms are not being used exclusively as a residence. Moreover, J must assure that there is an accessible route to the day care rooms and bathroom.

## III-4.0000 SPECIFIC REQUIREMENTS

Regulatory references: 28 CFR 36.301-36.310.

### III-4.1000 Eligibility criteria

**III-4.1100 General.** A public accommodation may not impose eligibility criteria that either screen out or tend to screen out persons with disabilities from fully and equally enjoying any goods, services, privileges, advantages, or accommodations offered to individuals without disabilities, unless it can show that such requirements are necessary for the provision of the goods, services, privileges, advantages, or accommodations.

ILLUSTRATION 1: A restaurant has an unofficial policy of seating individuals with visible disabilities in the least desirable parts of the restaurant. This policy violates the ADA because it establishes an eligibility criterion that discriminates against individuals with certain disabilities and that is not necessary for the operation of the restaurant. The restaurant may not justify its policy on the basis of the preferences of its other customers.

ILLUSTRATION 2: A parking garage refuses to allow vans to park inside even though the garage has adequate roof clearance and space for vans. Although the garage operator does not intend to discriminate against individuals with disabilities, the garage's policy unnecessarily tends to screen out people with certain mobility impairments who, in order to have enough space for mobility aids such as wheelchairs, use vans rather than cars.

ILLUSTRATION 3: A cruise ship subject to the ADA discovers that an individual who uses a wheelchair has made a reservation for a cruise and plans to travel independently. The cruise line notifies the individual that she must bring a "traveling companion" or her reservation will be cancelled. Requiring a traveling companion as an eligibility criterion violates the ADA, unless the cruise line demonstrates that its policy is necessary for some compelling reason.

ILLUSTRATION 4: A committee reviews applications from physicians seeking "admitting privileges" at a privately owned hospital. The hospital requires all applicants, no matter their specialty, to meet certain physical and mental health qualifications, because the hospital

believes they will promote the safe and efficient delivery of medical care. The hospital must
be able to show that the specific qualifications imposed are necessary.

**III-4.1200 Safety.** A public accommodation may impose legitimate safety requirements necessary for safe
operation. However, the public accommodation must ensure that its safety requirements are based on real
risks, not on speculation, stereotypes, or generalizations about individuals with disabilities.

> ILLUSTRATION: A wilderness tour company may require participants to meet a necessary
> level of swimming proficiency in order to participate in a rafting expedition.

**III-4.1300 Unnecessary inquiries.** The ADA prohibits unnecessary inquiries into the existence of a
disability.

> ILLUSTRATION 1: A private summer camp requires parents to fill out a questionnaire and
> to submit medical documentation regarding their children's ability to participate in various
> camp activities. The questionnaire is acceptable if the summer camp can demonstrate that
> each piece of information requested is needed to ensure safe participation in camp activities.
> The camp, however, may not use this information to screen out children with disabilities from
> admittance to the camp.

> ILLUSTRATION 2: A retail store requires applicants for a store credit card to supply
> information regarding their physical or mental health history. This policy violates the ADA
> because such information is not relevant to a determination of credit worthiness.

**III-4.1400 Surcharges.** Although compliance may result in some additional cost, a public
accommodation may not place a surcharge only on particular individuals with disabilities or groups of
individuals with disabilities to cover these expenses.

> ILLUSTRATION: The ABC pharmacy is located on the second floor of an older four-story
> building that does not have an elevator. Because the pharmacy's owner has determined that
> providing physical access to the pharmacy for those unable to climb stairs would not be
> readily achievable, she has chosen to provide home delivery as a readily achievable
> alternative to barrier removal. The pharmacy may not charge an individual who uses a
> wheelchair the cost of providing home delivery.

> ILLUSTRATION 2: In order to ensure effective communication with a deaf patient during an
> office visit, a doctor arranges for the services of a sign language interpreter. The cost of the
> interpreter's services must be absorbed by the doctor.

> ILLUSTRATION 3: A community civic association arranges to provide interpreting services
> for a deaf individual wishing to attend a business seminar sponsored by the organization in
> rented space at a local motel. The interpreting service requires the organization to provide
> payment in full prior to the seminar. Due to a business emergency, the individual is unable to
> attend. The organization may not charge the deaf individual for the cost of the unused
> interpreting services.

**III-4.2000 Reasonable modifications**

**III-4.2100 General.** A public accommodation must reasonably modify its policies, practices, or
procedures to avoid discrimination. If the public accommodation can demonstrate, however, that a
modification would fundamentally alter the nature of the goods, services, facilities, privileges, advantages,
or accommodations it provides, it is not required to make the modification.

> ILLUSTRATION 1: A private health clinic, in collaboration with its local public safety
> officials, has developed an evacuation plan to be used in the event of fire or other emergency.
> The clinic occupies several floors of a multistory building. During an emergency, elevators,
> which are the normal means of exiting from the clinic, will be shut off. The health clinic is
> obligated to modify its evacuation procedures, if necessary, to provide alternative means for

clients with mobility impairments to be safely evacuated from the clinic without using the elevator. The clinic should also modify its plan to take into account the needs of its clients with visual, hearing, and other disabilities.

ILLUSTRATION 2: Under its obligation to remove architectural barriers where it is readily achievable to do so, a local motel has greatly improved physical access in several of its rooms. However, under its present reservation system, the motel is unable to guarantee that, when a person requests an accessible room, one of the new rooms will actually be available when he or she arrives. The ADA requires the motel to make reasonable modifications in its reservation system to ensure the availability of the accessible room.

ILLUSTRATION 3: A retail store has a policy of not taking special orders for out-of-stock merchandise unless the customer appears personally to sign the order. The store would be required to reasonably modify its procedures to allow the taking of special orders by phone from persons with disabilities who cannot visit the store. If the store's concern is obtaining a guarantee of payment that a signed order would provide, the store could, for example, take orders by mail or take credit card orders by telephone from persons with disabilities.

**III-4.2200 Specialties.** It is not considered discriminatory for a public accommodation with a specialty in a particular area to refer an individual with a disability to a different public accommodation if --

1) The individual is seeking a service or treatment outside the referring public accommodation's area of expertise; and

2) The public accommodation would make a similar referral for an individual who does not have a disability.

ILLUSTRATION: An individual who is blind initially visits a doctor who specializes in family medicine. The doctor discovers that the individual has a potentially cancerous growth. The family practice physician may refer the blind individual to a cancer specialist, if he or she has no expertise in that area, and if he or she would make a similar referral for an individual who is not blind. The cancer specialist who receives the referral may not refuse to treat the individual for cancer-related problems simply because the individual is blind.

**III-4.2300 Service animals.** A public accommodation must modify its policies to permit the use of a service animal by an individual with a disability, unless doing so would result in a fundamental alteration or jeopardize the safe operation of the public accommodation.

Service animals include any animal individually trained to do work or perform tasks for the benefit of an individual with a disability. Tasks typically performed by service animals include guiding people with impaired vision, alerting individuals with impaired hearing to the presence of intruders or sounds, providing minimal protection or rescue work, pulling a wheelchair, or retrieving dropped items.

The care or supervision of a service animal is the responsibility of his or her owner, not the public accommodation. A public accommodation may not require an individual with a disability to post a deposit as a condition to permitting a service animal to accompany its owner in a place of public accommodation, even if such deposits are required for pets.

ILLUSTRATION: An individual who is blind wishes to be accompanied in a restaurant by her guide dog. The restaurant must permit the guide dog to accompany its owner in all areas of the restaurant open to other patrons and may not insist that the dog be separated from her.

A number of States have programs to certify service animals. A private entity, however, may not insist on proof of State certification before permitting the entry of a service animal to a place of public accommodation.

**III-4.2400 Check-out aisles.** If a store has check-out aisles, customers with disabilities must be provided an equivalent level of convenience in access to check-out facilities as customers without disabilities. To accomplish this, the store must either keep an adequate number of accessible aisles open or otherwise modify its policies and practices.

> ILLUSTRATION: PQR Foodmart has twenty narrow, inaccessible check-out aisles and one wider, accessible aisle. The accessible aisle is used as an express lane limited to customers purchasing fewer than ten items. K, who uses a wheelchair, wishes to make a larger purchase. PQR Foodmart must permit K to make his large purchase at the express lane.

**III-4.2500 Accessible or special goods.** As a general rule, a public accommodation is not required to alter its inventory to carry accessible or special products that are designed for or easier to use by customers with disabilities. Examples of accessible goods include Brailled books, books on audio tape, closed-captioned video tapes, specially sized or designed clothing, and foods that meet special dietary needs.

> ILLUSTRATION: A local book store has customarily carried only regular print versions of books. The ADA does not require the bookstore to expand its inventory to include large print books or books on audio tape.

On the other hand, a public accommodation may be required to special order accessible goods at the request of a customer with a disability if --

1) It makes special orders for unstocked goods in its regular course of business, and

2) The accessible or special goods requested can be obtained from one of its regular suppliers.

> ILLUSTRATION: A customer of a local bookstore begins to experience some vision loss and has difficulty reading regular print. Upon request by the customer, the bookstore is required to try to obtain large print books, if it normally fills special orders (of any kind) for its other customers, and if large print books can be obtained from its regular suppliers.

The ADA does not require that manufacturers provide warranties or operating manuals that are packed with the product in accessible formats.

**III-4.2600 Personal services and devices.** A public accommodation is not required to provide individuals with disabilities with personal or individually prescribed devices, such as wheelchairs, prescription eyeglasses, or hearing aids, or to provide services of a personal nature, such as assistance in eating, toileting, or dressing.

Although discussed here as a limit on the duty to make reasonable modifications, this provision applies to all aspects of the title III rule and limits the obligations of public accommodations in areas such as the provision of auxiliary aids and services, alternatives to barrier removal, and examinations and courses.

However, the phrase "services of a personal nature" is not to be interpreted as referring to minor assistance provided to individuals with disabilities. For example, measures taken as alternatives to barrier removal, such as retrieving items from shelves or providing curb service or home delivery, or actions required as modifications in policies, practices, and procedures, such as a waiter's removing the cover from a customer's straw, a kitchen's cutting up food into smaller pieces, or a bank's filling out a deposit slip, would not be considered "services of a personal nature. " Also, if a public accommodation such as a hospital or nursing home customarily provides its clients with what might otherwise be considered services of a personal nature, it must provide the same services for individuals with disabilities.

> ILLUSTRATION: An exclusive women's clothing shop provides individualized assistance to its customers in selecting and trying on garments. Although "dressing" might otherwise be considered a personal service, in this case the store must extend the same service to its

Del Amo Hospital, Inc.
Cited by March 24, 2021
No. 19-56069 (Archive)

customers with disabilities. However, a "no frills" merchandiser would not be required to provide assistance in trying on garments, because it does not provide such a service to any of its customers.

## III-4.3000 Auxiliary aids

**III-4.3100 General.** A public accommodation is required to provide auxiliary aids and services that are necessary to ensure equal access to the goods, services, facilities, privileges, or accommodations that it offers, unless an undue burden or a fundamental alteration would result.

Who is entitled to auxiliary aids? This obligation extends only to individuals with disabilities who have physical or mental impairments, such as vision, hearing, or speech impairments, that substantially limit the ability to communicate. Measures taken to accommodate individuals with other types of disabilities are covered by other title III requirements such as "reasonable modifications" and "alternatives to barrier removal. "

> ILLUSTRATION: W, an individual who is blind, needs assistance in locating and removing an item from a grocery store shelf. A store employee who locates the desired item for W would be providing an "auxiliary aid or service. "

BUT: If G, who uses a wheelchair, receives the same retrieval service, not because of a disability related to communication, but rather because of his inability to physically reach the desired item, the store would be making a required "reasonable modification" in its practices, as discussed in III-4.2000 of this manual.

III-4.3200 Effective communication. In order to provide equal access, a public accommodation is required to make available appropriate auxiliary aids and services where necessary to ensure effective communication. The type of auxiliary aid or service necessary to ensure effective communication will vary in accordance with the length and complexity of the communication involved.

> ILLUSTRATION 1: H, an individual who is deaf, is shopping for film at a camera store. Exchanging written notes with the sales clerk would be adequate to ensure effective communication.

> ILLUSTRATION 2: H then stops by a new car showroom to look at the latest models. The car dealer would be able to communicate effectively general information about the models available by providing brochures and exchanging notes by pen and notepad, or perhaps by means of taking turns at a computer terminal keyboard. If H becomes serious about making a purchase, the services of a qualified interpreter may be necessary because of the complicated nature of the communication involved in buying a car.

> ILLUSTRATION 3: S, an individual who is blind, visits an electronics store to purchase a clock radio and wishes to inspect the merchandise information cards next to the floor models in order to decide which one to buy. Reading the model information to S should be adequate to ensure effective communication. Of course, if S is unreasonably demanding or is shopping when the store is extremely busy, it may be an undue burden to spend extended periods of time reading price and product information.

> ILLUSTRATION 4: S also has tickets to a play. When S arrives at the theater, the usher notices that S is an individual who is blind and guides S to her seat. An usher is also available to guide S to her seat following intermission. With the provision of these services, a Brailled ticket is not necessary for effective communication in seating S.

> ILLUSTRATION 5: The same theater provides S with a tape-recorded version of its printed program for the evening's performance. A Brailled program is not necessary to effectively communicate the contents of the program to S, if an audio cassette and tape player are provided.

Del Amo Hospital, Inc.
cited in: C.J. Del Amo Hospital, Inc.
No. 19-56074 archived: March 24, 2021

Who decides what type of auxiliary aid should be provided? Public accommodations should consult with individuals with disabilities wherever possible to determine what type of auxiliary aid is needed to ensure effective communication. In many cases, more than one type of auxiliary aid or service may make effective communication possible. While consultation is strongly encouraged, the ultimate decision as to what measures to take to ensure effective communication rests in the hands of the public accommodation, provided that the method chosen results in effective communication.

> ILLUSTRATION: A patient who is deaf brings his own sign language interpreter for an office visit without prior consultation and bills the physician for the cost of the interpreter. The physician is not obligated to comply with the unilateral determination by the patient that an interpreter is necessary. The physician must be given an opportunity to consult with the patient and make an independent assessment of what type of auxiliary aid, if any, is necessary to ensure effective communication. If the patient believes that the physician's decision will not lead to effective communication, then the patient may challenge that decision under title III by initiating litigation or filing a complaint with the Department of Justice (see III-8.0000).

Who is a qualified interpreter? There are a number of sign language systems in use by persons who use sign language. (The most common systems of sign language are American Sign Language and signed English.) Individuals who use a particular system may not communicate effectively through an interpreter who uses another system. When an interpreter is required, the public accommodation should provide a qualified interpreter, that is, an interpreter who is able to sign to the individual who is deaf what is being said by the hearing person and who can voice to the hearing person what is being signed by the individual who is deaf. This communication must be conveyed effectively, accurately, and impartially, through the use of any necessary specialized vocabulary.

Can a public accommodation use a staff member who signs "pretty well" as an interpreter for meetings with individuals who use sign language to communicate? Signing and interpreting are not the same thing. Being able to sign does not mean that a person can process spoken communication into the proper signs, nor does it mean that he or she possesses the proper skills to observe someone signing and change their signed or fingerspelled communication into spoken words. The interpreter must be able to interpret both receptively and expressively.

If a sign language interpreter is required for effective communication, must only a certified interpreter be provided? No. The key question in determining whether effective communication will result is whether the interpreter is "qualified," not whether he or she has been actually certified by an official licensing body. A qualified interpreter is one "who is able to interpret effectively, accurately and impartially, both receptively and expressively, using any necessary specialized vocabulary." An individual does not have to be certified in order to meet this standard. A certified interpreter may not meet this standard in all situations, e.g., where the interpreter is not familiar with the specialized vocabulary involved in the communication at issue.

**III-4.3300 Examples of auxiliary aids and services.** Auxiliary aids and services include a wide range of services and devices that promote effective communication. Examples of auxiliary aids and services for individuals who are deaf or hard of hearing include qualified interpreters, notetakers, computer-aided transcription services, written materials, telephone handset amplifiers, assistive listening systems, telephones compatible with hearing aids, closed caption decoders, open and closed captioning, telecommunications devices for deaf persons (TDD's), videotext displays, and exchange of written notes.

> Examples for individuals with vision impairments include qualified readers, taped texts, audio recordings, Brailled materials, large print materials, and assistance in locating items.

> Examples for individuals with speech impairments include TDD's, computer terminals, speech synthesizers, and communication boards.

**III-4.3400 Telecommunication devices for the deaf (TDD's).** In order to ensure effective communication by telephone, a public accommodation is required to provide TDD's in certain circumstances. Because TDD relay systems required by title IV of the ADA (which must be operational

by July 26, 1993) will eliminate many telephone system barriers to TDD users, the auxiliary aids
requirements relating to TDD's are limited in nature.

**III-4.3410 Calls incident to business operations.** A public accommodation is not required to have a
TDD available for receiving or making telephone calls that are part of its business operations. Even during
the interim period between the effective date of title III and the date the TDD relay service becomes
available, there is no requirement that public accommodations have TDD's. Of course, the ADA does not
prevent a public accommodation from obtaining a TDD if, for business or other reasons, it chooses to do
so.

**III-4.3420 Outgoing calls by customers, clients, patients, or participants.** On the other hand, TDD's
must be provided when customers, clients, patients, or participants are permitted to make outgoing calls
on "more than an incidental convenience basis. " For example, TDD's must be made available on request
to hospital patients or hotel guests where in-room phone service is provided. A hospital or hotel front desk
should also be equipped with a TDD so that patients or guests using TDD's in their rooms have the same
access to in-house services as other patients or guests.

**III-4.3500 Closed caption decoders.** Hospitals that provide televisions for use by patients, and hotels,
motels, and other places of lodging that provide televisions in five or more guest rooms, must provide
closed caption decoder service upon request.

**III-4.3600 Limitations and alternatives.** A public accommodation is not required to provide any
auxiliary aid or service that would fundamentally alter the nature of the goods or services offered or that
would result in an undue burden.

However, the fact that providing a particular auxiliary aid or service would result in a fundamental
alteration or undue burden does not necessarily relieve a public accommodation from its obligation to
ensure effective communication. The public accommodation must still provide an alternative auxiliary aid
or service that would not result in an undue burden or fundamental alteration but that would ensure
effective communication to the maximum extent possible if one is available.

ILLUSTRATION: It may be an undue burden for a small private historic house museum on a
shoestring budget to provide a sign language interpreter for a deaf individual wishing to
participate in a tour. Providing a written script of the tour, however, would be an alternative
that would be unlikely to result in an undue burden.

What is a fundamental alteration? A fundamental alteration is a modification that is so significant that it
alters the essential nature of the goods, services, facilities, privileges, advantages, or accommodations
offered.

What is an undue burden? "Undue burden" is defined as "significant difficulty or expense. " Among the
factors to be considered in determining whether an action would result in an undue burden are the
following --

1) The nature and cost of the action;

2) The overall financial resources of the site or sites involved; the number of persons
employed at the site; the effect on expenses and resources; legitimate safety requirements
necessary for safe operation, including crime prevention measures; or any other impact of the
action on the operation of the site;

3) The geographic separateness, and the administrative or fiscal relationship of the site or
sites in question to any parent corporation or entity;

4) If applicable, the overall financial resources of any parent corporation or entity; the overall
size of the parent corporation or entity with respect to the number of its employees; the
number, type, and location of its facilities; and

5) If applicable, the type of operation or operations of any parent corporation or entity, including the composition, structure, and functions of the workforce of the parent corporation or entity.

Does a public accommodation have to do more or less under the "undue burden" standard than under other ADA limitations such as "undue hardship" and "readily achievable"? The definition of undue burden is identical to the definition of undue hardship used in title I of the ADA as the limitation on an employer's obligation to reasonably accommodate an applicant or employee. Under both limitations, an action is not required if it results in "significant difficulty or expense. " The undue burden standard, however, requires a greater level of effort by a public accommodation in providing auxiliary aids and services than does the "readily achievable" standard for removing barriers in existing facilities (see III-4.4200). Although "readily achievable" is therefore a "lesser" standard, the factors to be considered in determining what is readily achievable are identical to those listed above for determining undue burden.

**III-4.4000 Removal of barriers**

**III-4.4100 General.** Public accommodations must remove architectural barriers and communication barriers that are structural in nature in existing facilities, when it is readily achievable to do so.

What is an architectural barrier? Architectural barriers are physical elements of a facility that impede access by people with disabilities. These barriers include more than obvious impediments such as steps and curbs that prevent access by people who use wheelchairs.

In many facilities, telephones, drinking fountains, mirrors, and paper towel dispensers are mounted at a height that makes them inaccessible to people using wheelchairs. Conventional doorknobs and operating controls may impede access by people who have limited manual dexterity. Deep pile carpeting on floors and unpaved exterior ground surfaces often are a barrier to access by people who use wheelchairs and people who use other mobility aids, such as crutches. Impediments caused by the location of temporary or movable structures, such as furniture, equipment, and display racks, are also considered architectural barriers.

What is a communication barrier that is structural in nature? Communication barriers that are "structural in nature" are barriers that are an integral part of the physical structure of a facility. Examples include conventional signage, which generally is inaccessible to people who have vision impairments, and audible alarm systems, which are inaccessible to people with hearing impairments. Structural communication barriers also include the use of physical partitions that hamper the passage of sound waves between employees and customers, and the absence of adequate sound buffers in noisy areas that would reduce the extraneous noise that interferes with communication with people who have limited hearing.

How does the communication barrier removal requirement relate to the obligation to provide auxiliary aids? Communications devices, such as TDD's, telephone handset amplifiers, assistive listening devices, and digital check-out displays, are not an integral part of the physical structure of the building and, therefore, are considered auxiliary aids under the Department's title III regulation. The failure to remove auxiliary aids is not a communication barrier that is structural in nature. The obligation to remove structural communications barriers is independent of any obligation to provide auxiliary aids and services.

What is a "facility"? The term "facility" includes all or any part of a building, structure, equipment, vehicle, site (including roads, walks, passageways, and parking lots), or other real or personal property. Both permanent and temporary facilities are subject to the barrier removal requirements.

**III-4.4200 Readily achievable barrier removal.** Public accommodations are required to remove barriers only when it is "readily achievable" to do so. "Readily achievable" means easily accomplishable and able to be carried out without much difficulty or expense.

How does the "readily achievable" standard relate to other standards in the ADA? The ADA establishes different standards for existing facilities and new construction. In existing facilities, where retrofitting may be expensive, the requirement to provide access is less stringent than it is in new construction and

Cited in C.L. v. Del Amo Hospitality, Inc.
No. Fargo 74 archived on March 24, 2021

alterations, where accessibility can be incorporated in the initial stages of design and construction without a significant increase in cost.

This standard also requires a lesser degree of effort on the part of a public accommodation than the "undue burden" limitation on the auxiliary aids requirements of the ADA. In that sense, it can be characterized as a lower standard. The readily achievable standard is also less demanding than the "undue hardship" standard in title I, which limits the obligation to make reasonable accommodation in employment.

How does a public accommodation determine when barrier removal is readily achievable? Determining if barrier removal is readily achievable is necessarily a case-by-case judgment. Factors to consider include:

    1) The nature and cost of the action;

    2) The overall financial resources of the site or sites involved; the number of persons employed at the site; the effect on expenses and resources; legitimate safety requirements necessary for safe operation, including crime prevention measures; or any other impact of the action on the operation of the site;

    3) The geographic separateness, and the administrative or fiscal relationship of the site or sites in question to any parent corporation or entity;

    4) If applicable, the overall financial resources of any parent corporation or entity; the overall size of the parent corporation or entity with respect to the number of its employees; the number, type, and location of its facilities; and

    5) If applicable, the type of operation or operations of any parent corporation or entity, including the composition, structure, and functions of the workforce of the parent corporation or entity.

If the public accommodation is a facility that is owned or operated by a parent entity that conducts operations at many different sites, the public accommodation must consider the resources of both the local facility and the parent entity to determine if removal of a particular barrier is "readily achievable. " The administrative and fiscal relationship between the local facility and the parent entity must also be considered in evaluating what resources are available for any particular act of barrier removal.

What barriers will it be "readily achievable" to remove? There is no definitive answer to this question because determinations as to which barriers can be removed without much difficulty or expense must be made on a case-by-case basis.

The Department's regulation contains a list of 21 examples of modifications that may be readily achievable:

    1) Installing ramps;

    2) Making curb cuts in sidewalks and entrances;

    3) Repositioning shelves;

    4) Rearranging tables, chairs, vending machines, display racks, and other furniture;

    5) Repositioning telephones;

    6) Adding raised markings on elevator control buttons;

    7) Installing flashing alarm lights;

    8) Widening doors;

Vasquez v. Del Amo Hospital, Inc.
8:18-cv-00475    Archived on March 24, 2021

Case 8:18-cv-00475-DOC-DFM Document 208 Filed 03/30/21 Page 55 of 101 Page ID #:5759

9) Installing offset hinges to widen doorways;

10) Eliminating a turnstile or providing an alternative accessible path;

11) Installing accessible door hardware;

12) Installing grab bars in toilet stalls;

13) Rearranging toilet partitions to increase maneuvering space;

14) Insulating lavatory pipes under sinks to prevent burns;

15) Installing a raised toilet seat;

16) Installing a full-length bathroom mirror;

17) Repositioning the paper towel dispenser in a bathroom;

18) Creating designated accessible parking spaces;

19) Installing an accessible paper cup dispenser at an existing inaccessible water fountain;

20) Removing high pile, low density carpeting; or

21) Installing vehicle hand controls.

Businesses such as restaurants may need to rearrange tables and department stores may need to adjust their layout of racks and shelves in order to permit wheelchair access, but they are not required to do so if it would result in a significant loss of selling or serving space.

The list is intended to be illustrative. Each of these modifications will be readily achievable in many instances, but not in all. Whether or not any of these measures is readily achievable is to be determined on a case-by-case basis in light of the particular circumstances presented and the factors discussed above.

Are public accommodations required to retrofit existing buildings by adding elevators? A public accommodation generally would not be required to remove a barrier to physical access posed by a flight of steps, if removal would require extensive ramping or an elevator. The readily achievable standard does not require barrier removal that requires extensive restructuring or burdensome expense. Thus, where it is not readily achievable to do, the ADA would not require a public accommodation to provide access to an area reachable only by a flight of stairs.

Does a public accommodation have an obligation to search for accessible space? A public accommodation is not required to lease space that is accessible. However, upon leasing, the barrier removal requirements for existing facilities apply. In addition, any alterations to the space must meet the accessibility requirements for alterations.

Does the ADA require barrier removal in historic buildings? Yes, if it is readily achievable. However, the ADA takes into account the national interest in preserving significant historic structures. Barrier removal would not be considered "readily achievable" if it would threaten or destroy the historic significance of a building or facility that is eligible for listing in the National Register of Historic Places under the National Historic Preservation Act (16 U.S.C. 470, et seq.), or is designated as historic under State or local law.

ILLUSTRATION 1: The installation of a platform lift in an historic facility that is preserved because of its unique place in American architecture, or because it is one of few surviving examples of the architecture of a particular period, would not be readily achievable, if the installation of the lift would threaten or destroy architecturally significant elements of the building.

ILLUSTRATION 2: The installation of a ramp or lift in a facility that has historic
significance because of events that have occurred there, rather than because of unique
architectural characteristics, may be readily achievable, if it does not threaten or destroy the
historic significance of the building and is within appropriate cost constraints.

Does the ADA permit a public accommodation to consider the effect of a modification on the operation of
its business? Yes. The ADA permits consideration of factors other than the initial cost of the physical
removal of a barrier.

ILLUSTRATION 1: CDE convenience store determines that it would be inexpensive to
remove shelves to provide access to wheelchair users throughout the store. However, this
change would result in a significant loss of selling space that would have an adverse effect on
its business. In this case, the removal of the shelves is not readily achievable and, thus, is not
required by the ADA.

ILLUSTRATION 2: BCD Hardware Store provides three parking spaces for its customers.
BCD determines that it would be inexpensive to restripe the parking lot to create an
accessible space and reserve it for use by persons with disabilities. However, this change
would reduce the available parking for individuals who do not have disabilities. The loss of
parking (not just the cost of the paint for restriping) can be considered in determining whether
the action is readily achievable.

**III-4.4300 Standards to apply.** Measures taken to remove barriers should comply with the ADA
Accessibility Guidelines (ADAAG) contained in the appendix to the Department's rule. Barrier removal in
existing facilities does not, however, trigger the accessible path of travel requirement (see III-6.2000).
Deviations from ADAAG are acceptable only when full compliance with those requirements is not readily
achievable. In such cases, barrier removal measures may be taken that do not fully comply with the
standards, so long as the measures do not pose a significant risk to the health or safety of individuals with
disabilities or others.

ILLUSTRATION: As a first step toward removing architectural barriers, the owner of a small
shop decides to widen the shop's 26-inch wide front door. However, because of space
constraints, he is unable to widen the door to the full 32-inch clearance required for
alterations under ADAAG. Because full compliance with ADAAG is not readily achievable,
the shop owner need not widen the door the full 32 inches but, rather, may widen the door to
only 30 inches. The 30-inch door clearance does not pose a significant risk to health or safety.

Are portable ramps permitted? Yes, but only when the installation of a permanent ramp is not readily
achievable. In order to promote safety, a portable ramp should have railings and a firm, stable, nonslip
surface. It should also be properly secured.

**III-4.4400 Continuing obligation.** The obligation to engage in readily achievable barrier removal is a
continuing one. Over time, barrier removal that initially was not readily achievable may later be required
because of changed circumstances.

If the obligation is continuing, are there any limits on what must be done? The obligation is continuing,
but not unlimited. The obligation to remove barriers will never exceed the level of access required under
the alterations standard (or the new construction standard if ADAAG does not provide specific standards
for alterations).

ILLUSTRATION 1: A 100-room hotel is removing barriers in guest accommodations. If the
hotel were newly constructed, it would be required to provide five fully accessible rooms
(including one with a roll-in shower) and four rooms that are equipped with visual alarms and
notification devices and telephones equipped with amplification devices. A hotel that is being
altered is required to provide a number of accessible rooms in the area being altered that is
proportionate to the number it would be required to provide in new construction.

A hotel that is engaged in barrier removal should meet this alterations standard, if it is readily achievable to do so. It is not required to exceed this level of access. Even if it is readily achievable to make more rooms accessible than would be required under the ADAAG alterations standards, once the hotel provides this level of access, it has no obligation to remove barriers in additional guest rooms.

> ILLUSTRATION 2: A grocery store that has more than 5000 square feet of selling space and now has six inaccessible check-out aisles is assessing its obligations under the barrier removal requirement. ADAAG does not contain specific provisions applicable to the alteration of check-out aisles, but, in new construction, two of the six check-out aisles would be required to be accessible. The store is never required to provide more than two accessible check-out aisles, even if it would be readily achievable to do so.

> ILLUSTRATION 3: An office building that houses places of public accommodation is removing barriers in common areas. If the building were newly constructed, the building would be required to contain areas of rescue assistance. However, the ADAAG alterations standard explicitly specifies that areas of rescue assistance are not required in buildings that are being altered. Because barrier removal is not required to exceed the alterations standard, the building owner need not establish areas of rescue assistance.

**III-4.4500 Priorities for barrier removal.** The Department's regulation recommends priorities for removing barriers in existing facilities. Because the resources available for barrier removal may not be adequate to remove all existing barriers at any given time, the regulation suggests a way to determine which barriers should be mitigated or eliminated first. The purpose of these priorities is to facilitate long-term business planning and to maximize the degree of effective access that will result from any given level of expenditure. These priorities are not mandatory. Public accommodations are free to exercise discretion in determining the most effective "mix" of barrier removal measures to undertake in their facilities.

The regulation suggests that a public accommodation's first priority should be to enable individuals with disabilities to physically enter its facility. This priority on "getting through the door" recognizes that providing physical access to a facility from public sidewalks, public transportation, or parking is generally preferable to any alternative arrangements in terms of both business efficiency and the dignity of individuals with disabilities.

The next priority is for measures that provide access to those areas of a place of public accommodation where goods and services are made available to the public. For example, in a hardware store, to the extent that it is readily achievable to do so, individuals with disabilities should be given access not only to assistance at the front desk, but also access, like that available to other customers, to the retail display areas of the store.

The third priority should be providing access to restrooms, if restrooms are provided for use by customers or clients.

The fourth priority is to remove any remaining barriers to using the public accommodation's facility by, for example, lowering telephones.

Must barriers be removed in areas used only by employees? No. The "readily achievable" obligation to remove barriers in existing facilities does not extend to areas of a facility that are used exclusively by employees as work areas.

How can a public accommodation decide what needs to be done? One effective approach is to conduct a "self-evaluation" of the facility to identify existing barriers. The Department's regulation does not require public accommodations to conduct a self-evaluation. However, public accommodations are urged to establish procedures for an ongoing assessment of their compliance with the ADA's barrier removal requirements. This process should include consultation with individuals with disabilities or organizations representing them. A serious effort at self-assessment and consultation can diminish the threat of litigation and save resources by identifying the most efficient means of providing required access.

Exhibit C-1, Del Amo Hospital, Inc. No. 19-360, Cited and Reviewed on Dec. 24, 2021

If a public accommodation determines that its facilities have barriers that should be removed, but it is not readily achievable to undertake all of the modifications now, what should it do? The Department recommends that a public accommodation develop an implementation plan designed to achieve compliance with the ADA's barrier removal requirements. Such a plan, if appropriately designed and diligently executed, could serve as evidence of a good faith effort to comply with the ADA's barrier removal requirements.

In developing an implementation plan for readily achievable barrier removal, a public accommodation should consult with local organizations representing persons with disabilities to solicit their suggestions for cost-effective means of making individual places of public accommodation accessible. These organizations may provide useful guidance to public accommodations in identifying the most significant barriers to remove, and the most efficient means of removing them.

If readily achievable modifications are being made in a single facility that has more than one restroom for each sex, should the public accommodation focus its resources on making one restroom for each sex fully accessible or should the public accommodation make some changes (e.g. , lowering towel dispensers or installing grab bars) in each restroom? This is a decision best made on a case-by-case basis after considering the specific barriers that need to be removed in that facility, and whether it is readily achievable to remove these barriers. It is likely that if it is readily achievable to make one restroom fully accessible, that option would be preferred by the clients or customers of the facility.

**III-4.4600 Seating in assembly areas.** Public accommodations are required to remove barriers to physical access in assembly areas such as theaters, lecture halls, and conference rooms with fixed seating.

If it is readily achievable to do so, public accommodations that operate places of assembly must locate seating for individuals who use wheelchairs so that it --

    1) Is dispersed throughout the seating area;

    2) Provides lines of sight and choices of admission prices comparable to those offered to the general public;

    3) Adjoins an accessible route for emergency egress; and

    4) Permits people who use wheelchairs to sit with their friends or family.

If it is not readily achievable for auditoriums or theaters to remove seats to allow individuals who use wheelchairs to sit next to accompanying family members or friends, the public accommodation may meet its obligation by providing portable chairs or other means to allow the accompanying individuals to sit with the persons who use wheelchairs. Portable chairs or other means must be provided only when it is readily achievable to do so.

How many seating locations for persons who use wheelchairs must be provided? Under the general principles applicable to barrier removal in existing facilities, a public accommodation is never required to provide greater access than it would be required to provide under the alterations provisions of the ADAAG.

Must the seating locations be dispersed? The ADA accessibility standard for alterations requires wheelchair seating to be dispersed (i.e. , provided in more than one location) only in assembly areas with fixed seating for more than 300 people. Because the requirements for making existing facilities accessible never exceed the ADAAG standard for alterations, public accommodations engaged in barrier removal are not required to disperse wheelchair seating in assembly areas with 300 or fewer seats, or in any case where it is technically infeasible.

Must a public accommodation permit a person who uses a wheelchair to leave his or her wheelchair and view the performance or program from a stationary seat? Yes. And in order to facilitate seating of wheelchair users who wish to transfer to existing seating when fixed seating is provided, a public accommodation must provide, to the extent readily achievable, a reasonable number of seats with

Del Amo Hospital, Inc. cited in C.L. No. 19-56074 archived March 24, 2021

removable aisle-side armrests. Many persons who use wheelchairs are able to transfer to fixed seating with this relatively minor modification. This solution avoids the potential safety hazard created by the use of portable chairs, and it also fosters integration. In situations when a person who uses a wheelchair transfers to existing seating, the public accommodation may provide assistance in handling the wheelchair of the patron with the disability.

May a public accommodation charge a wheelchair user a higher fee to compensate for the extra space required to accommodate a wheelchair or for storing or retrieving a wheelchair? No. People with disabilities may not be subjected to additional charges related to their use of a wheelchair. In fact, to the extent readily achievable, wheelchair seating should provide a choice of admission prices and lines of sight comparable to those for members of the general public.

**III-4.4700 Transportation barriers.** Public accommodations that provide transportation to their clients or customers must remove barriers to the extent that it is readily achievable to do so. Public accommodations that provide transportation service must also comply with the applicable portions of the ADA regulation issued by the Department of Transportation (56 Fed. Reg. 45,884 (September 6, 1991) to be codified at 49 CFR Part 37)).

What kinds of transportation systems are covered by the Department of Justice's title III rule? The Department of Justice's rule covers any fixed route or demand responsive transportation system operated by a public accommodation that is not primarily engaged in the business of transporting people. Examples include airport shuttle services operated by hotels, customer bus or van services operated by shopping centers, transportation systems at colleges and universities, and transport systems in places of recreation, such as those at stadiums, zoos, and amusement parks. If a public accommodation is primarily engaged in the business of transporting people, its activities are not covered under the Department of Justice's title III regulation. Rather, its activities are subject to the Department of Transportation's ADA regulation.

What requirements apply to the acquisition of new vehicles? Requirements for the acquisition of new vehicles are found in the Department of Transportation regulation and vary depending on both the capacity of the vehicle and its intended use, as follows:

1) Fixed route system: Vehicle capacity over 16. Any vehicle with a capacity over 16 that is purchased or leased for a fixed route system must be "readily accessible to and usable by individuals with disabilities, including those who use wheelchairs. "

2) Fixed route system: Vehicle capacity of 16 or less. Vehicles of this description must meet the same "readily accessible and usable" standard described in (1) above, unless they are part of a system that already meets the "equivalent service" standard.

3) Demand responsive system: Vehicle capacity over 16. These vehicles must meet the "readily accessible and usable" standard, unless they are part of a system that already meets the "equivalent service" standard.

4) Demand responsive system: Vehicle capacity of 16 or less. Vehicles of this description are not subject to any requirements for purchase of accessible vehicles. However, "equivalent service" must be provided.

What is "equivalent service"? A system is deemed to provide equivalent service if, when the system is viewed in its entirety, the service provided to individuals with disabilities, including those who use wheelchairs, is provided in the most integrated setting appropriate to the needs of the individual and is equivalent to the service provided other individuals. The Department of Transportation regulation lists eight service characteristics that must be equivalent. These include schedules/response time, fares, and places and times of service availability.

Is it necessary to install a lift in an existing vehicle? No. The ADA states that the installation of hydraulic lifts in existing vehicles is not required.

Are employee transportation systems covered? Transportation services provided only to employees of a place of public accommodation are not subject to the Department's title III regulation but are covered by the regulation issued by the Equal Employment Opportunity Commission to implement title I of the ADA. However, if employees and customers or clients are served by the same transportation system, the provisions of the title III regulation will also apply.

## III-4.5000 Alternatives to barrier removal

**III-4.5100 General.** When a public accommodation can demonstrate that the removal of barriers is not readily achievable, the public accommodation must make its goods and services available through alternative methods, if such methods are readily achievable.

> ILLUSTRATION 1: A retail store determines that it is not readily achievable to rearrange display racks to make every aisle accessible. However, the store is still required to make the goods and services that are located along inaccessible aisles available to individuals with disabilities through alternative methods. For example, the store could instruct a clerk to retrieve inaccessible merchandise, if it is readily achievable to do so.

> ILLUSTRATION 2: A pharmacy that is located in a building that can be entered only by means of a long flight of stairs determines that it is not readily achievable to provide a ramp to that entrance; therefore, it is not required to provide access to its facility. However, the pharmacy is still required to provide access to its services, if any readily achievable alternative method of delivery is available. Therefore, the pharmacy must consider options, such as delivering goods to customers at curbside or at their homes.

> ILLUSTRATION 3: A self-service gas station determines that it is not readily achievable to redesign gas pumps to enable people with disabilities to use them; therefore, the gas station is not required to make physical modifications to the gas pumps. However, the gas station is required to provide its services to individuals with disabilities through any readily achievable alternative method, such as providing refueling service upon request to an individual with a disability.

> ILLUSTRATION 4: A restaurant determines that it is not readily achievable to remove physical barriers to access in a specific area of the restaurant. The restaurant must offer the same menu in an accessible area of the restaurant, unless it would not be readily achievable to do so.

How can a public accommodation determine if an alternative to barrier removal is readily achievable? The factors to consider in determining if an alternative is readily achievable are the same as those that are considered in determining if barrier removal is readily achievable (see III-4.4200).

If a public accommodation provides its services through alternative measures, such as home delivery, may it charge its customers for this special service? No. When goods or services are provided to an individual with a disability through alternative methods because the public accommodation's facility is inaccessible, the public accommodation may not place a surcharge on the individual with a disability for the costs associated with the alternative method.

> ILLUSTRATION 1: A gas station that chooses to provide refueling service to individuals with disabilities at a self-service island, rather than removing the barriers that preclude that individual from refueling his or her own vehicle, must provide the refueling service at the self-service price.

> ILLUSTRATION 2: An inaccessible pharmacy that provides home delivery to individuals with disabilities, rather than removing the barriers that prevent those individuals from being served in the pharmacy, must provide the home delivery at no charge to the customer. However, a pharmacy that normally offers home delivery as an option to its customers and charges a fee for that service, may continue to charge a delivery fee to customers with

disabilities, if the pharmacy provides at least one "no-cost" alternative, such as delivering its products to a customer at curbside.

May a public accommodation consider security issues when it is determining if an alternative is readily achievable? Yes. Security is a factor that may be considered when a public accommodation is determining if an alternative method of delivering its goods or services is readily achievable.

> ILLUSTRATION 1: A service station is not required to provide refueling service to individuals with disabilities at any time when it is operating exclusively on a remote control basis with a single cashier.

> ILLUSTRATION 2: A cashier working in a security booth in a convenience store when there are no other employees on duty is not required to leave his or her post to retrieve items for individuals with disabilities.

**III-4.5200 Multiscreen cinemas.** The Department's regulation expressly recognizes that it may not be readily achievable to remove enough barriers to provide access to all of the theaters in a multiscreen cinema. In this situation, a cinema must make its services available by establishing a film rotation schedule that provides reasonable access for individuals who use wheelchairs to films being presented by the cinema. Public notice must be provided as to the location and time of accessible showings. Methods for providing notice include appropriate use of the international accessibility symbol in a cinema's print advertising and the addition of accessibility information to a cinema's recorded telephone information line.

**III-4.6000 Examinations and courses.** Any private entity that offers examinations or courses related to applications, licensing, certification, or credentialing for secondary or postsecondary education, professional, or trade purposes must offer such examinations or courses in a place and manner accessible to persons with disabilities, or offer alternative accessible arrangements for such individuals.

**III-4.6100 Examinations.** Examinations covered by this section include examinations for admission to secondary schools, college entrance examinations, examinations for admission to trade or professional schools, and licensing examinations, such as bar exams, examinations for medical licenses, or examinations for certified public accountants.

A private entity offering an examination covered by this section is responsible for selecting and administering the examination in a place and manner that ensures that the examination accurately reflects an individual's aptitude or achievement level or other factor the examination purports to measure, rather than reflecting the individual's impaired sensory, manual, or speaking skills (except where those skills are the factors that the examination purports to measure).

Where necessary, an examiner may be required to provide auxiliary aids or services, unless it can demonstrate that offering a particular auxiliary aid or service would fundamentally alter the examination or result in an undue burden. For individuals with hearing impairments, for example, oral instructions or other aurally delivered materials could be provided through an interpreter, assistive listening device, or other effective method. For individuals with visual impairments, providing examinations and answer sheets on audio tape, in large print or Braille, or providing qualified readers or transcribers to record answers, may be appropriate. Also, some individuals with learning disabilities may need auxiliary aids or services, such as readers, because of problems in perceiving and processing written information. See III-4.3000 for a general discussion of auxiliary aids and services.

In order to ensure that the examination accurately measures the factors that it purports to measure, the entity administering the examination must ensure that the auxiliary aid or service provided is effective.

> ILLUSTRATION 1: MNO Testing Service provides a reader for an applicant who is blind who is taking a bar examination, but the reader is unfamiliar with specific terminology used in the examination, mispronounces words, and, because he or she does not understand the questions, is unable to convey the information in the questions or to follow the applicant's instructions effectively. Because of the difficulty in communicating with the reader, the

Del Amo Fashion Inc.
No: 18-cv-00475-archived on March 24, 2021

applicant is unable to complete the examination. MNO is not in compliance with the ADA, because the results of the examination will reflect the reader's lack of skill and familiarity with the material, rather than the applicant's knowledge.

ILLUSTRATION 2: ABC Testing Service administers written examinations designed to test specific skills or areas of knowledge. An individual with a vision impairment or learning disability that limits the ability to read written material may be unable to pass such an examination because of limited reading ability, regardless of his or her knowledge or ability in the area that the test is designed to measure. ABC must administer the test in a manner that enables the applicant to demonstrate his or her skill or knowledge, rather than the ability to read.

BUT: If the test is designed to measure the ability to read written material, it may be administered in written form because the result will accurately reflect the individual's reading ability.

Aside from auxiliary aids or services, what other types of modifications may be required? In order to ensure that an examination provides an accurate measurement of the applicant's aptitude or achievement level, or whatever other factor it purports to measure, the entity administering the examination may also be required to modify the manner in which it is administered.

ILLUSTRATION: X has a manual impairment that makes writing difficult. It may be necessary to provide X with more time to complete the exam and/or permit typing of answers.

What obligations does an examiner have if its facilities are inaccessible? Examinations must be administered in facilities that are accessible to individuals with disabilities or alternative accessible arrangements must be made. If the facility in which the examination is offered is not accessible, it may be administered to an individual with a disability in a different room or other location. For instance, the entity might provide the examination at an individual's home with a proctor. The alternative location must, however, provide comparable conditions to the conditions in which the test is administered to others.

ILLUSTRATION: A nurse licensing examination is administered in a warm, well-lit, second-floor classroom that is not accessible to an individual who uses a wheelchair. The Nursing Board may allow that individual to take it in a classroom or office on the first floor that is accessible, but must ensure that the accessible room is also well-lit and has adequate heat.

Must all testing locations be accessible and offer specially designed exams? No, but if an examination for individuals with disabilities is administered in an alternative accessible location, or in a manner specially designed for individuals with disabilities, it must be offered as often and in as timely a manner as other examinations. Examinations must be offered to individuals with disabilities at locations that are as convenient as the location of other examinations.

ILLUSTRATION: A college entrance examination is offered by LMN Testing Service in several cities in a State, but only one location has either an accessible facility or an alternative accessible facility. X, an individual who uses a wheelchair, lives near an inaccessible test location at which no alternative accessible facility is provided. The nearest test location with an accessible facility is 500 miles away. LMN has violated the ADA, because X is required to travel a longer distance to take the examination than other people who can take the examination in the city that is most convenient for them.

Can individuals with disabilities be required to file their applications to take an examination earlier than the deadline for other applicants? No. This would violate the requirement that examinations designed for individuals with disabilities be offered in as timely a manner as other examinations. Entities that administer tests may require individuals with disabilities to provide advance notice of their disabilities and of any modifications or aids that would be required, provided that the deadline for such notice is no earlier than the deadline for others applying to take the examination.

Case 8:18-cv-00475-DOC-DFM   Document 208   Filed 03/30/21   Page 63 of 101   Page ID
#:5767

May an examiner require that an applicant provide documentation of the existence and nature of the disability as evidence that he or she is entitled to modifications or aids? Yes, but requests for documentation must be reasonable and must be limited to the need for the modification or aid requested. Appropriate documentation might include a letter from a physician or other professional, or evidence of a prior diagnosis or accommodation, such as eligibility for a special education program. The applicant may be required to bear the cost of providing such documentation, but the entity administering the examination cannot charge the applicant for the cost of any modifications or auxiliary aids, such as interpreters, provided for the examination.

> ILLUSTRATION: A testing service may be required to provide individuals with dyslexia with more time to complete an examination. An individual who requests additional time may, however, be required to notify the testing service of the request at the time he or she applies to take the examination, and to furnish appropriate documentation to establish that the additional time is needed because of a disability.

Can an entity refuse to provide modifications or aids for applicants with disabilities on the grounds that those individuals, because of their disabilities, would be unable to meet other requirements of the profession or occupation for which the examination is given? No. When an examination is one step in qualifying for a license, an individual may not be barred from taking the examination merely because he or she might be unable to meet other requirements for the license. If the examination is not the first stage of the qualification process, an applicant may be required to complete the earlier stages prior to being admitted to the examination. On the other hand, the applicant may not be denied admission to the examination on the basis of doubts about his or her abilities to meet requirements that the examination is not designed to test.

> ILLUSTRATION: An individual with a disability may not be required to demonstrate that he or she is capable of practicing medicine in order to be provided with an auxiliary aid in taking a test for admission to medical school.

BUT: An individual may be required to complete medical school before being admitted to a licensing examination for medical school graduates.

**III-4.6200 Courses**. The requirements for courses under this section are generally the same as those for examinations. Any course covered by this section must be modified to ensure that the place and manner in which the course is given are accessible. Examples of possible modifications that might be required include extending the time permitted for completion of the course, providing auxiliary aids or services (except where to do so would fundamentally alter the course or result in an undue burden), or offering the course in an accessible location or making alternative accessible arrangements.

> ILLUSTRATION: If the course is offered in an inaccessible location, alternative accessible arrangements may include provision of the course through videotape, cassettes, or prepared notes.

Alternative arrangements for courses, like those for examinations, must provide comparable conditions to those provided to others, including similar lighting, room temperature, and the like.

The entity offering the course must ensure that the course materials that it provides are available in alternate formats that individuals with disabilities can use.

> ILLUSTRATION: Class handouts may be provided in Braille or on audio cassettes for individuals with visual impairments.

BUT: If the course uses published materials that are available from other sources, the entity offering the course is not responsible for providing them in alternate formats. It should, however, inform students in advance what materials will be used so that an individual with a disability can obtain them in a usable format, such as Braille or audio tape, before the class begins.

cited in Del Amo Hospital Inc.
No. 56074 archived on March 24, 2021

An entity offering a variety of courses covered by this section may not limit the selection or choice of courses available to individuals with disabilities. Courses offered to fulfill a continuing education requirement for a profession, for example, are covered by the requirement that they be offered in an accessible place and manner, and an entity that offers such courses may not designate particular courses for individuals with disabilities and refuse to make other courses accessible.

## III-5.0000 NEW CONSTRUCTION

Regulatory references: 28 CFR 36.401; 36.406; Appendix A.

**III-5.1000 General.** All newly constructed places of public accommodation and commercial facilities must be readily accessible to and usable by individuals with disabilities to the extent that it is not structurally impracticable. This requirement, along with the requirement for accessible alterations, are the only requirements that apply to commercial facilities.

What is "readily accessible and usable"? This means that facilities must be built in strict compliance with the Americans with Disabilities Act Accessibility Guidelines (ADAAG). There is no cost defense to the new construction requirements.

What buildings are covered? The new construction requirements apply to any facility first occupied after January 26, 1993, for which the last application for a building permit or permit extension is certified as complete after January 26, 1992; or in those jurisdictions where the government does not certify completion of applications, the date that the last application for a building permit or permit extension is received by the government.

What if a building is occupied before January 26, 1993? It is not covered by the title III new construction requirements.

What does "structurally impracticable" mean? The phrase "structurally impracticable" means that unique characteristics of the land prevent the incorporation of accessibility features in a facility. In such a case, the new construction requirements apply, except where the private entity can demonstrate that it is structurally impracticable to meet those requirements. This exception is very narrow and should not be used in cases of merely hilly terrain. The Department expects that it will be used in only rare and unusual circumstances.

Even in those circumstances where the exception applies, portions of a facility that can be made accessible must still be made accessible. In addition, access should be provided for individuals with other types of disabilities, even if it may be structurally impracticable to provide access to individuals who use wheelchairs.

> ILLUSTRATION: M owns a large piece of land on which he plans to build many facilities, including office buildings, warehouses, and stores. The eastern section of the land is fairly level, the central section of the land is extremely steep, and the western section of the land is marshland. M assumes that he only need comply with the new construction requirements in the eastern section. He notifies his architect and construction contractor to be sure that all buildings in the eastern section are built in full compliance with ADAAG. He further advises that no ADAAG requirements apply in the central and western sections.

M's advice as to two of the sections is incorrect. The central section may be extremely steep, but that is not sufficient to qualify for the "structural impracticability" exemption under the ADA. M should have advised his contractor to grade the land to provide an accessible slope at the entrance and apply all new construction requirements in the central section.

M's advice as to the western section is also incorrect. Because the land is marshy, provision of an accessible grade-level entrance may be structurally impracticable. This is one of the rare situations in which the exception applies, and full compliance with ADAAG is not required. However, M should have advised his contractor to nevertheless construct the facilities in compliance with other ADAAG requirements, including provision of features that serve individuals who use crutches or who have vision

No. 18-1069, Archived on March 24, 2021
Cited by: City of Hope National Medical Center / Beverly Hospital, Inc.

Case 8:18-cv-00475-DOC-DFM   Document 218   Filed 03/30/21   Page 65 of 101   Page ID
#:5769

or hearing impairments. For instance, the facility needs to have stairs and railings that comply with
ADAAG, and it should comply with the ADAAG signage and alarm requirements, as well.

Who is liable for violation of the ADA in the above example? Any of the entities involved in the design
and construction of the central and western sections might be liable. Thus, in any lawsuit, M, the architect,
and the construction contractor may all be held liable in an ADA lawsuit.

**III-5.2000 Commercial facilities in a home.** When a commercial facility, such as a home sales office or
production workshop, is located in a home, the portion used exclusively as a commercial facility, as well
as the portion used both as a commercial facility and for residential purposes, are covered by the new
construction and alterations requirements. The covered areas include not only the rooms used as a
commercial facility but also an accessible route to the commercial facility from the sidewalk, through the
doorway, through the hallway, and other portions of the home, such as restrooms, used by employees and
visitors.

**III-5.3000 Application of ADAAG.** The Department of Justice has adopted the ADA Accessibility
Guidelines (ADAAG), issued by the Architectural and Transportation Barriers Compliance Board, as the
standard to be applied in new construction. The major provisions of ADAAG are summarized in III-
7.0000.

What if ADAAG has no standards for a particular type of facility -- such as bowling alleys, golf courses,
exercise equipment, pool lifts, amusement park rides, and cruise ships? In such cases, the ADAAG
standards should be applied to the extent possible. Where appropriate technical standards exist, they
should be applied. If there are no applicable scoping requirements (i.e. , how many features must be
accessible), then a reasonable number, but at least one, must be accessible.

> ILLUSTRATION 1: A swimming pool complex must comply fully with ADAAG in the
> parking facilities, route to the facility door, entrance to the facility, locker rooms, showers,
> common areas, and route to the pool. However, ADAAG does not contain technical standards
> for access to the pool itself. Thus, the owner cannot be found in violation of ADAAG for
> failure to install a lift or other means of access into the pool.

> ILLUSTRATION 2: Most bowling alleys are inaccessible because they have a few steps
> down to the bowling area and a step up to the lanes. ADAAG requirements for ramping steps
> can be applied to the design of new bowling alleys, resulting in an accessible bowling alley.
> Unlike in the case of pool lifts above, appropriate technical standards for ramps are
> applicable. However, ADAAG contains no "scoping" for bowling alleys. In other words, it
> does not specify how many alleys need to be accessible. As a result, if a reasonable number,
> but at least one, of the alleys is designed to be accessible, no ADA violation will be found.
> ILLUSTRATION 3: Because of the unique structure of ships, none of the ADAAG technical
> or scoping standards are appropriate. Until such time as the Architectural and Transportation
> Barriers Compliance Board issues specific standards applicable to ships, there is no
> requirement that ships be constructed accessibly. (Cruise ships would still be subject to other
> title III requirements.)

**III-5.4000 Elevator exemption.** Elevators are the most common way to provide access in multistory
buildings. Title III of the ADA, however, contains an exception to the general rule requiring elevators.
Elevators are not required in facilities under three stories or with fewer than 3000 square feet per floor,
unless the building is a shopping center or mall; professional office of a health care provider; public
transit station; or airport passenger terminal.

> ILLUSTRATION 1: A two-story office building has 40,000 square feet on each floor.
> Because the building is less than three stories, an elevator is not required. (To qualify for the
> exemption, a building must either be under three stories or have fewer than 3000 square feet
> per floor; it need not meet both criteria.)

BUT: A two-story shopping center with 40,000 square feet on each floor is required to have an elevator,
because shopping centers are not entitled to the exemption.

cited for ? - Def. Adlor credit? Inc.
No. 1 to 56074 archived Mar 24, 2021

ILLUSTRATION 2: A four-story building has 2900 square feet per floor. An elevator is not required because each floor has less than 3000 square feet.

ILLUSTRATION 3: A four-story office building has 3500 square feet on the first floor and 2500 square feet on each of the other floors. An elevator is required. (All of the stories must be under 3000 square feet to qualify for the exemption.)

What is a "story"? A story is "occupiable" space, which means space designed for human occupancy and equipped with one or more means of egress, light, and ventilation. Basements designed or intended for occupancy are considered "stories. " Mezzanines are not counted as stories, but are just levels within stories.

If a two-story building is not required to have an elevator to the second floor, must it provide a lift? No. The elevator exemption is a "vertical access" exemption. This means that no access by any means need be provided to the second floor. However, if an entity wishes to provide access by ramp or a lift, it is, of course, free to do so.

What if a building is not required to have an elevator, but the owner decides to install an elevator anyway? Must the elevator comply with ADAAG elevator requirements? Yes. And that elevator must serve every level of the building, unless it only provides service from a garage to one level of the building.

If a building is subject to the elevator exemption, do any other ADAAG requirements apply in the building? Yes. Even in buildings that are exempt from the elevator requirement, all other ADAAG requirements (apart from the requirement for an elevator) must still be met.

ILLUSTRATION: A two-story building will be used as real estate offices. There will be bathrooms on both the ground floor and the second floor. No elevator will be installed because it is not required in a building with less than three stories. However, the second floor bathrooms must still be accessible. In other words, both the ground floor and the second floor bathrooms must be accessible.

But why are accessible bathrooms and fountains required on the second floor when there is no way that an individual using a wheelchair can get to the second floor? There are many individuals who can walk up stairs by using crutches but then use wheelchairs to get around once they reach the upper floor. Also, since the ground floor is being designed to be accessible, there is little additional cost involved in designing the second floor to be accessible as well. In addition, ADAAG contains accessibility features for individuals with disabilities other than those who use wheelchairs, and those features should be incorporated in building design. Finally, an elevator may be installed at a future date, or an addition with an elevator may be added later on. In addition, accessible design of bathroom facilities will foster ease of use by all persons.

**III-5.4100 Shopping center or mall.** A "shopping center or mall" is either --

(1) A building with five or more "sales or retail establishments," or

(2) A series of buildings on a common site, either under common ownership or common control or developed together, with five or more "sales or retail establishments. "

Included within the phrase "sales or retail establishments" are those types of stores listed in the fifth category of places of public accommodations, i.e. , bakery, grocery store, clothing store, hardware store, etc. (see III-1.2000). The term includes floor levels containing at least one such establishment, or any floor that was designed or intended for use by at least one such establishment. The definition of "shopping center or mall" is slightly different for purposes of alterations (see III-6.3000).

ILLUSTRATION 1: A strip of stores includes a grocery store, a clothing store, a restaurant, a dry-cleaner, a bank, and a pharmacy. This is not a shopping center or mall because only two stores are in the fifth category of "sales or retail establishments" (the grocery store and the clothing store). The restaurant is an establishment serving food or drink (the second category

of place of public accommodation). The remaining establishments are "service
establishments" included under the sixth category in the definition of place of public
accommodation.

> ILLUSTRATION 2: A building has a card store, office supply store, video store, and a bakery
> on the first floor; and a hobby shop, accountant's office, and lawyer's office on the second
> floor. In this case, both the first and second floors qualify as a "shopping center or mall,"
> because each of those floors has at least one sales establishment. Although no floor alone has
> five sales establishments, the first and second floor each have at least one such establishment
> and, together, the total is five. (The accountant's and lawyer's offices are "service
> establishments" and are not included in the number of "sales or retail establishments. ")

When a building is being constructed, the owner or developer does not always know exactly what types of
stores will be located in the facility. In such a situation, how will the Department of Justice determine
whether a facility was intended as a shopping center? There are a number of factors that can be considered
in determining whether a particular floor was designed or intended for use by at least one sales or rental
establishment (which would mean that floor is a shopping center). Relevant questions include --

> 1) What type of businesses did the developer target in his advertising and marketing of the
> property? Was the developer trying to encourage sales establishments to join the property?

> 2) Was the facility designed with any special features for sales or rental establishments? For
> example, are there counters and large windows and check-out aisles?

> 3) What type of establishment actually first occupied the floor? Was it retail stores or was it
> offices, for example?

If a shopping mall has 25 stores on each level, how many elevators are needed? Generally, one is enough,
as long as an individual could use the elevator and then be able to reach any of the stores on the second
level during the hours that the mall is open.

**III-5.4200 Professional office of a health care provider.**

A "professional office of a health care provider" is a location where a State-regulated professional
provides physical or mental health services to the public. The ADA's elevator exemption does not apply to
buildings housing the offices of a health care provider.

> ILLUSTRATION: A physician has offices on the first floor of a multistory building. The
> second floor has other types of offices. An elevator is not required.

BUT: If the second floor was designed or intended for use by a health care provider, an elevator would be
required.

> ILLUSTRATION 2: A newly constructed two-story building houses a business that provides
> home health care services. No health care services are actually provided at the company's
> offices. While the building must meet all other requirements for new construction, no elevator
> is required.

How will the Department of Justice determine whether a facility was designed or intended for occupancy
by a health care provider? Factors that the Department of Justice will look at in making that determination
include --

> 1) Whether the facility has special plumbing, electrical, or other features needed by health
> care providers;

> 2) Whether the facility was marketed as a medical office center; and

Reproduced in C.L.V. Del Mar Hospital, Inc.
No. 19-560, archived on March 24, 2021

3) Whether any of the establishments that actually first occupied the floor were, in fact, health care providers.

**III-5.4300 Transportation terminals.** The ADA's elevator exemption also does not apply to bus or train terminals or depots, or to airport passenger terminals. If, however, all passenger services in a two-story facility - including boarding, debarking, loading and unloading, baggage claim, dining facilities, and other common areas open to the public - are located on the same floor level and on an accessible route from an accessible entrance, an elevator is not required.

## III-6.0000 ALTERATIONS

Regulatory references: 28 CFR 36.402-36.406; Appendix A.

**III-6.1000 General.** If an alteration in a place of public accommodation or commercial facility is begun after January 26, 1992, that alteration must be readily accessible to and usable by individuals with disabilities in accordance with ADAAG to the maximum extent feasible.

What is an alteration? An alteration is any change that affects usability. It includes remodeling, renovation, rearrangements in structural parts, and changes or rearrangement of walls and full-height partitions. Normal maintenance, reroofing, painting, wallpapering, asbestos removal, and changes to electrical and mechanical systems are not "alterations," unless they affect usability.

ILLUSTRATION 1: Flooring in a store is being replaced. This is an alteration because it can affect whether or not an individual in a wheelchair can travel in the store. The new floor must comply with, for example, ADAAG requirements for a nonslip surface or with the ADAAG carpeting requirements, if applicable.

ILLUSTRATION 2: A doorway is being relocated and a new door will be installed. The new doorway must be wide enough to meet ADAAG. The new door must have appropriate hardware that can be used without grasping, twisting, or pinching of the wrist.

ILLUSTRATION 3: An electrical outlet is being relocated. The location of the new outlet can affect usability by an individual who uses a wheelchair because, if the outlet is placed too low, the individual will be unable to reach it. This, then, is an alteration that must be done in accordance with ADAAG reach requirements.

BUT: If the electrical wiring inside the wall is being changed, usability by an individual with disabilities is not affected. Thus, the wiring need not be done in compliance with ADAAG because it is not an "alteration. "

What does "maximum extent feasible" mean? Occasionally, the nature of a facility makes it impossible to comply with all of the alterations standards. In such a case, features must only be made accessible to the extent that it is technically feasible to do so. The fact that adding accessibility features during an alteration may increase costs does not mean compliance is technically infeasible. Cost is not to be considered. Moreover, even when it may be technically infeasible to comply with standards for individuals with certain disabilities (for instance, those who use wheelchairs), the alteration must still comply with standards for individuals with other impairments.

ILLUSTRATION 1: A restaurant is undergoing a major renovation. Widening the entrance would affect the building structure because removal of an essential part of the structural frame would be required. In this case, it is "technically infeasible" to widen the entrance, and the action is not required. However, all other ADAAG alterations requirements apply to the renovation.

BUT: If the only problem with widening the entrance is that it would increase the cost of the renovation, the "technically infeasible" exception does not apply, and the entrance must be widened.

**III-6.2000 Alterations: Path of travel.** When an alteration is made to a "primary function area," not only must that alteration be done in compliance with ADAAG, but there must also be an accessible path of travel from the altered area to the entrance. The "path of travel" requirement includes an accessible route to the altered area and the bathrooms, telephones, and drinking fountains serving the area. Alterations to provide an accessible path of travel are required to the extent that they are not "disproportionate" to the original alteration, that is, to the extent that the added accessibility costs do not exceed 20 percent of the cost of the original alteration to the primary function area.

What is a primary function area? It is any area where a major activity takes place. It includes both the customer services areas and work areas in places of public accommodation. It includes all offices and work areas in commercial facilities. It does not include mechanical rooms, boiler rooms, supply storage rooms, employee lounges or locker rooms, janitorial closets, entrances, corridors, or restrooms.

> ILLUSTRATION 1: The customer service area of a dry cleaning store and the employee area behind the counter are both primary function areas.

> ILLUSTRATION 2: Remodeling an office is an alteration to a primary function area. But remodeling the employee restrooms is not an alteration to a primary function area.

> ILLUSTRATION 3: Installing a new floor surface in a factory work room is an alteration to a primary function area, but installing a new floor surface in the corridor leading to the work room is not.

What is a "path of travel"? It is a continuous route connecting the altered area to the entrance. It can include sidewalks, lobbies, corridors, rooms, and elevators. It also includes phones, restrooms, and drinking fountains serving the altered area.

Does this mean that every single time any minor alteration is made in a primary function area, the "path of travel" requirement is triggered? In other words, does a simple thing like changing door hardware trigger the path of travel requirement? No. There are some alterations that will never trigger the path of travel requirement. The Department's regulation states that alterations to windows, hardware, controls, electrical outlets, and signs do not trigger path of travel requirements. (If they affect usability, however, they are still considered to be "alterations" and must be done accessibly.) ADAAG gives some additional exceptions: the path of travel requirement is not triggered if alteration work is limited solely to the electrical, mechanical, or plumbing system, hazardous material abatement, or automatic sprinkler retrofitting, unless the project involves alteration to elements required to be accessible.

> ILLUSTRATION 1: An office building manager is replacing all of the room number signs. This is an "alteration" because it can affect usability by an individual who is blind. Thus, the new signs must comply with ADAAG requirements for permanent signs. However, the path of travel requirement is not triggered. Even though an alteration is being made in a primary function area, alterations to "signs" are in the list of alterations that will never trigger the path of travel requirement.

> ILLUSTRATION 2: The building manager now replaces the men's and women's room signs. Again this is an alteration because it can affect usability, and the new signs must comply with ADAAG. Here, the path of travel requirements are not triggered for two separate reasons. First, as in the above case, the alteration is to "signs" and thus will never trigger the path of travel requirement. In addition, in this case, the alteration is to the restroom. Restrooms are not primary function areas except in limited circumstances, such as highway rest stops.

What if a tenant remodels his store in a manner that would trigger the path of travel obligation, but the tenant has no authority to create an accessible path of travel because the common areas are under the control of the landlord? Does this mean the landlord must now make an accessible path of travel to the remodeled store? No. Alterations by a tenant do not trigger a path of travel obligation for the landlord. Nor is the tenant required to make changes in areas not under his control.

Del Shah Hospital, Inc.
Exhibit B
No. 1-10-14-archived March 24, 2021

What costs can be included in determining whether the 20 percent disproportionality limitation has been met? Widening doorways, installing ramps, making bathrooms accessible, lowering telephones, relocating water fountains -- as well as any other costs associated with making the path of travel accessible -- can be included.

What if the cost of making an accessible path of travel would exceed the cost of the original alteration by much more than 20 percent? In such a case, is the entity exempt from the path of travel requirement? No. The entity must still make the path of travel accessible to the extent possible without going over 20 percent, giving priority to those elements that provide the greatest degree of access. Changes should be made in the following order: accessible entrance, accessible route to the altered area, at least one accessible restroom for each sex or single unisex restroom, phones, drinking fountains, and then other elements such as parking, storage, and alarms.

> ILLUSTRATION: A library is remodeling its reading area for a total cost of $20,000. The library must spend, if necessary, up to an additional $4,000 (20 percent of $20,000) on "path of travel" costs. For $4,000 the library can install a ramp leading to the reading area, and it can lower telephones and drinking fountains. For $3,500 the library can create an accessible restroom. Because the most important path of travel element is the entrance and route to the area, the library should spend the money on the ramp, telephones, and drinking fountains.

Can an entity limit its path of travel obligation by engaging in a series of small alterations? No. An entity cannot evade the path of travel requirement by doing several small alterations (each of which, if considered by itself, would be so inexpensive that adding 20 percent would not result in addition of any path of travel features). Whenever an area containing a primary function is altered, other alterations to that area (or to other areas on the same path of travel) made within the preceding three years are considered together in determining disproportionality. Only alterations after January 26, 1992, are counted. In other words, all of the alterations to the same path of travel taken within the preceding three years are considered together in deciding whether the 20 percent has been reached.

> ILLUSTRATION: On February 1, 1992, a nursery school with several steps at its entrance renovates one of its classrooms. The renovations total $500, triggering up to $100 worth of path of travel obligations (20 percent of $500). Because $100 will not buy a ramp and because no other accessible features needed in that particular nursery school can be added for $100, no path of travel features are added. On October 1, 1992, more renovations are done at a cost of $1,000, this time triggering path of travel obligations of up to $200. As before, no path of travel features are added. Then, on March 1, 1993, another minor renovation ($2,000) is made to the same area, this time triggering path of travel obligations of up to $400. Had the nursery school done all three small renovations at the same time, the cost would have been $3,500, triggering a path of travel obligation of up to $700. For $700, an accessible ramp could have been installed.

In determining amounts that must be spent on path of travel features at the time of the March 1, 1993, renovation, the nursery school must spend up to 20 percent not just of the $2,000 renovation taking place on March 1, but, rather, up to 20 percent of all of the renovations in the preceding three years put together. Thus, on March 1, 1993, the nursery school must spend up to 20 percent of $3,500 or $700 (the total cost of the three small renovations) rather than up to 20 percent of $2,000 or $400 (the cost of just the March 1, 1993, renovation).

III-6.3000 Alterations: Elevator exemption. As under new construction, elevators are not required to be installed during alterations in facilities under three stories or with fewer than 3,000 square feet per floor, unless the building is a shopping center or mall; professional office of a health care provider; public transit station; or airport passenger terminal. As discussed below, "shopping center or mall" is defined differently for alterations than it is for new construction.

Does this mean that shopping centers, health care providers, and transit facilities have to install elevators every time they do alterations that would trigger a path of travel obligation involving vertical access? No. The 20 percent disproportionality limit discussed above applies and means that elevators are not required

NO: 4398 of CA, LA92 Del Amo On San Pedro
cited on cited or saved on March 24, 2021

when installing them would exceed 20 percent of the cost of the original alteration (which will most often be the case).

BUT, if escalators or stairs are being planned where none existed before and major structural modifications are necessary, an elevator or platform lift may need to be installed, because ADAAG provides that, in such a situation, an accessible means of vertical access must be provided. However, elevators or lifts are never required to be installed during alterations if it is technically infeasible to do so.

Why is there a different definition of "shopping center or mall" for alterations as opposed to new construction? A "shopping center or mall" is defined in the alterations provisions as a series of existing buildings on a common site connected by a "common pedestrian route" above or below the ground floor. This definition was included to avoid a requirement for several separate elevators in buildings that were initially designed and built independently of one another. The common pedestrian route would allow access to all of the stores to be provided by a single elevator.

If an alteration is planned on the third floor of a building and an elevator is not required, do any other ADAAG requirements apply to the third floor? Yes. All other ADAAG requirements, aside from the requirement for an elevator, apply to the third floor.

**III-6.4000 Alterations: Historic preservation.** Alterations to historic properties must comply with the historic property provisions of ADAAG, to the maximum extent feasible. Under those provisions, alterations should be done in full compliance with the alterations standards for other types of buildings. However, if following the usual standards would threaten or destroy the historic significance of a feature of the building, alternative standards may be used. The decision to use alternative standards for that feature must be made in consultation with the appropriate advisory board designated in ADAAG, and interested persons should be invited to participate in the decision-making process.

What are "historic properties"? These are properties that are listed or that are eligible for listing in the National Register or Historic Places, or properties designated as historic under State or local law.

What are the alternative requirements? The alternative requirements provide a minimal level of access. For example --

    1) An accessible route is only required from one site access point (such as the parking lot).

    2) A ramp may be steeper than is ordinarily permitted.

    3) The accessible entrance does not need to be the one used by the general public.

    4) Only one accessible toilet is required and it may be unisex.

    5) Accessible routes are only required on the level of the accessible entrance.

But what if complying with even these minimal alternative requirements will threaten or destroy the historic significance? In such a case, which is rare, structural changes need not be made. Rather, alternative methods can be used to provide access, such as providing auxiliary aids or modifying policies.

    ILLUSTRATION: A historic house is being altered to be used as a museum. The architect designing the project concludes that most of the normal standards for alterations can be applied during the renovation process without threatening or destroying historic features. There appears, however, to be a problem if one of the interior doors is widened, because historic decorative features on the door might be destroyed. After consulting ADAAG, the architect determines that the appropriate historic body with jurisdiction over the particular historic home is the Advisory Council on Historic Preservation. The architect sets up a meeting with the Council, to which a local disability group is invited.

At the meeting the participants agree with the architect's conclusion that the normal alterations standards cannot be applied to the interior door. They then review the special alternative requirements, which

Case 8:18-cv-00475-DOC-DFM   Document 218   Filed 03/30/21   Page 72 of 101   Page ID #:5776

require an accessible entrance. The meeting participants determine that application of the alternative minimal requirements is likewise not possible.

In this situation, the museum owner is not required to widen the interior door. Instead, the owner modifies the usual operational policies and provides alternative access to the activities offered in the inaccessible room by making available a video presentation of the items within the inaccessible room. The video can be viewed in a nearby accessible room in the museum.

## III-7.0000 THE AMERICANS WITH DISABILITIES ACT ACCESSIBILITY GUIDELINES (ADAAG)

Regulatory references: Appendix A to 28 CFR Part 36.

**III-7.1000 General.** The standards to be used in new construction and alterations covered by subpart D of the Department's title III regulation are those found in the Americans with Disabilities Act Accessibility Guidelines published by the Architectural and Transportation Barriers Compliance Board. These guidelines are incorporated as an appendix to the Department's regulations. The substance and form of ADAAG is drawn from several sources, particularly the Uniform Federal Accessibility Standards (UFAS) (the Federal standard for buildings constructed with Federal funds), and the private sector American National Standard Institute's ANSI A117.1 standards.

How does ADAAG compare to ANSI? ADAAG's technical design standards (e.g. , how many inches wide a doorway must be) resemble the 1986 ANSI A117.1 standards, in large part. Some design standards were adopted from the proposed new version of ANSI as it appeared in draft form when ADAAG was developed. The numbering and format of ADAAG also resemble ANSI. However, there are significant differences between ADAAG and the 1986 ANSI standards.

Perhaps the most important difference is in the new scoping requirements. ADAAG, unlike the 1986 ANSI standards, contains scoping requirements; that is, specifications as to how many, and under what circumstances, accessibility features must be incorporated. These requirements explain when to apply the technical standards.

Other differences reflect congressional intent that the ADA guidelines focus on certain areas not specifically addressed in ANSI such as dressing rooms, restaurants, automated teller machines, and mercantile establishments. ADAAG also reflects congressional intent that the guidelines place an increased emphasis on communications with individuals with vision or hearing impairments.

### III-7.2000 General requirements/definitions

**III-7.2100 Equivalent facilitation (§2.2).** Departures are permitted from particular requirements where alternative designs and technologies will provide substantially equivalent or greater access to and usability of the facility.

ADAAG itself provides various examples of equivalent facilitation, i.e. , acceptable deviations from the standards. For instance --

    1) In altered areas, elevator car dimensions can be smaller than the standards would mandate for new construction (§4.1.6(3)(c));

    2) Rather than install a text telephone next to a pay phone, hotels may keep portable text telephones at the desk, if they are available 24 hours per day and certain other conditions are met (§4.31.9);

    3) A folding shelf with space for handing materials back and forth can be used instead of providing an accessible ticketing or other similar counter (§7.2(2)(iii));

    4) Accessible guest quarters in newly constructed hotels may all be "multiple-occupancy" rooms, provided that individuals with disabilities who request accessible single-occupancy

cited in C.L. v. Del Amo Hospital, Inc.
Archived on March 24, 2021

rooms are allowed to use the multiple-occupancy rooms at the cost of a single-occupancy
room (?9.1.4(2));

5) If balconies or terraces cannot be made accessible because wind or water damage will
result, a ramp or raised decking may be used (§9.2.2(6)).

Are these the only places where equivalent facilitation can be used? No. Departures from any provision in
ADAAG are permitted as long as equivalent access is provided. However, portable ramps are not
considered equivalent facilitation.

**III-7.3000 Accessible elements and spaces: Scoping and technical requirements.**

**III-7.3100 Application (ADAAG §4.1.1(1)).** ADAAG applies to all areas in new construction and
alterations, except where limited by scoping requirements.

**III-7.3110 Work areas (ADAAG §4.1.1(3)).** Access to work areas, but not to individual work stations, is
required. The requirement for work areas is that they be designed so that individuals with disabilities can
approach, enter, and exit the areas.

Neither maneuvering within the work area nor accessible racks and shelves are required. It is
recommended, however, that when there are identical work stations, five percent, but not less than one,
should be constructed so that an individual with disabilities can maneuver within the work stations. This
will facilitate reasonable accommodation that may later be required under title I for particular employees.
There are no requirements concerning placement of fixtures and equipment.

What about areas such as hotel rooms that are work areas for cleaning people? Are they considered "work
areas" subject to the limited requirements for approach, enter, and exit? No. The "work area" limited
exception applies only to areas used exclusively by employees as work areas. Because the hotel room is
also used by customers for sleeping, it is not a work area subject to the limited exemption.

What is included in the term "work area"? Does it include employee lounges, restrooms, cafeterias, health
units, and exercise facilities? No. These common use areas are not considered work areas, and they must
be constructed or altered in full compliance with ADAAG.

What if an owner of a building believes that an individual who uses a wheelchair could never do the kind
of job that will be performed in the particular area? Does the area still have to be made accessible? Yes.
The ADA does not permit such assumptions to be made about the capabilities of individuals with
disabilities. Unless the area is exempt from accessibility requirements (see III-7.3130), it must be
designed so that individuals with disabilities can approach, enter, and exit the area. Even if an individual
with a certain type of disability would not be qualified for a particular job, access must be provided for
other individuals with disabilities such as, for example, supervisors, maintenance workers, volunteers, or
inspectors, who may need to approach, enter, and exit the work area.

Does the work area exemption apply only to areas that can be characterized as individual work stations,
such as cubicles, counters, offices, or booths? Or does it also apply to larger work spaces, such as
restaurant kitchens, factory production areas, and warehouse space? It applies to the larger spaces as well.
Thus, the requirement for a restaurant kitchen, a factory production area, or warehouse space, is that it be
constructed so that an individual with a disability can approach, enter, or exit the area. However,
alterations within those work areas need not be done accessibly, because that interior area is not covered
by ADAAG. On the other hand, if alterations are made in such work areas, the path of travel requirements
will be triggered because those work areas are primary function areas (see III-6.2000).

Does this mean that there can no longer be raised platforms for grocery managers or pharmacists? If a
raised platform for a grocery manager station or area for pharmacists is an "observation galler[y] used
primarily for security purposes," it is one of the types of facilities that is totally exempt from any
accessibility requirements (see III-7.3130) (although title I may later require a lift as a reasonable
accommodation for a particular employee). Otherwise, the general ADAAG work area requirements
apply, and an individual with disabilities must be able to approach, enter, and exit the area. This means

No. G.L. v. Del Amo Hospital,
No. 19-56017
Admitted on March 9, 2021

that, if there is a change in level of over 1/2", a ramp or lift must be provided to the raised area. Note, however, that in many instances a raised platform is surrounded by another work area, such as a service counter. The work area accessibility requirement would be satisfied as long as that outer area could be approached, entered, and exited.

What if the raised area is a mezzanine (i.e. , an actual floor level) used, for example, as an employee lounge area? In this case, whether there needs to be an elevator to the mezzanine depends upon whether the elevator exemption applies. If an elevator is not required (because, for example, the building is under three stories and is not a shopping center or other exempt facility), then access need not be provided to that mezzanine. Likewise, access to the mezzanine need not be provided in one-story buildings. However, if an elevator is required (because the facility is a shopping center, for example), then there will need to be access to the mezzanine.

> ILLUSTRATION: A two-story grocery store is located next to a bakery and a card store. The grocery store has a mezzanine that is used as an employee lounge area. The lounge area can be built without a ramp or elevator, because the facility is subject to the elevator exemption. (It is not a shopping center because it does not have five stores in it.) Given that inaccessible floors are permitted, inaccessible mezzanines are also allowed.

BUT: If the grocery store were located in a complex with four other sales or rental establishments, it would be a "shopping center. " As such, it would not be entitled to the elevator exemption and the employees' lounge on the mezzanine would have to be made fully accessible, either by ramp or elevator.

**III-7.3120 Temporary structures (ADAAG §4.1.1(4)).** Temporary buildings that are extensively used or are essential for public use are covered. However, structures, sites, and equipment directly associated with major construction are not covered.

**III-7.3130 General exceptions (ADAAG §4.1.1(5)).** Accessibility is not required to --

1) Observation galleries used primarily for security purposes; or

2) Nonoccupiable spaces accessed only by ladders, crawl spaces, very narrow passageways, or freight (nonpassenger) elevators, and frequented only by service personnel for repair purposes. This includes elevator pits, elevator penthouses, piping or equipment catwalks, cooling towers, and utility tunnels.

What about mechanical rooms or closets not accessed by ladders or narrow passageways? They are not exempt. However, they are work areas subject to the limited exemption discussed above. In addition, mechanical rooms are exempt from the elevator requirement (§4.1.3(5), Exception 2).

**III-7.4000 Sites and exterior facilities**

**III-7.4100 General.** This section addresses exterior features such as parking, portable toilets, and exterior signage in new construction.

**III-7.4200 Accessible route** (ADAAG §4.1.2(1)). An accessible route must connect accessible public transportation stops, parking spaces, passenger loading zones, and public streets or sidewalks to an accessible building entrance.

Note, however, that private entities often do not have control over streets and sidewalks. In such a case, the private entity is not responsible for compliance. However, it is encouraged to request public entities to modify sidewalks and install curb cuts.

**III-7.4300 Parking (ADAAG §4.1.2(5)(b)).** ADAAG provides a table with the number of accessible parking spaces required dependent on the size of the lot. For example, only four percent of the spaces in a 100-space lot must be accessible. Certain facilities, however, are subject to higher requirements.

cited in C.L. v. Del Amo Hospital, Inc.
No. 8:18-cv-00475, archived on March 24, 2021

Case 8:18-cv-00475-DOC-DFM   Document 208   Filed 03/30/21   Page 75 of 101   Page ID #:5779

Outpatient units are subject to a higher requirement if they are part of medical care facilities where persons may need assistance in responding to an emergency and where the period of stay may exceed twenty-four hours. For such facilities, ten percent of the total parking attributable to the outpatient unit or facility must be accessible.

In addition, any unit or facility providing medical care or other services, including occupational or physical therapy, or vocational rehabilitation, is subject to a higher accessible parking requirement, if it specializes in treatment or services for persons with mobility impairments. Twenty percent of the total number of parking spaces serving each such unit or facility must be accessible.

In addition to the general requirements for accessible automobile spaces, ADAAG requires that at least one of every eight accessible parking spaces have adequate adjacent space for a van lift to be deployed. Each such space must have a sign indicating that it is van-accessible, but it is not to be reserved exclusively for vans. Alternatively, "universal parking," in which all spaces can accommodate van widths, is permitted.

If valet parking is provided, there must be an accessible passenger loading zone.

If a lot is limited to the exclusive use of employees, and none of the employees are individuals with disabilities requiring accessible parking, accessible spaces may be assigned to employees without disabilities.

**III- 7.4400 Signage (ADAAG §4.1.2(7)).** Requirements for exterior signs are essentially the same as those for interior signs (see §4.1.3(b) below). The international symbol of accessibility must be used to indicate accessible parking spaces; accessible passenger loading zones; and accessible entrances and toilet facilities, if all are not accessible.

**III-7.5000 Buildings: New construction (ADAAG §4.1.3).**

**III-7.5100 General.** This section contains scoping requirements for new construction.

**III-7.5105 Accessible route (ADAAG §4.1.3(1)).** An accessible route must connect all accessible elements within a building.

**III-7.5110 Stairs (ADAAG §4.1.3(4)).** Interior and exterior stairs must comply if they go between levels not connected by an elevator, ramp, or lift.

**III-7.5115 Elevators and platform lifts (ADAAG §4.1.3(5)).** Elevators are required to serve each level in a newly constructed building, with four exceptions:

    1) Exception 1 is the "elevator exemption" discussed above (see III-5.4000).

    2) Exception 2 exempts elevator pits, elevator penthouses, mechanical rooms, and piping or equipment catwalks.

    3) Exception 3 permits the use of accessible ramps instead of elevators at any time.

    4) Exception 4 permits the use of platform lifts under certain conditions. Lifts must permit unassisted entry, operation, and exit.

**III-7.5120 Windows (ADAAG §4.1.3(6)).** There are currently no requirements for windows.

**III-7.5125 Doors (ADAAG §4.1.3(7)).** The following doors must be accessible:

    1) At least one at each accessible entrance and at each accessible space;

    2) Each door that is part of an accessible route; and

    3) Each door that is required for egress.

Cited in C.L. v. Del Amo Hospital, Inc.
No. 19-56074, Archived on March 24, 2021

Automated doors are not required. Because of a wide variety of factors that affect door usability, no
specific force limit for exterior doors is identified, although standards are provided for interior doors.

**III-7.5130 Entrances (ADAAG §4.1.3(8)).** At least 50 percent of all public entrances must be accessible
with certain qualifications. In addition, there must be accessible entrances to enclosed parking, pedestrian
tunnels, and elevated walkways.

**III-7.5135 Areas of rescue assistance (ADAAG §4.1.3(9)).** Areas of rescue assistance (safe areas in
which to await help in an emergency) are generally required on each floor, other than the ground floor, of
a multistory building. An accessible egress route or an area of rescue assistance is required for each exit
required by the local fire code. Specific requirements are provided for such features as location, size,
stairway width, and two-way communications. Areas of rescue assistance are not required in buildings
with supervised automatic sprinkler systems, nor are they required in alterations.

**III-7.5140 Drinking fountains (ADAAG §4.1.3(10)).** Where there is only one drinking fountain on a
floor, it must be accessible both to individuals who use wheelchairs and to those who have difficulty
bending or stooping (for example, by using a "hi-lo" fountain or a fountain and a water cooler). Where
there is more than one fountain on a floor, 50 percent must be accessible to persons using wheelchairs.

**III-7.5145 Bathrooms (ADAAG §§4.1.3(11); 4.22.4).** Every public and common use bathroom must be
accessible. Generally only one stall must be accessible (standard five-by-five feet). When there are six or
more stalls, there must be one accessible stall and one stall that is three feet wide.

**III-7.5150 Storage, shelving, and display units (ADAAG §4.1.3(12)).** One of each type of storage
facility must be accessible. Self-service shelves and displays must be on an accessible route but need not
be lowered within reach ranges of individuals who use wheelchairs.

**III-7.5155 Controls and operating mechanisms (ADAAG §4.1.3(13)).** All controls in accessible areas
must comply with reach requirements and must be operable with one hand and without tight grasping,
pinching, or twisting of the wrist.

**III-7.5160 Alarms (ADAAG §4.1.3(14)).** Both audible and visual alarms are required when emergency
warning systems are provided. ADAAG has detailed requirements concerning features needed for visual
alarms, including type of lamp, color, flash rate, and intensity.

**III-7.5161 Detectable warnings (ADAAG 4.1.3(15)).** The requirement for detectable warnings at certain
locations is under review by the Architectural and Transportation Barriers Compliance Board, and will be
the subject of future rulemaking.

**III-7.5165 Signage (ADAAG §§4.1.3(16); 4.30.7).** Different requirements apply to various types of
signs:

> 1) Signs designating permanent rooms and spaces (e.g. , men's and women's rooms, room
> numbers, exit signs) must have raised and Brailled letters; must comply with finish and
> contrast standards; and must be mounted at a certain height and location.

> 2) Signs that provide direction to or information about functional spaces of a building (e.g. ,
> "cafeteria this way;" "copy room") need not comply with requirements for raised and Brailled
> letters, but they must comply with requirements for character proportion, finish, and contrast.
> If suspended or projected overhead, they must also comply with character height
> requirements.

> 3) Building directories and other signs providing temporary information (such as current
> occupant's name) do not have to comply with any ADAAG requirements.

> 4) New symbols of accessibility identifying volume control telephones, text telephones, and
> assistive listening systems are required.

Cited in C.L. v. Del Amo Hospital, Inc.
No. 19-56997. Archived on March 24, 2021.

5) When pictograms (pictorial symbols) are used as a sign to designate a permanent room or space (e.g. , a men's or women's room), they must be accompanied by an equivalent verbal description placed directly below the pictogram. The field used for the pictogram must be at least six inches in height (not counting the space used for the verbal description), and the verbal description must employ Braille and raised characters.

**III-7.5170 Telephones (ADAAG §4.1.3(17)).** This section establishes requirements for accessibility of pay phones to persons with mobility impairments, hearing impairments (requiring some phones with volume controls), and those who cannot use voice telephones and need "text telephones" (referred to in the Department's rule as telecommunication devices for the deaf (TDD's)):

1) One accessible public phone must be provided for each floor, unless the floor has two or more banks of phones, in which case there must be one accessible phone for each bank.

2) All accessible public phones must be equipped with volume controls. In addition, 25 percent, but never less than one, of all other public phones must have volume controls.

3) One TDD or text telephone must be provided inside any building that has four or more public pay telephones, counting both interior and exterior phones. In addition, one TDD or text telephone (per facility) must be provided whenever there is an interior public pay phone in a stadium or arena; convention center; hotel with a convention center; covered shopping mall; or hospital emergency, recovery, or waiting room.

**III-7.5175 Fixed seating (ADAAG §4.1.3(18)).** At least five percent of fixed or built-in seating or tables must be accessible. Wheelchair seating spaces in assembly areas and restaurants are not subject to this requirement but, rather, are covered by specific requirements for "assembly areas" and "restaurants. "

**III-7.5180 Assembly areas (ADAAG §4.1.3(19)).** This section specifies the number of wheelchair seating spaces and types and numbers of assistive listening systems required in assembly areas.

1) Wheelchair seating: Requirements for wheelchair seating are triggered in any area that seats four or more people. The number of wheelchair locations required depends upon the size of the assembly area. Dispersal of wheelchair seating is required in assembly areas where there are more than 300 seats. In addition, at least one percent of all fixed seats must be aisle seats without armrests (or with removable armrests) to allow for transfer from a wheelchair. Fixed seating for companions must be located adjacent to each wheelchair location. Finally, wheelchair seating must adjoin an accessible route that serves a means of egress from the assembly area. Under circumstances where wheelchair seating will be located adjacent to a portion of an aisle that serves as an accessible means of egress, then other portions of that aisle and other aisles that do not serve the accessible wheelchair locations are not required to comply with the requirements for ramps. ADAAG does not specify the location of the accessible means of egress. Therefore, the accessible means of egress from wheelchair locations can be through the rear, the side, or the front of the theater. (The general requirements for accessible routes are discussed above in III-7.4200.)

2) Assistive listening systems: Certain fixed seating assembly areas that accommodate 50 or more people or have audio-amplification systems must have a permanently installed assistive listening system. Other assembly areas must have a permanent system or an adequate number of electrical outlets or other wiring to support a portable system. A special sign indicating the availability of the system is required. The minimum number of receivers must be equal to four percent of the total number of seats, but never less than two.

**III-7.5185 Automated teller machines (ATM's) (ADAAG §4.1.3(20)).** Where ATM's are provided, each must be accessible, except that only one need comply when two or more ATM's are at the same location. Accessible machines must have, among other features, accessible controls as well as instructions and other information accessible to persons with sight impairments. This can include Braille and raised letters and/or audio handsets, along with tactile keys.

Cited: C.L. v. Del Amo Hospital, Inc.
https://casetext.com/ archived on March 24, 2021

ADA Technical Assistance Manual

The ADAAG standard now in effect provides that ATMs must meet the requirements for both a forward and a side approach. That standard, however, is under review by the Architectural and Transportation Barriers Compliance Board, and is the subject of current rulemaking.

ADAAG permits departures from particular technical requirements by use of other designs and technologies where the alternative designs and technologies will provide substantially equivalent or greater access to and usability of the facility. It may be possible to show that meeting only one of the reach ranges with respect to a particular ATM, as installed, provides equivalent facilitation in compliance with ADAAG.

**III-7.5190 Dressing and fitting rooms (ADAAG §4.1.3(21)).** Where dressing rooms are provided, five percent or at least one must be accessible. Technical standards are provided for doors, benches, and mirrors, with less stringent standards for alterations.

**III-7.6000 Additions (ADAAG §4.1.5).** Each addition to an existing building is regarded as an alteration subject to the ADAAG alterations requirements (including triggering of path of travel obligations, if applicable). If the addition does not have an accessible entrance, the path of travel obligation may require an accessible route from the addition through the existing building, including its entrance and exterior approaches, subject to the 20 percent disproportionality limitation. Moreover, to the extent that a space or element is newly constructed as part of an addition, it is also regarded as new construction and must comply with the applicable new construction provisions of ADAAG.

> ILLUSTRATION: A new multistory parking structure is planned as an addition to an existing shopping mall that is served by an elevator. Each floor of the parking garage will be connected by an accessible route to the shopping mall. As an addition, the parking structure is subject to both the new construction and alterations requirements of ADAAG. If the parking structure functions as a separate building and may be used independently of the shopping mall -- for instance, when the shopping mall is not open for business -- then it would not be sufficient to provide vertical access only through the shopping center. In that case, an elevator or accessible ramp would be required in the parking structure to serve each level of the garage. If, on the other hand, vertical access to each level of the garage may be achieved through the shopping mall at all times that the garage is open, an elevator or accessible ramp would not be required in the parking structure.

**III-7.7000 Alterations (ADAAG §4.1.6).** Throughout ADAAG, there are numerous examples of areas where there are less stringent standards for alterations than for new construction. For instance --

1) Section 4.1.6(3) contains a detailed set of special technical provisions for alterations to be applied where it is technically infeasible to comply with other provisions of the guidelines. Entities are permitted to --

(a) Install only one accessible unisex bathroom per floor;

(b) Cluster wheelchair seating in altered assembly areas;

(c) Use platform lifts as part of an accessible route, without having to meet any of the conditions for use of platform lifts applicable in the new construction context (§4.1.3(5)); and

(d) Install only one accessible dressing room for each sex on each level.

2) Areas of rescue assistance are not required in alterations (§4.1.6(1)(g)).

3) There are special less stringent requirements for alterations in many other areas, including sales and service counters (§7.2(1)), check-out aisles (§7.3(1)), hotels (?9.1.5), and homeless shelters (?9.5.2(2)).

**III-7.8000 Special facility types**

**III-7.8100 Historic preservation (ADAAG §4.1.7).** This section contains requirements for alterations to qualified historic buildings and facilities (see III-6.4000).

**III-7.8200 Restaurants and cafeterias (ADAAG §5).** In restaurants, generally all dining areas and five percent of fixed tables (but not less than one) must be accessible. While raised or sunken dining areas must be accessible, inaccessible mezzanines are permitted under certain conditions. ADAAG contains requirements for counters and bars, access aisles, food service lines, tableware and condiment areas, raised speaker's platforms, and vending machine areas (but not controls).

**III-7.8300 Medical care facilities (ADAAG §6).** In medical care facilities, all public and common use areas must be accessible. In general purpose hospitals, and in psychiatric and detoxification facilities, 10 percent of patient bedrooms and toilets must be accessible. The required percentage is 100 percent for special facilities treating conditions that affect mobility, and 50 percent for long-term facilities and nursing homes. There are special, less stringent requirements for alterations.

**III-7.8400 Business and mercantile (ADAAG §7).**

  1) Sales and service counters with cash registers: At least one of each type of sales or service counter where a cash register is located must be accessible. Accessible counters must be dispersed throughout the facility. Auxiliary counters are permissible in alterations.

  Are frozen food and deli counters covered? No, but employees should be instructed to bring food items around to the front of high counters for individuals with disabilities.

  What does "one of each type" mean in a store where computerized check-out permits universal service at any cash register? The size of the store and the number of floors will be relevant factors in determining how many counters need to be accessible.

    ILLUSTRATION 1: A small one-story clothing store has four identical cash register counters, one in each department. Only one counter need be accessible, if all items can be purchased there.

    ILLUSTRATION 2: A very narrow but six-story tall department store has identical cash register counters throughout the facility. ADAAG will be satisfied if there is one accessible counter per floor at which all purchases can be made.

  BUT: If the same six-story department store is a full city block long, one per floor may not be enough. A reasonable number should be provided.

  2) Other counters: At counters without cash registers, such as bank teller windows and ticketing counters, three alternatives are possible:

    (a) A portion of the counter may be lowered,

    (b) An auxiliary counter may be provided, or

    (c) Equivalent facilitation may be provided by installing a folding shelf on the front of a counter to provide a work surface for a person using a wheelchair.

  3) Check-out aisles (§7.3): At least one of each design of check-out aisle must be accessible, and, in some cases, additional check-out aisles are required to be accessible (i.e. , from 20 to 40 percent) depending on the number of check-out aisles and the size of the facility. There are less stringent standards for alterations.

**III-7.8500 Libraries (ADAAG §8). In libraries, all public areas must be accessible.** In addition, five percent of fixed tables or study carrels (or at least one) must be accessible. At least one lane at the check-out area and aisles between card catalogs, magazine displays, and stacks must be accessible.

**III-7.8600 Transient lodging (ADAAG §9).**

cited in CT v. Del Amo Hospital, Inc.
No. 56074 archived on March 24, 2021

1) Hotels, motels, dormitories, and similar places: Four percent of the first 100 rooms and approximately two percent of rooms in excess of 100 must be accessible to persons with mobility impairments and to persons with hearing impairments (i.e. , contain visual alarms, visual notification devices, volume-control telephones, and an accessible electrical outlet for a text telephone). In hotels with more than 50 rooms, an additional one percent of the rooms must be accessible rooms equipped with roll-in showers. Moreover, additional rooms must be accessible to persons with hearing impairments in the same percentages as above (i.e. , four percent of the first 100 rooms and approximately two percent of rooms in excess of 100). There are special provisions for alterations.

2) Homeless shelters, halfway houses, and other social service establishments: These entities must provide the same percentage of accessible sleeping accommodations as other places of transient lodging. At least one type of amenity in each common area must be accessible. Alterations are subject to less stringent standards.

**III-7.8700 Transportation facilities (ADAAG §10).** ADAAG provides requirements for bus stops and terminals, rail stations, and airports. These requirements have been incorporated by the Department of Transportation in its regulations implementing the transportation provisions of titles II and III.

There are currently no standards for boats or ferry docks.

## III-8.0000 ENFORCEMENT

Regulatory references: 28 CFR 36.501-36.508.

**III-8.1000 General.** The ADA establishes two avenues for enforcement of the requirements of title III --

1) Private suits by individuals who are being subjected to discrimination or who have reasonable grounds for believing that they are about to be subjected to discrimination.

2) Suits by the Department of Justice, whenever it has reasonable cause to believe that there is a pattern or practice of discrimination, or discrimination that raises an issue of general public importance. The Department will investigate complaints and conduct compliance reviews of covered entities.

Do State or local civil rights agencies have any role in enforcing title III? There is no provision for State or local civil rights agencies to directly enforce title III of the ADA. They can, however, enforce State or local laws that incorporate the standards of the ADA, or they can set up alternative dispute resolution mechanisms (see III-8.6000).

**III-8.2000 Private suits.** Any person who is being subjected to discrimination on the basis of disability in violation of title III of the Act may file a civil action for injunctive relief. Also, when a person has reasonable grounds for believing that he or she is "about to be subjected to discrimination" because of a violation of the new construction and alterations requirements of the ADA, he or she may file a civil action.

ILLUSTRATION: X has reasonable grounds for believing that the plans for a hotel complex are not in compliance with the ADA. X may file a lawsuit challenging the plans, even though construction has not begun.

An individual is not required to engage in a futile gesture, if he or she has notice that a person or organization does not intend to comply with its obligations under the Act.

At the request of the plaintiff or defendant, and if the court permits it, the Department of Justice can intervene in the civil action, if it determines that the case is of general public importance. The court may also appoint an attorney for the plaintiff and may permit him or her to commence the civil action without first paying fees, costs, or security.

Remedies available in a private suit may include a permanent or temporary injunction, restraining order, or other order, but not compensatory or punitive money damages or civil penalties. In the case of violations of the requirements for readily achievable barrier removal or for accessible new construction and alterations, remedies to correct a violation may, as appropriate, include an order to alter the facilities that do not meet the requirements of the Act to make them readily accessible to and usable by individuals with disabilities. Also, the remedies may include requiring the provision of an auxiliary aid or service, modification of a policy, or provision of alternative methods of barrier removal.

**III-8.3000 Investigations and compliance reviews.** The Department of Justice will investigate alleged violations of title III and undertake periodic reviews of compliance of covered entities. An investigation may be requested by any individual who believes that he or she has been discriminated against or that a specific class of persons has been discriminated against in violation of title III. Where the Department has reason to believe that there may be a violation, it may initiate a compliance review.

Complaints may be sent to the following address:

Office on the Americans with Disabilities Act
Civil Rights Division
U.S. Department of Justice
P.O. Box 66738
Washington, D.C. 20035-9998

**III-8.4000 Suit by the Attorney General.** The Department may bring a civil action in any appropriate United States district court if it has reasonable cause to believe that --

1) Any person or group of persons is engaged in a pattern or practice of discrimination in violation of title III; or

2) Any person or group of persons has been discriminated against in violation of title III and the discrimination raises an issue of general public importance.

What remedies are available in civil actions brought by the Department of Justice? The remedies available include those available in an action brought by an individual, such as an order granting temporary, preliminary, or permanent relief; requiring that facilities be made readily accessible to and usable by individuals with disabilities; requiring provision of an auxiliary aid or service; or modification of a policy, practice, or procedure.

In addition, in a suit brought by the Department, the court may award other appropriate relief, including, if requested by the Department, monetary damages to individual victims of discrimination. Monetary damages do not include punitive damages. They do include, however, all forms of compensatory damages, including out-of-pocket expenses and damages for pain and suffering.

Also, to vindicate the public interest, the court may assess a civil penalty against the covered entity in an amount --

1) Not exceeding $50,000 for a first violation; and

2) Not exceeding $100,000 for any subsequent violation.

How will violations be counted in determining whether a particular violation is "first" or "subsequent"? All violations found in the first suit against a covered entity are considered to be the first violation, so that the maximum penalty that may be assessed in that suit is $50,000. A "subsequent" violation would not be found until the Department brought a second suit against the same covered entity. The maximum penalty in each suit after the first suit is $100,000.

Will good faith efforts be considered in determining the amount of civil penalty? Yes. In considering what amount of civil penalty, if any, is appropriate, the court is required to give consideration to any good faith effort or attempt by the covered entity to comply with its obligations under the Act. One of the factors to

Cited in C.L. Del Amo Hospital, Inc.
(IC5001) archived on March 24, 2021

be considered in evaluating good faith is whether the entity could have reasonably anticipated the need for an appropriate type of auxiliary aid needed to accommodate the unique needs of a particular individual with a disability.

**III-8.5000 Attorney's fees.** The prevailing party (other than the United States) in any action or administrative proceeding under the Act may recover attorney's fees in addition to any other relief granted. The "prevailing party" is the party that is successful and may be either the complainant (plaintiff) or the covered entity against which the action is brought (defendant). The defendant, however, may not recover attorney's fees unless the court finds that the plaintiff's action was frivolous, unreasonable, or without foundation, although it does not have to find that the action was brought in subjective bad faith. Attorney's fees include litigation expenses, such as expert witness fees, travel expenses, and costs. The United States is liable for attorney's fees in the same manner as any other party, but is not entitled to them when it is the prevailing party.

**III-8.6000 Alternative means of dispute resolution.** The ADA encourages the use of alternative means of dispute resolution, including settlement negotiations, conciliation, facilitation, mediation, factfinding, minitrials, and arbitration to resolve disputes, where appropriate and to the extent authorized by law. In appropriate cases, these types of procedures may be faster, more efficient, and less expensive than the judicial and administrative procedures available under the ADA. Alternative means of dispute resolution, however, are intended to supplement the procedures provided in the ADA, not to replace them. Use of alternative procedures is completely voluntary and must be agreed to by the parties involved.

**III-8.7000 Technical assistance.** The ADA recognizes the necessity of educating the public about its rights and responsibilities under the Act and requires the Department of Justice, in consultation with other agencies, to provide technical assistance to assist covered entities and individuals with disabilities in understanding their rights and responsibilities under the ADA.

The Federal Government's experience in implementing section 504 of the Rehabilitation Act of 1973, as amended, has demonstrated that a publicized, readily available, comprehensive technical assistance program responsive to the problems and needs of its audience offers many advantages. Technical assistance that is designed to meet the needs of individuals with disabilities, covered entities, and the general public reduces misunderstandings regarding rights and responsibilities, facilitates voluntary compliance, and promotes the exchange of information and the development of more effective and less costly methods to address compliance issues. It also avoids an unnecessary reliance on enforcement and litigation to achieve compliance.

Technical assistance includes the provision of expert advice, and both general and specific information and assistance to individuals with disabilities, the general public, and entities covered by the ADA. The purposes of this technical assistance are two-fold: to inform the public (including individuals with rights protected under the Act) and covered entities about their rights and duties; and to provide information about cost-effective methods and procedures to achieve compliance.

The Department plans to provide technical assistance through publications, exhibits, videotapes and audiotapes, and public service announcements. It has developed a number of nontechnical publications, including this manual, explaining the requirements of the Act, and has established a Speakers Bureau to provide speakers for events such as conferences, workshops, and training programs. It is also operating a telephone information line to respond to inquiries and requests for publications and to provide advice to individuals about specific problems. The Department also engages in a variety of clearinghouse functions and operates an electronic bulletin board to distribute information.

The Department has awarded over $3,000,000 in technical assistance grants to 19 organizations to disseminate technical assistance to specific audiences. They include national associations of covered entities, such as restaurants, hotels and motels; and associations of individuals with disabilities representing individuals with speech, hearing, and vision impairments, mobility impairments, mental retardation, and epilepsy. Many of these organizations have also established telephone information lines to respond to inquiries and are producing publications and providing training directed to their specific audiences. The Architectural and Transportation Barriers Compliance Board (800-USA-ABLE [voice or TDD]), which was responsible for development of ADAAG, and the Equal Employment Opportunity

Evidence Cir. Co. v. AIDS Healthcare Hospital, Inc. No. 19-56078, archived on March 24, 2021

Commission (800-669-EEOC [voice]; 800-800-3302 [TDD]) have also established telephone information services. In addition, the National Institute on Disability and Rehabilitation Research has established ten Regional Disability and Business Accommodation Centers to serve as regional resources for ADA information.

The agencies involved in providing ADA technical assistance are making, and will continue to make, a sustained effort to ensure that effective technical assistance is available to all covered entities. Nevertheless, covered entities retain responsibility for ensuring that their activities comply with the requirements of the Act, and a public accommodation or other private entity is not excused from compliance because of any failure to receive technical assistance.

**III-8.8000 Effective date.** The ADA requirements became effective on --

    1) January 26, 1992, generally;

    2) August 26, 1990, for purchase or lease of new vehicles that are required to be accessible.

New facilities designed and constructed for first occupancy later than January 26, 1993, must be accessible.

Is there any grace period for small business? No. All businesses must comply by January 26, 1992. Small businesses, however, do enjoy limited protection from lawsuits. Except with respect to new construction and alterations, no lawsuit may be filed until --

    1) July 26, 1992, against businesses with 25 or fewer employees and gross receipts of $1 million or less.

    2) January 26, 1993, against businesses with ten or fewer employees and gross receipts of $500,000 or less.

## III-9.0000 CERTIFICATION

Regulatory references: 28 CFR 36.601-36.608.

**III-9.1000 General.** The ADA authorizes the Attorney General to certify that State laws, local building codes, or similar ordinances meet or exceed the title III accessibility requirements. Certification is advantageous for the following reasons --

    1) When an entity is designing, constructing, or altering a building in accordance with an applicable State or local code that has been certified by the Department, the designer or contractor will need to consult only that one code, in order to determine the applicable Federal, State, and local requirements.

    2) The covered entity will have some degree of assurance in advance of construction or alteration that the ADA requirements will be met.

    3) If a covered entity is subject to a lawsuit, compliance with a certified code will be rebuttable evidence of compliance with the ADA.

    4) A State or local agency enforcing a certified code is for practical, but not legal, purposes facilitating compliance with the ADA and helping to eliminate confusion and possible inconsistencies in standards.

    5) The amount of unnecessary litigation can be reduced, particularly if a State or local code agency has an administrative method of effectively handling complaints concerning violations of its code.

Does this mean that if an architectural firm follows a certified State or local code, it will be safe from any Federal lawsuits because the State or local government will be implementing the ADA? No, but the firm

cited in C.L. v. Del Amo Hospital, Inc.
No. 19-56074 archived on March 24, 2021

will be less likely to face a lawsuit; and if it is sued, it has the advantage of rebuttable evidence of compliance. Keep in mind that State and local agencies are not authorized to enforce the ADA -- which is a Federal civil rights statute -- on behalf of the Federal government. This is true even when those agencies are implementing a certified code.

Moreover, the existence of a certified code does not ensure that facilities will be constructed in accordance with the code. In addition, even if a building is built to a certified code, that does not prevent a lawsuit concerning the building's accessibility by the Department or by an individual.

**III-9.2000 Relationship to State and local enforcement efforts.** There are tens of thousands of code jurisdictions in the United States that enforce some combination of State and local building codes. Some, but not all, of these include accessibility requirements. Although many are based on a model code, there are major variations among the State codes, and among local codes within some States. Design and construction to these codes will not constitute compliance with the ADA, unless the codes impose requirements equal to or greater than those of the ADA.

The enforcement of these codes is the responsibility of State or local officials. They usually review building plans and inspect projects at specific intervals during construction to ensure that the construction complies with State and local laws. State and local officials do not have the authority to enforce the ADA on behalf of the Federal government.

Architects, builders, and others involved with design and construction are accustomed to the State and local enforcement system, which lets them know before construction whether they need to make changes to their plans in order to achieve compliance. The ADA relies on the traditional method of case-by-case civil rights enforcement in response to complaints. It does not contemplate Federal ADA inspections similar to those done at the State or local level. The ADA certification provisions will help to moderate the effects of these differences in enforcement procedures and standards.

If a building has been designed, built, or altered in accordance with a certified code, and a lawsuit concerning violation of the ADA standards is brought, the defendant will be able to point to compliance with the certified code as "rebuttable evidence" of compliance with the ADA.

　　ILLUSTRATION: The JKL Hotel chain builds hotels to a standard plan throughout the United States. The State of C has had its code certified by the Department, and JKL has designed a hotel, according to its standard plan, to be built in that State. The State has approved the plans, with no waivers or modifications. If the Department brings a lawsuit challenging the hotel's compliance with ADAAG, JKL has the advantage of being able to introduce the approved plans as evidence that the design complies with the ADA. A hotel designed to the same plans in the State of S, which does not have a code with accessibility requirements, would also have that advantage because the hotel was designed in compliance with a certified code.

If a builder follows a State's certified code, and the building official grants a waiver of certain requirements, does that mean the waiver is good for ADA purposes too? No. State or local officials have no authority to waive ADA requirements. Many State or local codes allow the building official to grant waivers, variances, or other types of exceptions (e.g. , in cases of "undue hardship," "impossibility," or "impracticability"). They may also allow compliance by means other than those required by the code if "equivalent facilitation" is provided.

The ADA standards also include some exceptions (e.g. , for structural impracticability in new construction) and allow for equivalent facilitation. But no individual is authorized under the ADA to grant the exceptions in advance; and the defendant in a lawsuit would have to justify the use of any of those ADA exceptions.

The Department would not refuse to certify a code merely because it includes authority for or procedures for waivers and variances. A defendant, however, would not be entitled to rely on certification as rebuttable evidence of compliance, if a local or State official had granted a waiver or other type of exception on the point at issue.

**III-9.3000 Procedure: Application and preliminary review.** The certification process begins with an application to the Department by a "submitting official. " The submitting official is one who has principal responsibility for administration of a code or who is authorized to submit a code on behalf of a jurisdiction.

In some States, the local jurisdictions are required to follow and enforce the State code. Can the State submit a single application on behalf of the State as well as on behalf of all the local jurisdictions? Yes, the State can submit one application on behalf of the State and on behalf of any local jurisdiction that has authorized the State to do so.

What does the State or local agency have to do before it applies for certification? Four things are required:

1) The code or law must have been formally approved by the issuing body. In those States where an administrative agency (rather than the legislature) is charged with developing a code, and it becomes law on a certain date if it is not modified by the legislature before that time, the Department will accept an application based on the code as approved by the agency.

2) The agency has to give public notice of its intent to request certification and notice of a hearing.

3) The agency has to hold a hearing within the State or locality at which the public is invited to comment on the proposed request for certification. The hearing must be held after adequate notice to the public and must be on the record (that is, a transcript of the hearing must be produced). This procedure ensures input from the public at the State or local level.

4) The agency has to make the materials and the certification request available for public examination and copying.

What should the application include? The submitting official must include two copies of --

1) The code;

2) Standards or other documents referenced in the code;

3) The law creating the agency;

4) Any relevant manuals, guides, or other interpretive information;

5) Any formal legal opinions that pertain to the code;

6) Any model code or statute on which the code is based, along with an explanation of any differences between the model and the code being submitted for certification;

7) The transcript of the public hearing; and

8) Any other information that the submitting official wants to be considered.

**III-9.4000 Preliminary determination.** After receiving the application, the Office of the Assistant Attorney General for Civil Rights will determine whether or not to begin considering the application for certification. If the Assistant Attorney General's office decides to proceed, the office will consult with the Architectural and Transportation Barriers Compliance Board. After that consultation, the office will make a preliminary determination to either --

1) Find that the code is equivalent (make a "preliminary determination of equivalency"); or

2) Deny certification.

The next step depends on which of these preliminary determinations is made.

cited in C.L. v. Del Amo Hospital, Inc.
No. 19-56074 archived on March 24, 2021

**III-9.5000 Procedure following preliminary determination of equivalency.** If the AAG makes a preliminary determination of equivalency, he or she will --

> 1) Inform the submitting official in writing;

> 2) Publish a notice in the Federal Register informing the public of the preliminary determination and inviting comment for 60 days;

> 3) Consider the comments, and then hold an informal hearing in Washington. In many cases, this "hearing" may consist of a meeting with those who are interested;

> 4) Consult again with the ATBCB and make a final determination of equivalency or a final determination to deny the request for certification.

> 5) Publish a notice of the final determination in the Federal Register.

**III-9.6000 Procedure following preliminary denial of certification.** If the preliminary determination is to deny certification, then there will be no hearing.

The Department will notify the submitting official of the preliminary determination. In the notification, the Department may specify how the code could be modified so that it could receive a preliminary determination of equivalency.

The submitting official will have at least 15 days to submit relevant material in opposition to the preliminary denial. If no more information is received, no further action will be taken.

If more information is received, the Department will consider it. The Department will then make either a final decision to deny certification or a preliminary determination of equivalency. If at that stage the Assistant Attorney General makes a preliminary determination of equivalency, the hearing procedures described in III-9.5000 will be followed.

**III-9.7000 Effect of certification.** Certification will only be effective concerning those features or elements that are both covered by the certified code and addressed by the Department's regulations.

> ILLUSTRATION: The Department's standards currently do not include specific provisions concerning children's facilities. A private elementary school is built to the specifications of a code certified by the Department. Certification will not be effective for those features of the building especially designed to be used by children (e.g. , children's restrooms, water fountains).

Will certification be effective only for the particular edition of the code that is certified? Yes. Amendments will not automatically be considered certified, and a submitting official will need to reapply for certification of the changed or additional provisions.

Will certification apply to the process by which a State or local code is administered or enforced? No. In other words, the Department will evaluate and certify only the code itself, not the process by which it is implemented. This is true even though the Department has certified a code with provisions concerning waivers, variances, or equivalent facilitation. Certification of a code with those provisions is not to be interpreted as an endorsement of actions taken pursuant to those provisions. The Department's certification of a code is effective only with respect to the standards in the code; it is not to be interpreted to apply to a State or local government's application of the code. For example, a local official's decision that a particular approach constitutes equivalent facilitation under a local code is not effective for ADA purposes.

Can a code that is consistent with ADAAG be certified if the local enforcement process allows deviations from ADAAG? Yes. The Department expects that many jurisdictions will allow slight variations from a particular code. ADAAG itself permits variations from its standards in certain limited circumstances. ADAAG includes in §2.2 a statement allowing departures from particular requirements where

cited in C.L. v. Del Amo Hospital,
No. 19-56074, archived on March 24, 2021

substantially equivalent or greater access and usability is provided. Several sections specifically allow for alternative methods of providing equivalent facilitation and, in some cases, provide examples.

What if a State or local official allows a facility to be constructed or altered in a manner that does not follow the technical or scoping provisions of the certified code? If an official either waives an accessible element or feature or allows a change that does not provide equivalent facilitation, the fact that the Department has certified the code itself will not constitute rebuttable evidence that the facility has been constructed or altered in accordance with the minimum accessibility requirements of the ADA.

**III-9.8000 Certification and barrier removal in existing facilities.** The Department will measure equivalency against subpart D of the title III rule, New Construction and Alterations. The Department will not require that provisions concerning barrier removal in existing facilities be included in a code in order for it to be certified.

Will the Department certify a code that includes provisions similar to those in the Department's title III rule concerning removal of barriers in existing facilities (e.g. , on priorities, portable ramps, seating in assembly areas)? The Department generally will not review these parts of a code.

**III-9.9000 Review of model codes.** The Department will not certify model codes, but the Department will review models for equivalency with ADA requirements.

The Department's rule provides for review of model codes in recognition of the fact that many codes are based on, or incorporate, models or consensus standards developed by nationally recognized organizations. These organizations include, for example, the American National Standards Institute (ANSI), Building Officials and Code Administrators (BOCA) International, the Council of American Building Officials (CABO) and its Board for the Coordination of Model Codes (BCMC), Southern Building Code Congress International (SBCCI), and the International Conference of Building Officials (ICBO). The Department wishes to encourage the continued viability of the consensus and model code process consistent with the purposes of the ADA.

The model code review process will be informal. The Department will not necessarily hold a public hearing, but it has the discretion to do so and to ask for public comment. After the review, the Department may issue guidance as to whether and in what respects the model code is consistent with the ADA's requirements.

This guidance will not be binding on any entity or on the Department. It will assist in evaluations of individual State or local codes; and it may also serve as a basis for establishing priorities for consideration of individual codes.

Who can submit a model code for review? It must be submitted by an authorized representative of the private entity responsible for developing the code.

ILLUSTRATION: The ABC model code, which includes both scoping and technical provisions, is followed by 13 States. It contains its own unique scoping requirements, with technical provisions that were developed by XYZ, Inc. , another private group. An authorized representative of ABC can submit the ABC code, including the XYZ technical provisions, for review, even if XYZ has not submitted its standard to the Department for review.

The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

**U.S. Department of Justice**

Civil Rights Division

*Disability Rights Section*



# Frequently Asked Questions
# about Service Animals and the ADA

Many people with disabilities use a service animal in order to fully participate in every-day life.  Dogs can be trained to perform many important tasks to assist people with disabilities, such as providing stability for a person who has difficulty walking, picking up items for a person who uses a wheelchair, preventing a child with autism from wandering away, or alerting a person who has hearing loss when someone is approaching from behind.

The Department of Justice continues to receive many questions about how the Americans with Disabilities Act (ADA) applies to service animals.  The ADA requires State and local government agencies, businesses, and non-profit organizations (covered entities) that provide goods or services to the public to make "reasonable modifications" in their policies, practices, or procedures when necessary to accommodate people with disabilities.  The service animal rules fall under this general principle.  Accordingly, entities that have a "no pets" policy generally must modify the policy to allow service animals into their facilities. This publication provides guidance on the ADA's service animal provisions and should be read in conjunction with the publication *ADA Revised Requirements:  Service Animals*.

## DEFINITION OF SERVICE ANIMAL

**Q1:**  **What is a service animal?**

A:  Under the ADA, a service animal is defined as a dog that has been individually trained to do work or perform tasks for an individual with a disability. The task(s) performed by the dog must be directly related to the person's disability.

**Q2:**  **What does "do work or perform tasks" mean?**

A: The dog must be trained to take a specific action when needed to assist the person with a disability. For example, a person with diabetes may have a dog that is trained to alert him when his blood sugar reaches high or low levels.  A person with depression may have a dog that is trained to remind her to take her medication.  Or, a person who has epilepsy may have a dog that is trained to detect the onset of a seizure and then help the person remain safe during the seizure.

cited in Cabral v. Dept. Amat Hospital, Inc.
archived on March 24, 2021
No. 18-560TA

**Q3:** **Are emotional support, therapy, comfort, or companion animals considered service animals under the ADA?**

A:  No. These terms are used to describe animals that provide comfort just by being with a person.  Because they have not been trained to perform a specific job or task, they do not qualify as service animals under the ADA.  However, some State or local governments have laws that allow people to take emotional support animals into public places. You may check with your State and local government agencies to find out about these laws.

**Q4:** **If someone's dog calms them when having an anxiety attack, does this qualify it as a service animal?**

A: It depends. The ADA makes a distinction between psychiatric service animals and emotional support animals.  If the dog has been trained to sense that an anxiety attack is about to happen and take a specific action to help avoid the attack or lessen its impact, that would qualify as a service animal.  However, if the dog's mere presence provides comfort, that would not be considered a service animal under the ADA.

**Q5:** **Does the ADA require service animals to be professionally trained?**

A:  No.  People with disabilities have the right to train the dog themselves and are not required to use a professional service dog training program.

**Q6:** **Are service-animals-in-training considered service animals under the ADA?**

A:  No.  Under the ADA, the dog must already be trained before it can be taken into public places.  However, some State or local laws cover animals that are still in training.

# GENERAL RULES

**Q7:** **What questions can a covered entity's employees ask to determine if a dog is a service animal?**

A:  In situations where it is not obvious that the dog is a service animal, staff may ask only two specific questions:  (1) is the dog a service animal required because of a disability? and (2) what work or task has the dog been trained to perform?  Staff are not allowed to request any documentation for the dog, require that the dog demonstrate its task, or inquire about the nature of the person's disability.

**Q8:** **Do service animals have to wear a vest or patch or special harness identifying them as service animals?**

A:  No. The ADA does not require service animals to wear a vest, ID tag, or specific harness.

**Q9:** **Who is responsible for the care and supervision of a service animal?**

A: The handler is responsible for caring for and supervising the service animal, which includes toileting, feeding, and grooming and veterinary care.  Covered entities are not obligated to supervise or otherwise care for a service animal.

**Q10:** Can a person bring a service animal with them as they go through a salad bar or other self-service food lines?

A: Yes. Service animals must be allowed to accompany their handlers to and through self-service food lines. Similarly, service animals may not be prohibited from communal food preparation areas, such as are commonly found in shelters or dormitories.

**Q11:** Can hotels assign designated rooms for guests with service animals, out of consideration for other guests?

A: No. A guest with a disability who uses a service animal must be provided the same opportunity to reserve any available room at the hotel as other guests without disabilities. They may not be restricted to "pet-friendly" rooms.

**Q12:** Can hotels charge a cleaning fee for guests who have service animals?

A: No. Hotels are not permitted to charge guests for cleaning the hair or dander shed by a service animal. However, if a guest's service animal causes damages to a guest room, a hotel is permitted to charge the same fee for damages as charged to other guests.

**Q13:** Can people bring more than one service animal into a public place?

A: Generally, yes. Some people with disabilities may use more than one service animal to perform different tasks. For example, a person who has a visual disability and a seizure disorder may use one service animal to assist with way-finding and another that is trained as a seizure alert dog. Other people may need two service animals for the same task, such as a person who needs two dogs to assist him or her with stability when walking. Staff may ask the two permissible questions (see Question 7) about each of the dogs. If both dogs can be accommodated, both should be allowed in. In some circumstances, however, it may not be possible to accommodate more than one service animal. For example, in a crowded small restaurant, only one dog may be able to fit under the table. The only other place for the second dog would be in the aisle, which would block the space between tables. In this case, staff may request that one of the dogs be left outside.

**Q14:** Does a hospital have to allow an in-patient with a disability to keep a service animal in his or her room?

A: Generally, yes. Service animals must be allowed in patient rooms and anywhere else in the hospital the public and patients are allowed to go. They cannot be excluded on the grounds that staff can provide the same services.

**Q15:** What happens if a patient who uses a service animal is admitted to the hospital and is unable to care for or supervise their animal?

A: If the patient is not able to care for the service animal, the patient can make arrangements for a family member or friend to come to the hospital to provide these services, as it is always preferable that the service animal and its handler not be separated, or to keep the dog during the hospitalization. If the patient is unable to care for the dog and is unable to arrange for someone else to care for the dog, the hospital may place the dog in a boarding facility until the patient is released, or make other appropriate arrangements. However, the hospital must give the patient opportunity to make arrangements for the dog's care before taking such steps.

3

**Q16:** **Must a service animal be allowed to ride in an ambulance with its handler?**

A:  Generally, yes.  However, if the space in the ambulance is crowded and the dog's presence would interfere with the emergency medical staff's ability to treat the patient, staff should make other arrangements to have the dog transported to the hospital.

## CERTIFICATION AND REGISTRATION

**Q17:** **Does the ADA require that service animals be certified as service animals?**

A:  No.  Covered entities may not require documentation, such as proof that the animal has been certified, trained, or licensed as a service animal, as a condition for entry.

> There are individuals and organizations that sell service animal certification or registration documents online.  These documents do not convey any rights under the ADA and the Department of Justice does not recognize them as proof that the dog is a service animal.

**Q18:** **My city requires all dogs to be vaccinated.  Does this apply to my service animal?**

A: Yes.  Individuals who have service animals are not exempt from local animal control or public health requirements.

**Q19:** **My city requires all dogs to be registered and licensed.  Does this apply to my service animal?**

A: Yes.  Service animals are subject to local dog licensing and registration requirements.

**Q20:** **My city requires me to register my dog as a service animal.  Is this legal under the ADA?**

A:  No.  Mandatory registration of service animals is not permissible under the ADA.  However, as stated above, service animals are subject to the same licensing and vaccination rules that are applied to all dogs.

**Q21:** **My city / college offers a voluntary registry program for people with disabilities who use service animals and provides a special tag identifying the dogs as service animals.  Is this legal under the ADA?**

A: Yes.  Colleges and other entities, such as local governments, may offer voluntary registries.  Many communities maintain a voluntary registry that serves a public purpose, for example, to ensure that emergency staff know to look for service animals during an emergency evacuation process.  Some offer a benefit, such as a reduced dog license fee, for individuals who register their service animals.  Registries for purposes like this are permitted under the ADA.  An entity may not, however, require that a dog be registered as a service animal as a condition of being permitted in public places. This would be a violation of the ADA.

4

# BREEDS

**Q22:** **Can service animals be any breed of dog?**

A: Yes. The ADA does not restrict the type of dog breeds that can be service animals.

**Q23:** **Can individuals with disabilities be refused access to a facility based solely on the
breed of their service animal?**

A: No. A service animal may not be excluded based on assumptions or stereotypes about
the animal's breed or how the animal might behave. However, if a particular service animal
behaves in a way that poses a direct threat to the health or safety of others, has a history of
such behavior, or is not under the control of the handler, that animal may be excluded. If
an animal is excluded for such reasons, staff must still offer their goods or services to the
person without the animal present.

**Q24:** **If a municipality has an ordinance that bans certain dog breeds, does the ban apply to
service animals?**

A: No. Municipalities that prohibit specific breeds of dogs must make an exception for a
service animal of a prohibited breed, unless the dog poses a direct threat to the health or
safety of others. Under the "direct threat" provisions of the ADA, local jurisdictions need
to determine, on a case-by-case basis, whether a particular service animal can be excluded
based on that particular animal's actual behavior or history, but they may not exclude a
service animal because of fears or generalizations about how an animal or breed might
behave. It is important to note that breed restrictions differ significantly from jurisdiction to
jurisdiction. In fact, some jurisdictions have no breed restrictions.

# EXCLUSION OF SERVICE ANIMALS

**Q25:** **When can service animals be excluded?**

A: The ADA does not require covered entities to modify policies, practices, or procedures if it
would "fundamentally alter" the nature of the goods, services, programs, or activities pro-
vided to the public. Nor does it overrule legitimate safety requirements. If admitting service
animals would fundamentally alter the nature of a service or program, service animals may
be prohibited. In addition, if a particular service animal is out of control and the handler
does not take effective action to control it, or if it is not housebroken, that animal may be
excluded.

**Q26:** **When might a service dog's presence fundamentally alter the nature of a service or
program provided to the public?**

A: In most settings, the presence of a service animal will not result in a fundamental altera-
tion. However, there are some exceptions. For example, at a boarding school, service ani-
mals could be restricted from a specific area of a dormitory reserved specifically for students
with allergies to dog dander. At a zoo, service animals can be restricted from areas where
the animals on display are the natural prey or natural predators of dogs, where the pres-
ence of a dog would be disruptive, causing the displayed animals to behave aggressively or
become agitated. They cannot be restricted from other areas of the zoo.

5

**Q27:** **What does under control mean?  Do service animals have to be on a leash?  Do they have to be quiet and not bark?**

A: The ADA requires that service animals be under the control of the handler at all times. In most instances, the handler will be the individual with a disability or a third party who accompanies the individual with a disability.  In the school (K-12) context and in similar settings, the school or similar entity may need to provide some assistance to enable a particular student to handle his or her service animal. The service animal must be harnessed, leashed, or tethered while in public places unless these devices interfere with the service animal's work or the person's disability prevents use of these devices.  In that case, the person must use voice, signal, or other effective means to maintain control of the animal. For example, a person who uses a wheelchair may use a long, retractable leash to allow her service animal to pick up or retrieve items.  She may not allow the dog to wander away from her and must maintain control of the dog, even if it is retrieving an item at a distance from her.  Or, a returning veteran who has PTSD and has great difficulty entering unfamiliar spaces may have a dog that is trained to enter a space, check to see that no threats are there, and come back and signal that it is safe to enter. The dog must be off leash to do its job, but may be leashed at other times.  Under control also means that a service animal should not be allowed to bark repeatedly in a lecture hall, theater, library, or other quiet place.  However, if a dog barks just once, or barks because someone has provoked it, this would not mean that the dog is out of control.

**Q28:** **What can my staff do when a service animal is being disruptive?**

A: If a service animal is out of control and the handler does not take effective action to control it, staff may request that the animal be removed from the premises.

**Q29:** **Are hotel guests allowed to leave their service animals in their hotel room when they leave the hotel?**

A: No, the dog must be under the handler's control at all times.

**Q30:** **What happens if a person thinks a covered entity's staff has discriminated against him or her?**

A: Individuals who believe that they have been illegally denied access or service because they use service animals may file a complaint with the U.S. Department of Justice.  Individuals also have the right to file a private lawsuit in Federal court charging the entity with discrimination under the ADA.

## MISCELLANEOUS

**Q31:** **Are stores required to allow service animals to be placed in a shopping cart?**

A:  Generally, the dog must stay on the floor, or the person must carry the dog.  For example, if a person with diabetes has a glucose alert dog, he may carry the dog in a chest pack so it can be close to his face to allow the dog to smell his breath to alert him of a change in glucose levels.

Used in C.L. v. Del Amo Hospital, Inc.
No. 19-56074, archived on March 24, 2021

6

**Q32:** **Are restaurants, bars, and other places that serve food or drink required to allow service animals to be seated on chairs or allow the animal to be fed at the table?**

A:  No.  Seating, food, and drink are provided for customer use only.  The ADA gives a person with a disability the right to be accompanied by his or her service animal, but covered entities are not required to allow an animal to sit or be fed at the table.

**Q33:** **Are gyms, fitness centers, hotels, or municipalities that have swimming pools required to allow a service animal in the pool with its handler?**

A:  No.  The ADA does not override public health rules that prohibit dogs in swimming pools. However, service animals must be allowed on the pool deck and in other areas where the public is allowed to go.

**Q34:** **Are churches, temples, synagogues, mosques, and other places of worship required to allow individuals to bring their service animals into the facility?**

A:  No.  Religious institutions and organizations are specifically exempt from the ADA.  However, there may be State laws that apply to religious organizations.

**Q35:** **Do apartments, mobile home parks, and other residential properties have to comply with the ADA?**

A: The ADA applies to housing programs administered by state and local governments, such as public housing authorities, and by places of public accommodation, such as public and private universities.  In addition, the Fair Housing Act applies to virtually all types of housing, both public and privately-owned, including housing covered by the ADA.  Under the Fair Housing Act, housing providers are obligated to permit, as a reasonable accommodation, the use of animals that work, provide assistance, or perform tasks that benefit persons with a disabilities, or provide emotional support to alleviate a symptom or effect of a disability. For information about these Fair Housing Act requirements see HUD's Notice on Service Animals and Assistance Animals for People with Disabilities in Housing and HUD-funded Programs.

**Q36:** **Do Federal agencies, such as the U. S. Department of Veterans Affairs, have to comply with the ADA?**

A:  No.  Section 504 of the Rehabilitation Act of 1973 is the Federal law that protects the rights of people with disabilities to participate in Federal programs and services.  For information or to file a complaint, contact the agency's equal opportunity office.

**Q37:** **Do commercial airlines have to comply with the ADA?**

A:  No.  The Air Carrier Access Act is the Federal law that protects the rights of people with disabilities in air travel.  For information or to file a complaint, contact the U.S. Department of Transportation, Aviation Consumer Protection Division, at 202-366-2220.

7

For more information about the ADA, please visit our website or call our toll-free number.

**ADA Website**

www.ADA.gov

To receive e-mail notifications when new ADA information is available, visit the ADA Website's home page and click the link near the bottom of the right-hand column.

**ADA Information Line**

800-514-0301 (Voice) and 800-514-0383 (TTY)

24 hours a day to order publications by mail.

M-W, F 9:30 a.m. – 5:30 p.m. , Th 12:30 p.m. – 5:30 p.m. (Eastern Time)
to speak with an ADA Specialist.  Calls are confidential.

For people with disabilities, this publication is available in alternate formats.

Duplication of this document is encouraged.                    July 20, 2015

cited in C.L. v. Del Amo Hospital, Inc.
No. 19-56074 archived on March 24, 2021

The Americans with Disabilities Act authorizes the Department of Justice (the Department) to provide technical assistance to individuals and entities that have rights or responsibilities under the Act. This document provides informal guidance to assist you in understanding the ADA and the Department's regulations.

This guidance document is not intended to be a final agency action, has no legally binding effect, and may be rescinded or modified in the Department's complete discretion, in accordance with applicable laws. The Department's guidance documents, including this guidance, do not establish legally enforceable responsibilities beyond what is required by the terms of the applicable statutes, regulations, or binding judicial precedent.

Del Amo Hospital, Inc.

Submitted and admitted on March 24, 2021

No. 18-56078 and related cases

cited in C.L. v. Del Amo Hospital, Inc. No. 19-56074 archived on March 24, 2021

## United States Court of Appeals for the Ninth Circuit

### Office of the Clerk
95 Seventh Street
San Francisco, CA 94103

## Information Regarding Judgment and Post-Judgment Proceedings

**Judgment**
- This Court has filed and entered the attached judgment in your case. Fed. R. App. P. 36.  Please note the filed date on the attached decision because all of the dates described below run from that date, not from the date you receive this notice.

**Mandate (Fed. R. App. P. 41; 9th Cir. R. 41-1 & -2)**
- The mandate will issue 7 days after the expiration of the time for filing a petition for rehearing or 7 days from the denial of a petition for rehearing, unless the Court directs otherwise.  To file a motion to stay the mandate, file it electronically via the appellate ECF system or, if you are a pro se litigant or an attorney with an exemption from using appellate ECF, file one original motion on paper.

**Petition for Panel Rehearing  (Fed. R. App. P. 40; 9th Cir. R. 40-1)**
**Petition for Rehearing En Banc (Fed. R. App. P. 35; 9th Cir. R. 35-1 to -3)**

**(1)   A.   Purpose (Panel Rehearing):**
- A party should seek panel rehearing only if one or more of the following grounds exist:
  - ► A material point of fact or law was overlooked in the decision;
  - ► A change in the law occurred after the case was submitted which appears to have been overlooked by the panel; or
  - ► An apparent conflict with another decision of the Court was not addressed in the opinion.
- Do not file a petition for panel rehearing merely to reargue the case.

**B.   Purpose (Rehearing En Banc)**
- A party should seek en banc rehearing only if one or more of the following grounds exist:

> ►    Consideration by the full Court is necessary to secure or maintain uniformity of the Court's decisions; or
>
> ►    The proceeding involves a question of exceptional importance; or
>
> ►    The opinion directly conflicts with an existing opinion by another court of appeals or the Supreme Court and substantially affects a rule of national application in which there is an overriding need for national uniformity.

**(2)**    **Deadlines for Filing:**
- A petition for rehearing may be filed within 14 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the United States or an agency or officer thereof is a party in a civil case, the time for filing a petition for rehearing is 45 days after entry of judgment.  Fed. R. App. P. 40(a)(1).
- If the mandate has issued, the petition for rehearing should be accompanied by a motion to recall the mandate.
- *See* Advisory Note to 9th Cir. R. 40-1 (petitions must be received on the due date).
- An order to publish a previously unpublished memorandum disposition extends the time to file a petition for rehearing to 14 days after the date of the order of publication or, in all civil cases in which the United States or an agency or officer thereof is a party, 45 days after the date of the order of publication.  9th Cir. R. 40-2.

**(3)**    **Statement of Counsel**
- A petition should contain an introduction stating that, in counsel's judgment, one or more of the situations described in the "purpose" section above exist.  The points to be raised must be stated clearly.

**(4)**    **Form & Number of Copies (9th Cir. R. 40-1; Fed. R. App. P. 32(c)(2))**
- The petition shall not exceed 15 pages unless it complies with the alternative length limitations of 4,200 words or 390 lines of text.
- The petition must be accompanied by a copy of the panel's decision being challenged.
- An answer, when ordered by the Court, shall comply with the same length limitations as the petition.
- If a pro se litigant elects to file a form brief pursuant to Circuit Rule 28-1, a petition for panel rehearing or for rehearing en banc need not comply with Fed. R. App. P. 32.

- The petition or answer must be accompanied by a Certificate of Compliance found at Form 11, available on our website at www.ca9.uscourts.gov under *Forms.*
- You may file a petition electronically via the appellate ECF system. No paper copies are required unless the Court orders otherwise. If you are a pro se litigant or an attorney exempted from using the appellate ECF system, file one original petition on paper. No additional paper copies are required unless the Court orders otherwise.

**Bill of Costs (Fed. R. App. P. 39, 9th Cir. R. 39-1)**
- The Bill of Costs must be filed within 14 days after entry of judgment.
- See Form 10 for additional information, available on our website at www.ca9.uscourts.gov under *Forms.*

**Attorneys Fees**
- Ninth Circuit Rule 39-1 describes the content and due dates for attorneys fees applications.
- All relevant forms are available on our website at www.ca9.uscourts.gov under *Forms* or by telephoning (415) 355-7806.

**Petition for a Writ of Certiorari**
- Please refer to the Rules of the United States Supreme Court at www.supremecourt.gov

**Counsel Listing in Published Opinions**
- Please check counsel listing on the attached decision.
- If there are any errors in a published <u>opinion</u>, please send a letter **in writing within 10 days** to:
  - ▶ Thomson Reuters; 610 Opperman Drive; PO Box 64526; Eagan, MN 55123 (Attn: Jean Green, Senior Publications Coordinator);
  - ▶ and electronically file a copy of the letter via the appellate ECF system by using "File Correspondence to Court," or if you are an attorney exempted from using the appellate ECF system, mail the Court one copy of the letter.

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT
## Form 10. Bill of Costs

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form10instructions.pdf

**9th Cir. Case Number(s)**

**Case Name**

The Clerk is requested to award costs to (*party name(s)*):

I swear under penalty of perjury that the copies for which costs are requested were actually and necessarily produced, and that the requested costs were actually expended.

**Signature**                                              **Date**

*(use "s/[typed name]" to sign electronically-filed documents)*

| COST TAXABLE | REQUESTED *(each column must be completed)* | | | |
|---|---|---|---|---|
| DOCUMENTS / FEE PAID | No. of Copies | Pages per Copy | Cost per Page | TOTAL COST |
| Excerpts of Record* | | | $ | $ |
| Principal Brief(s) *(Opening Brief; Answering Brief; 1st, 2nd , and/or 3rd Brief on Cross-Appeal; Intervenor Brief)* | | | $ | $ |
| Reply Brief / Cross-Appeal Reply Brief | | | $ | $ |
| Supplemental Brief(s) | | | $ | $ |
| Petition for Review Docket Fee / Petition for Writ of Mandamus Docket Fee | | | | $ |
| TOTAL: | | | | $ |

***Example:** Calculate 4 copies of 3 volumes of excerpts of record that total 500 pages [Vol. 1 (10 pgs.) + Vol. 2 (250 pgs.) + Vol. 3 (240 pgs.)] as:*
*No. of Copies: 4; Pages per Copy: 500; Cost per Page: $.10 (or actual cost IF less than $.10);*
*TOTAL: 4 x 500 x $.10 = $200.*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*