Scott D. Buchholz, Esq. – State Bar No. 139979
Scott.buchholz@dbt.law
Moira S. Brennan, Esq. – State Bar No. 242126
Moira.brennan@dbt.law
**DUMMIT, BUCHHOLZ & TRAPP**
101 W. Broadway, Suite 1400
San Diego, California 92101-8122
(619) 231-7738
Fax    (619) 231-0886

Attorneys for Defendant, DEL AMO HOSPITAL, INC.

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.L., an individual, | ) Case No. CASE NO. 8:18-CV-00475-DOC (DFMX) |
| Plaintiff, | ) |
| v. | ) DEL AMO HOSPITAL, INC.'S APPENDIX OF EXHIBITS IN SUPPORT OF SUPPLEMENTAL BRIEF ON REMAND FROM NINTH CIRCUIT COURT OF APPEAL |
| DEL AMO HOSPITAL, INC. a California corporation; and DOES 1-10, inclusive, | ) |
| Defendants. | ) Date: July 12, 2021 ) Time: 8:30 a.m. ) Courtroom: 9D ) Judge: Hon. David O. Carter |

Defendant Del Amo Hospital, Inc. hereby submits the following exhibits in support of its Supplemental Brief on Remand from Ninth Circuit Court of Appeal.

Exhibit A    Relevant portions of trial transcript, Docket No. 162, Day 2, Volume 1.

Exhibit B    Relevant portions of trial transcript, Docket No. 175, Day 2,

1                    Volume 2.

2   Exhibit C     Relevant portions of trial transcript, Docket No. 176, Day 3,

3                    Volume 2.

4   Exhibit D     Relevant portions of trial transcript, Docket No. 180, Day 3,

5                    Volume 4.

6   Exhibit E     Relevant portions of trial transcript, Docket No. 184, Day 3,

7                    Volume 3.

8   Exhibit F     Relevant portions of trial transcript, Docket No. 177, Day 4,

9                    Volume 1.

10   DATED:  July 21, 2021          DUMMIT, BUCHHOLZ & TRAPP

11

12

13   By:  /s/ *Moira S. Brennan*

14            Scott D. Buchholz

15            Moira S. Brennan

        Attorneys for Defendant, DEL AMO

        HOSPITAL, INC.

16

17

18

19

20

21

22

23

24

25

26

27

28

DEL AMO HOSPITAL, INC.'S APPENDIX OF EXHIBITS IN  SUPPORT OF SUPPLEMENTAL BRIEF ON REMAND FROM NINTH CIRCUIT COURT OF APPEAL

Exhibit A

1

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

- - - - - - -

| | |
|---|---|
| C.L., an individual, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) No. 8:18-CV-0475-DOC |
| | ) |
| DEL AMO HOSPITAL, INC., *a* | ) |
| *California corporation,* | ) |
| | ) |
| Defendants. | ) |
| _____ | ) TRIAL DAY 2, VOL. I |

(A.M. SESSION)

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Court Trial

Santa Ana, California

July 24, 2019

SHARON A. SEFFENS, RPR
United States Courthouse
411 West 4th Street, Suite 1-1053
Santa Ana, CA  92701
(612) 804-8655

3

```
 1

 2

 3                          I-N-D-E-X

 4
    PLAINTIFF'S
 5  WITNESSES:            DIRECT    CROSS    REDIRECT    RECROSS

 6  C.L.
       (Continued)         6
 7
    PLAINTIFF'S
 8  EXHIBITS:                                MARKED      RECEIVED

 9  Exhibits 2 through 8                                    69
    Exhibit 19                                             101
10
    DEFENSE
11  WITNESSES:           DIRECT    CROSS    REDIRECT    RECROSS

12   (None)

13  DEFENSE
    EXHIBITS:                                MARKED      RECEIVED
14
     (None)
15

16

17

18

19

20

21

22

23

24

25
```

08:46  1    Hospital, so he was familiar with Del Amo's program, and his

08:46  2    approach is very in alignment with their process.  He uses a

08:46  3    lot of the same psycho-educational aspects.

08:46  4    Q    Can you describe the similarities between Dr. Foust --

08:46  5    excuse me.  I'll lay the foundation first.

08:46  6         Did there come a time when you started treatment

08:47  7    at Del Amo's National Treatment Center?

08:47  8    A    Yes.

08:47  9    Q    And when was that?

08:47  10   A    I believe it was in 2013.

08:47  11   Q    And how did you come to start treating at that

08:47  12   hospital?

08:47  13   A    It had been recommended to me through my psychiatrist

08:47  14   via Dr. Foust.

08:47  15   Q    Okay.  And you have attended -- or, excuse me.

08:47  16   Approximately how many times have you been admitted to Del

08:47  17   Amo's National Treatment Center since you first entered

08:47  18   there, approximately?

08:47  19   A    I think 13, 12 or 13.

08:47  20   Q    Thirteen times.  Okay.  And you have gone through Del

08:47  21   Amo's program during each of your visits that you have

08:47  22   mentioned, correct?

08:47  23   A    I have gone through the NTC program each of my visits

08:48  24   to Del Amo.

08:48  25   Q    All right.  Can you explain any similarities between

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

32

09:11  1   the first few weeks it was all about getting the environment

09:11  2   set up that would work for both of us, getting her shots,

09:11  3   firming up her potty training.  And kind of within that but

09:11  4   the next big step was socialization, so going into public

09:11  5   and being exposed to different people and sounds and

09:11  6   environments.

09:11  7           She needed to have her first set of shots.  There

09:11  8   was a medical requirement before she was able to start

09:11  9   training in a group setting, and so we completed her shots

09:12  10  and began puppy classes as soon as that was an option.

09:12  11  Q    And approximately when was that?

09:12  12  A    I believe it was by the time she was three months, but

09:12  13  I could be mistaken.

09:12  14  Q    And what did you do in that regard in terms of puppy

09:12  15  classes?

09:12  16  A    I signed up for a program through Wags & Wiggles

09:12  17  Service Dogs called Training for Life.  And we did the puppy

09:12  18  class.

09:12  19  Q    Why did you select that specific program?

09:12  20  A    Because they are well renowned in the community.  They

09:12  21  also use dog trainers who are certified.  They also have a

09:12  22  program where they train people to become dog trainers.  The

09:12  23  people who work there are involved in not just having dogs

09:13  24  as pets but in competitions.

09:13  25          And it's all about dogs.  Dogs are -- it's like --

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

34

| | | |
|---|---|---|
| 09:14 | 1 | them and receive guidance that fit because I was training |
| 09:15 | 2 | her to do a specific behavior. |
| 09:15 | 3 | Q    When did you start training her to perform specific |
| 09:15 | 4 | tasks for you? |
| 09:15 | 5 | A    So she began waking me from nightmares on her own.  And |
| 09:15 | 6 | when I discovered that she was doing that, I trained it.  I |
| 09:15 | 7 | reinforced it and I extinguished the behavior when she was |
| 09:15 | 8 | waking me and it was not connected to a nightmare. |
| 09:15 | 9 | Q    How did you do that? |
| 09:15 | 10 | A    So being excited and reinforcing her, giving her treats |
| 09:15 | 11 | and verbal acknowledgment when it was appropriate and |
| 09:15 | 12 | ignoring her when it was inappropriate. |
| 09:15 | 13 | Q    And was that training behavior based on any training |
| 09:15 | 14 | that you had received? |
| 09:15 | 15 | A    Yes.  I began learning about behavioral principles in |
| 09:16 | 16 | 1987.  In training -- that's a very bad way to say that.  In |
| 09:16 | 17 | supporting children who had autism, behavioral aspects were |
| 09:16 | 18 | commonly implemented.  So that's when my training specific |
| 09:16 | 19 | to behavior began, and it continued through my education and |
| 09:16 | 20 | career.  And it was also at Wags & Wiggles. |
| 09:16 | 21 | Q    Okay.  And what did you did learn at Wags & Wiggles in |
| 09:16 | 22 | terms of behavior training for your dog? |
| 09:16 | 23 | A    What was new to me was the use of a clicker, doing |
| 09:16 | 24 | clicker training and creating that a click could be a |
| 09:16 | 25 | positive that could let them know that, yes, you're on |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

40

| 09:40 | 1 | interrupting your nightmares in 2013. |

```
09:40   1   interrupting your nightmares in 2013.
09:40   2   A    So having better sleep impacted all kinds of areas in
09:41   3   my day.
09:41   4   Q    How so?
09:41   5   A    Well, being better rested, I could have more energy
09:41   6   through the day.  I could focus on whatever I was trying to
09:41   7   accomplish.
09:41   8   Q    Anything else that comes to mind?
09:41   9   A    Not that comes to mind, no.
09:41  10   Q    Prior to the end of 2013, were there any other tasks
09:41  11   that you had trained Aspen to perform for you related to
09:41  12   your disability?
09:41  13   A    By the end of 2013 she was also consistently providing
09:41  14   pressure to help with grounding.
09:41  15   Q    Can you describe that?
09:41  16   A    It's where she positions herself on my lap in a
09:41  17   specific way so that there is -- between the pressure and
09:41  18   the movement and her heartbeat, I can become grounded and be
09:42  19   aware that -- I'm not sure I have the verb tenses.  When she
09:42  20   does that, I become more grounded and in the present moment
09:42  21   rather than more caught up in a flashback or intrusive
09:42  22   thought.
09:42  23   Q    Okay.  And is it related solely to bringing you back
09:42  24   from an alternate self state?
09:42  25   A    No.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

```
09:42    1    Q     How so?  Can you just explain grounding in terms of
09:42    2    applying to other aspects of your disability other than
09:42    3    having alternate self states?
09:42    4    A     Sure.  If my anxiety increases, that's one method of
09:42    5    helping me stay in the present.  So if someone is moving
09:42    6    around close in my proximity, if I'm having a hard time
09:42    7    focusing because my energy goes there, one technique might
09:43    8    be to have Aspen in my lap grounding me.
09:43    9    Q     Okay.
09:43   10    A     If there is a lot of noise or chaos that's
09:43   11    overwhelming, having her perform the pressure would be a way
09:43   12    of decreasing my anxiety and helping me stay grounded.
09:43   13    Q     And how does Aspen provide pressure for grounding?
09:43   14    A     It's hard to put words to some things.  So in addition
09:43   15    to her weight being on me, which is additional weight and
09:43   16    therefore pressure, she kind of drops her weight initially
09:43   17    so that it's a larger amount or it's more impactful, kind of
09:43   18    draws more attention, I guess.
09:43   19    Q     You feel that shift in her weight?
09:43   20    A     Yes.
09:43   21    Q     And that -- okay.  Can you explain in terms of what
09:44   22    that shift in her weight does for you?
09:44   23    A     It's an external -- so it helps me become aware of
09:44   24    whatever I'm caught up in in my mind is not congruent with
09:44   25    what is happening externally in the present.
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:44   1    Q    Can you explain more what you mean, if you can?

09:44   2    A    So if I am busy thinking about the girl being put in

09:44   3    the incinerator, that's not something that's happening in

09:44   4    the here and now, so my anxiety might escalate.  And if she

09:44   5    comes in my lap and provides the pressure, that's an

09:44   6    indication of, oh, yeah, there is something happening to me

09:44   7    physically right now that reinforces I'm not standing up.

09:44   8    I'm not standing in the girl's shoes watching her being put

09:45   9    on fire.

09:45   10   Q    Okay.  As a result, what effect does that have on you?

09:45   11   A    It decreases my anxiety and helps me be focused on the

09:45   12   present and not as focused on the intrusive thoughts.

09:45   13   Q    To what extent was Aspen performing this grounding task

09:45   14   for you in 2013?

09:45   15   A    By the end of 2013 she was performing it consistently.

09:45   16   Q    And how did her behavior change or what specifically

09:45   17   did you teach her to do to perform this grounding task of

09:45   18   pressure?

09:45   19   A    It's the way that she is in my lap.  Like, in my

09:45   20   experience a lot of dogs might come up in your lap and they

09:45   21   might wiggle.  Or even if they sit still, it might be at

09:45   22   least to me an uncomfortable, awkward -- like, to me I'd be

09:45   23   ready to have it be finished in a short amount of time.

09:45   24        For Aspen, it had to do with her positioning so

09:46   25   that it was comfortable and the way that I could feel her

09:46  1    heartbeat.  So it was positioning and the weight itself.

09:46  2    Q    What about her demeanor while she was on your lap

09:46  3    applying pressure?

09:46  4    A    Calm as well.

09:46  5    Q    Why is that important?

09:46  6    A    Because being in a calming environment or around

09:46  7    calming people or, in this case, a calming animal is a lot

09:46  8    different than being around a chaotic, antsy, busy kind of

09:46  9    animal.

09:46  10   Q    In terms of grounding you, can you describe what effect

09:46  11   calm has?

09:46  12   A    It helps me feel safe.  Again, it helps -- the external

09:46  13   helps show that it's incongruent with what's happening

09:46  14   internally.

09:46  15   Q    When you say internally, you mean in your mind?

09:47  16   A    Yes.

09:47  17   Q    Okay.  And to what extent did Ms. Gonzalez's book

09:47  18   assist you in teaching the task of grounding in 2013?

09:47  19   A    So deep pressure I believe is something that was

09:47  20   covered in the book.  I don't recall the extent to which I

09:47  21   used that specifically from her book at that point in time.

09:47  22   Q    And it's your testimony that by the end of 2013, Aspen

09:47  23   was consistently performing the task of grounding for you?

09:47  24   A    She was consistently waking me from nightmares and

09:47  25   providing the pressure, yes.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

44

| | | |
|---|---|---|
| 09:47 | 1 | Q    And I don't want to be repetitive, but what |
| 09:48 | 2 | specifically did you do to train Aspen to perform the |
| 09:48 | 3 | grounding task for you in 2013? |
| 09:48 | 4 | A    The biggest part -- I mean, dogs jump in people's laps |
| 09:48 | 5 | all the time.  The specific part for her was teaching her |
| 09:48 | 6 | how to position herself, and that was done kind of through |
| 09:48 | 7 | learning, and because of her size I could place her -- |
| 09:48 | 8 | Q    Through what?  I'm sorry. |
| 09:48 | 9 | A    I don't know if this is the right term, but luring |
| 09:48 | 10 | using a treat to guide her to be in a specific position, |
| 09:48 | 11 | reinforcing when she was in the correct position, and |
| 09:48 | 12 | extinguishing behaviors that were not congruent. |
| 09:48 | 13 | Q    And prior to your providing this training through |
| 09:48 | 14 | luring, positive reinforcement, and extinguishing behaviors, |
| 09:49 | 15 | was Aspen jumping in your lap as a typical pet would? |
| 09:49 | 16 | A    Yes.  She got on my lap and she would move around. |
| 09:49 | 17 | Yes. |
| 09:49 | 18 | Q    And you taught her to extinguish the moving around part |
| 09:49 | 19 | of that? |
| 09:49 | 20 | A    Correct. |
| 09:49 | 21 | Q    Were there any other tasks that you worked on with |
| 09:49 | 22 | Aspen prior to your first admission to Del Amo? |
| 09:49 | 23 | A    Yes. |
| 09:49 | 24 | Q    What were they? |
| 09:49 | 25 | A    I worked on a variety of tasks.  There were some that |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:49  1   were consistently being performed appropriately before that

09:49  2   first admission.  She was doing the alerting relating to

09:50  3   hypervigilance consistently, and she was consistently

09:50  4   alerting me to spiked anxiety.

09:50  5   Q    Okay.  And can you describe in greater detail this task

09:50  6   of alerting?

09:50  7   A    So in terms of hypervigilance, it happens in different

09:50  8   ways.  If I am sitting and someone is moving towards me or

09:50  9   appears to be coming into my space, she will sit up.  And if

09:50  10  we are walking, it's more of how she moves around me if

09:50  11  someone is approaching or getting into my space.

09:50  12        In terms of the alerting for anxiety spikes, she

09:50  13  often paws me, uses her front paws on my legs to get my

09:51  14  attention, or she will jump in my lap and put herself in the

09:51  15  pressure position.

09:51  16  Q    And when you're speaking of her performing this task,

09:51  17  you're specifically speaking of the period in 2014 before

09:51  18  you began going to Del Amo?

09:51  19  A    Correct.

09:51  20  Q    And what you testified about was what Aspen was doing

09:51  21  during that time period?

09:51  22  A    Correct.

09:51  23  Q    And what training did you utilize to teach her the

09:51  24  alert task?

09:51  25  A    Part of that was through -- I'm sorry.  Restate that.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

09:51    1    I went a different direction.  Can you ask me again, please.
09:51    2    Q    Yes.  What training did you use, the training that you
09:51    3    learned, the information that you had available to you to be
09:51    4    able to teach Aspen the alert task in early 2014?
09:51    5    A    So as I experienced anxiety or increases in my anxiety,
09:52    6    I would call her, and I believe I started with a touch
09:52    7    command so that she would touch my hand that I had on my
09:52    8    leg.  And then just kind of dog training, reinforcing
09:52    9    desired behaviors, extinguishing when it's not appropriate.
09:52    10   Q    And to any extent did you use Ms. Gonzalez's book in
09:52    11   that regard?
09:52    12   A    I don't recall.
09:52    13   Q    Okay.  And then in terms of -- were there any other
09:52    14   tasks that you were teaching Aspen prior to your first
09:52    15   admission to Del Amo in early 2014?
09:52    16   A    I don't remember the progression, if I started teaching
09:52    17   this group of tasks in this specific group of time, but
09:52    18   there were several tasks that we worked on.  The tasks that
09:52    19   I have identified so far I can say were completed at that
09:53    20   point because I have documentation supporting it.
09:53    21        But there were other tasks we were working on.  We
09:53    22   were working on the task of her staying outside of where I
09:53    23   shower so she can alert me if someone comes, for that.  We
09:53    24   were working on her alerting me when my anxiety had
09:53    25   increased to the point that it would be beneficial for me to

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 09:53 | 1 | take additional medication. |
| 09:53 | 2 | Q    How did Aspen alert you in that regard in early 2014? |
| 09:53 | 3 | A    I don't know that it was in early 2014.  It was |
| 09:53 | 4 | something that we worked on across time.  Right now I don't |
| 09:53 | 5 | have the specific of when that was a solid task.  I would |
| 09:54 | 6 | have to go back and look. |
| 09:54 | 7 | Q    Do you recall working on that task early in 2014? |
| 09:54 | 8 | A    Yes. |
| 09:54 | 9 | Q    All right.  And was there any point that you began |
| 09:54 | 10 | working with Aspen on intervening during self-injurious |
| 09:54 | 11 | behavior? |
| 09:54 | 12 | A    Yes. |
| 09:54 | 13 | Q    When did that begin? |
| 09:54 | 14 | A    We began working on that likely at the very beginning |
| 09:54 | 15 | of 2014, maybe a little bit farther in. |
| 09:54 | 16 | Q    Do you recall it was something you were working on with |
| 09:54 | 17 | her prior to attending Del Amo? |
| 09:54 | 18 | A    Yes. |
| 09:54 | 19 | Q    And explain the process of how you began training Aspen |
| 09:54 | 20 | on the task of intervening during self-injurious behavior. |
| 09:54 | 21 | A    So there are kind of two primary ways that I engage in |
| 09:55 | 22 | self-injurious behavior.  One is cutting and one is head |
| 09:55 | 23 | banging. |
| 09:55 | 24 | With cutting, the first time -- I'm sorry.  I'm |
| 09:55 | 25 | thinking about a lot of things.  I believe she was tuned in |

09:55  1    to my level of anxiety and she -- when I started cutting,

09:55  2    she was close by.  She came and she started licking the

09:55  3    blood.  And her having done that I realized could be a task

09:55  4    to prevent my continuing to do those types of behavior.  So

09:55  5    again I reinforced it.

09:55  6         If there were times when I was cutting and she

09:55  7    didn't respond, I would call her over and do the

09:56  8    reinforcement and positive training.  It wasn't -- there

09:56  9    wasn't, as I'm aware, a way to extinguish the behavior

09:56  10   because it was specific to cutting, and there wouldn't be a

09:56  11   time that it was appropriate to me to cut and her not

09:56  12   intervene.

09:56  13        For head banging, that was more active, and I

09:56  14   trained her to get between me and the wall.

09:56  15   Q    And what did that do?

09:56  16   A    Having her between me and the wall prevented me from

09:56  17   banging my head because she would be injured should I do

09:56  18   that, and I didn't want her to be injured.

09:56  19   Q    What effect did she have in getting between you and the

09:56  20   wall while you were head banging?

09:56  21   A    At most I would, like, hit my head once, and then it

09:57  22   would be stopped rather than continuing.

09:57  23   Q    And right now we're at the period of early 2014.  Up

09:57  24   until that time period, how often would you cut yourself or

09:57  25   have head-banging episodes?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:18 | 1 | went, and there was a place where there was one class we |
| 10:19 | 2 | would go one of two ways, and she would want to go in the |
| 10:19 | 3 | way that we most often went. |
| 10:19 | 4 | So she would kind of pull in that direction, and I |
| 10:19 | 5 | would have to redirect her about, like -- I needed to figure |
| 10:19 | 6 | out how to help her know to be able to walk in front of me |
| 10:19 | 7 | and go around corners and still let me be the one to lead |
| 10:19 | 8 | where we were going or to decide where we were going.  So -- |
| 10:19 | 9 | Q    How did you do that? |
| 10:19 | 10 | A    With that, part of the correction came in.  I tried -- |
| 10:19 | 11 | I learned things like -- I used the cue, "This way."  I |
| 10:19 | 12 | have -- I started -- I did not -- I was not consistent with |
| 10:19 | 13 | teaching her left and right, but this way is what I use at |
| 10:20 | 14 | this point. |
| 10:20 | 15 | Q    What does that mean, the this-way command? |
| 10:20 | 16 | A    That means this is the way we're going.  Come this way |
| 10:20 | 17 | or go this way. |
| 10:20 | 18 | Q    And how did you perform that command? |
| 10:20 | 19 | A    Positive reinforcement.  I don't think I used treats at |
| 10:20 | 20 | that point.  I think I used touch. |
| 10:20 | 21 | Q    And at what point was Aspen performing the cornering |
| 10:20 | 22 | task for you routinely? |
| 10:20 | 23 | A    I would have to go back and look at the notes that I |
| 10:20 | 24 | pulled together.  I don't have a solid recollection. |
| 10:20 | 25 | Q    Give me your best estimate.  Was it in 2014? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:20 | 1 | A    Likely. |
| 10:20 | 2 | Q    What about the about-face task? |
| 10:20 | 3 | A    That was likely in 2014 as well. |
| 10:21 | 4 | Q    What about the term boundary control? |
| 10:21 | 5 | A    Yes. |
| 10:21 | 6 | Q    What is that? |
| 10:21 | 7 | A    As I understand it, it's a term that's used for a task |
| 10:21 | 8 | where a dog creates a boundary of, like, where people can be |
| 10:21 | 9 | in an individual's space or where they cannot be.  It |
| 10:21 | 10 | creates a space between the individual and other people. |
| 10:21 | 11 | Q    When did you begin teaching -- or, excuse me.  Did you |
| 10:21 | 12 | teach Aspen that task? |
| 10:21 | 13 | A    I didn't refer to it as that, and I use it differently. |
| 10:21 | 14 | But, yes. |
| 10:21 | 15 | Q    And when did you begin teaching her that task? |
| 10:21 | 16 | A    Likely in 2014 is when it started. |
| 10:21 | 17 | Q    And did she consistently perform that task for you? |
| 10:21 | 18 | A    She does. |
| 10:21 | 19 | Q    At what point did you determine that she consistently |
| 10:21 | 20 | began performing the task of boundary control for you? |
| 10:22 | 21 | A    I would have to again look at the documents I pulled |
| 10:22 | 22 | together.  It was likely in 2014. |
| 10:22 | 23 | Q    Okay.  Are you familiar with the term medical alert as |
| 10:22 | 24 | it relates to a task for service dogs? |
| 10:22 | 25 | A    Yes. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:22 | 1 | Q    What is that task? |
| 10:22 | 2 | A    That is a task that varies in meaning depending on the |
| 10:22 | 3 | individual using the service dog.  It can be an alert to a |
| 10:22 | 4 | seizure.  It can be an alert to a diabetic episode. |
| 10:22 | 5 | Q    Okay.  And was that a task that you taught Aspen? |
| 10:22 | 6 | A    I think it can fall in the purview.  I taught her to |
| 10:22 | 7 | alert me when my anxiety was escalated to the point that I |
| 10:22 | 8 | needed prn medication, as-needed medication. |
| 10:22 | 9 | Q    That's what prn means? |
| 10:22 | 10 | A    As needed, correct. |
| 10:22 | 11 | Q    And what is your as-needed medication? |
| 10:23 | 12 | A    Klonopin. |
| 10:23 | 13 | Q    And explain how you taught Aspen to task of alerting |
| 10:23 | 14 | you to take your prn mediation. |
| 10:23 | 15 | A    A lot of it had to do with whether or not her task |
| 10:23 | 16 | leading up to that alleviated anxiety or whether my anxiety |
| 10:23 | 17 | continued to escalate, and the period, the amount of time |
| 10:23 | 18 | that it remained at a high level. |
| 10:23 | 19 | So a lot of it, it was kind of a dynamic process |
| 10:23 | 20 | where her performing her tasks alerted me to what I needed |
| 10:23 | 21 | to pay attention to so that I could train her at the time to |
| 10:23 | 22 | perform the task. |
| 10:23 | 23 | Q    And did you do so? |
| 10:23 | 24 | A    Yes. |
| 10:23 | 25 | Q    And was there -- did there come a time when Aspen |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:23 | 1 | mastered the task of alerting you regarding medications? |
| 10:23 | 2 | A     Yes. |
| 10:23 | 3 | Q     Do you have an approximation of when that was? |
| 10:23 | 4 | A     2014, early 2015. |
| 10:24 | 5 | Q     And then what about -- are you familiar with the term |
| 10:24 | 6 | standing guard to alert? |
| 10:24 | 7 | A     I have heard the term.  I believe that that's the |
| 10:24 | 8 | professional term that was given to Aspen's task of sitting |
| 10:24 | 9 | outside my shower. |
| 10:24 | 10 | Q     And forgive me if we have covered this, but can you |
| 10:24 | 11 | discuss when you started teaching Aspen the task of standing |
| 10:24 | 12 | outside your shower, standing guard to alert? |
| 10:24 | 13 | A     So there are different aspects of it.  There is, like, |
| 10:24 | 14 | just training her on how I wanted her to behave, and there's |
| 10:24 | 15 | training the task.  It started off very early on with |
| 10:24 | 16 | training her where I wanted her to be while I was in the |
| 10:24 | 17 | shower.  It was later that I incorporated the task aspect of |
| 10:25 | 18 | coming to me if there was someone in the area. |
| 10:25 | 19 | Q     Okay.  And that was a specific aspect of the task that |
| 10:25 | 20 | you trained Aspen to perform? |
| 10:25 | 21 | A     Correct. |
| 10:25 | 22 | Q     And when did you begin doing that? |
| 10:25 | 23 | A     The beginning part where I wanted her to be was she was |
| 10:25 | 24 | younger than six months. |
| 10:25 | 25 | Q     When was she consistently performing the task of |

10:25  1   standing guard to alert by your shower?

10:25  2   A    Again I would have to look.  Likely 2014, potentially

10:25  3   early 2015.

10:25  4   Q    In terms of standing guard outside your shower as

10:25  5   opposed to the formal task of standing guard to alert, I

10:25  6   believe it was your testimony that she was consistently

10:25  7   standing outside your shower and alerting you in 2014; is

10:26  8   that right?

10:26  9   A    It's likely that that was consistent in 2014.  I'm not

10:26 10   possible without reviewing.

10:26 11   Q    I guess my question is was she performing the task of

10:26 12   standing guard outside your shower prior to your first

10:26 13   admission to Del Amo?

10:26 14   A    I do not believe so.

10:26 15   Q    Okay.  At what point in your admission to Del Amo was

10:26 16   she performing that task consistently?

10:26 17   A    Again, I would have to look at what I have come up

10:26 18   with.

10:26 19   Q    But you believe it was 2014 or 2015?

10:26 20   A    Correct.

10:26 21   Q    Okay.  At any point are any of the tasks that we have

10:26 22   discussed, did any of those tasks become mastered much

10:26 23   later, say, in 2016, or were they all mastered in 2014 or

10:26 24   2015?

10:26 25   A    By the time she was two years old, she had mastered the

```
10:26   1    tasks that I had set out for her to perform consistently in
10:27   2    addition to at least one other.
10:27   3    Q    And when did she turn two years old?
10:27   4    A    Mid -- I just lost it -- '15.
10:27   5    Q    And you mentioned there was one other task that she had
10:27   6    mastered?
10:27   7    A    At least one, yes.
10:27   8    Q    What was that?
10:27   9    A    That was helping me stay alert and focused while I
10:27  10    drive.
10:27  11    Q    Okay.  How did she do that?
10:27  12    A    It's set up where I have my hand partly on the middle
10:27  13    console and partly on her seat.  She rests her chin, her
10:27  14    head, on my hand.  If I become distracted, the first thing
10:27  15    she will do is nudge me.  And if I am not responsive, she
10:27  16    will put her nuzzle under my hand and flip it up.
10:28  17    Q    And when had she mastered that task?
10:28  18    A    All of her tasks were solid by the time she was two
10:28  19    years old.
10:28  20    Q    All right.  And counsel mentioned in his opening
10:28  21    statement about an issue with Aspen struggling with her
10:28  22    leash.  Do you recall that?
10:28  23    A    I remember him saying that.
10:28  24    Q    Okay.  So what is your recollection regarding any
10:28  25    issues you had with Aspen struggling with leash training or
```

Exhibit B

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| C.L., an individual, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 18-0475-DOC |
| | ) Day 2, Volume II |
| DEL AMO HOSPITAL, INC., a | ) |
| California corporation, | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

COURT TRIAL

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

WEDNESDAY, JULY 24, 2019

1:00 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

I N D E X


PLAINTIFF'S WITNESSES:    DIRECT   CROSS   REDIRECT   RECROSS

C.L.                                5       89         104
                                   62



E X H I B I T S

DEFENDANT'S EXHIBITS:                  IDENTIFICATION   EVIDENCE

  1      Letter                                           61

  2      E-mail                                           39

  3      E-mail                                           40

  5      E-mail                                           26

  8      Form                                             85

  207    E-mail                                           76

  211    E-mail                                           32

  213    Letter                                           82

  216    Letter                                           83

  227    Demand Letter                                    78

  228    Letter                                           78

  230    E-mail                                           12

  231    E-mail                                           57


*Deborah D. Parker, U.S. Court Reporter*

18

1     after she did her "Puppy Class."  She did the training

2     consecutively.

3     Q      What do you mean --

4             THE COURT:  Counsel, where you were at before I

5     clumsily negated the realtime was in the discussion

6     concerning the service dogs and whether Wags & Wiggles ever

7     specifically trained a service dog or if they had a group

8     training on individual training that they knew about,

9     specific training of a service dog.  And I've never gotten

10    an answer to that question.  I've gotten an opinion on her

11    part that they could and that they helped her with her

12    service dog, but I never got an answer about whether they

13    actually trained a service dog or service dogs.

14            MS. BRENNAN:  I believe her testimony was that she

15    didn't know.  I would have to ask them [sic] something to

16    that effect.

17            THE WITNESS:  That was for the percentage of

18    service dogs that they trained.

19            MS. BRENNAN:  I see.

20    BY MS. BRENNAN:

21    Q      Does Wags & Wiggles conduct group classes for training

22    service dogs?

23    A      Specific to service dog training, not that I'm aware

24    of.

25    Q      Does Wags & Wiggles conduct individualized service dog

*Deborah D. Parker, U.S. Court Reporter*

19

1    training?

2    A    They conduct individual training, if it's -- the person

3    needs it specific to a service dog, then yes.

4    Q    Do they have any certifications in training service

5    dogs?

6    A    I don't know.  They are certified in dog training.

7    Q    Wags & Wiggles conducts basic obedience classes for

8    dogs, correct?

9    A    That's one of the things they do, yes.

10   Q    Did you attend a basic obedience class at

11   Wags & Wiggles with Aspen?

12   A    Yes.

13   Q    How old was Aspen when you attended that class?

14   A    I would, again, state that I would have to go back and

15   look at records.  She would -- she took the class after the

16   puppy class.  As soon as she was able to take classes, we

17   continued with her training consistently.

18   Q    What does the "Puppy Class" consist of?

19   A    That is primarily socialization and learning how to

20   interact with other dogs and become familiar with sounds and

21   movements that they might not experience in just a home

22   setting.

23   Q    Following the "Puppy Class," you then took a basic

24   obedience class.  Is that the correct order?

25   A    I believe that's the next class, correct.

20

```
 1    Q       What does the basic obedience class entail?
 2    A       I believe that that's the basic commands, such as sit,
 3    stay, down, come.
 4    Q      Is it your understanding that a dog has to be solid on
 5    the basic obedience skills prior to learning service dog
 6    tasks?
 7    A      That is not my understanding.
 8    Q      Is it your understanding that a -- service dogs don't
 9    begin to learn tasks or not even enter training until
10    they're a year old?
11    A      That is not correct.  That is not my understanding.
12            MS. BRENNAN:  Your Honor, I would like permission
13    to bring up a portion of plaintiff's deposition testimony
14    from April 26, 2017.
15            THE COURT:  I'll need a copy of that from
16    somebody.
17            MR. KLATTE:  May I approach?
18            THE COURT:  And now you'd like what volume?
19            MS. BRENNAN:  The 2017.
20            THE COURT:  Okay.  And you've got April 26th.  Are
21    these duplicates of each other?
22            MS. BRENNAN:  No.
23            THE COURT:  Okay.  Which one am I going to look
24    at?
25            MS. BRENNAN:  April 26th, 2017.
```

44

1    She alerts me when my anxiety is escalated to the point that

2    I need to take additional medication as needed, medication.

3    She alerts me when I'm driving if I lose focus.

4    Q    What behavior does she engage in when you're anxious

5    that's an alert?

6    A    When my anxiety spikes, she puts her front paws on me.

7    Q    Are there other times she puts her front paws on you?

8    A    Yes.

9    Q    What other times would she do that?

10   A    If she is excited to see me.  For example, if I go to

11   the front of the house to get the mail and she stays in the

12   backyard, she is excited to see me and puts her feet on me.

13   Q    When did you begin teaching the cornering task?

14   A    So I'm trying to not make a face, because I feel like I

15   keep saying this a kazillion times.  I don't have that

16   timeline in front of me.  I don't have it memorized.

17        At some point, I created a document to put it in a

18   time frame.  I don't know how to give you what you want

19   without having a piece of paper in front of me.

20        THE COURT:  Is there something that would refresh

21   your recollection?

22        THE WITNESS:  I have a specific document that has

23   her tasks and the approximate point.

24        THE COURT:  Where is that?

25        THE WITNESS:  Do you guys have that?

```
1    there's someone who she knows that's there, she continues.

2    If there is someone that she does not know, she stops.

3    There's one environment in which she backs up because of how

4    it is arranged.

5    Q    When you're walking in a straight line, does Aspen also

6    stop where she sees a stranger?

7    A    Not typically, no.

8    Q    So it's only with the corners?

9    A    Correct.

10   Q    What would occur if someone you knew was approaching

11   you or coming around a corner?  How would Aspen react to

12   that?

13   A    She would be excited.  Her tail would wag.  She would

14   probably bounce a little bit.

15   Q    Is Aspen instructed to lie on a particular place when

16   you're showering.  Because you testified that that's

17   something you have an issue with.  So is Aspen instructed to

18   be at a particular --

19          (Court Reporter requests clarification for the

20          record.)

21   BY MS. BRENNAN:

22   Q    Is there a particular place that Aspen is instructed to

23   be while you're showering?

24   A    There -- there's one of two places that she's

25   instructed to be.
```

49

1    Q        What are those two places?

2    A        One is what I call her mat and one is a carpet.

3    Q        Where are those places with respect to the shower?

4    A        On either side of the bathroom door.

5    Q        Outside the bathroom door or outside the room?

6    A        There's not room inside for her to sit.  I have a very,

7    very tiny place.

8    Q        Does she stay there the entire time you're showering?

9    A        There are times she goes to the door, if she hears

10   something.  There are times when she comes to me in the

11   shower to indicate that someone is coming.

12   Q        When you say "someone is coming," does that mean

13   someone coming to the front door?

14   A        Someone in the backyard.

15   Q        Does she bark or does she just come into the bathroom?

16   A        There are two specific people who she will bark.

17   Everyone else, she comes into the bathroom.

18   Q        And to you that means an alert; that there's someone in

19   the proximity of your house.  Is that accurate?

20   A        That's accurate.

21   Q        Is dynamic pressure and grounding the same thing?

22   A        No, it is not.

23   Q        What is the difference between dynamic pressure and

24   grounding?

25   A        As I would describe it, "dynamic pressure" is the

Exhibit C

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| C.L., an individual, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 18-0475-DOC |
| | ) Day 3, Volume II |
| DEL AMO HOSPITAL, INC., a | ) |
| California corporation, | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

COURT TRIAL

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

THURSDAY, JULY 25, 2019

1:23 P.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

4

```
1                        I N D E X

2

3   PLAINTIFF'S WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

4    KATIE GONZALEZ            5      32      58

5

6   DEFENDANT'S WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

7    PETER HIRSCH, M.D.       64     102

8

9

10                       E X H I B I T S

11  DEFENDANT'S EXHIBITS:              IDENTIFICATION  EVIDENCE

12   122 and 125 Admission Report of                    89
        April 16, 2014 and
13      Admission Report of
        July 30, 2014
14
     132   Admission Report of                          89
15         August 19, 2014

16   139   Admission Report of                          90
           September 3, 2015
17
     154   Admission report of                          90
18         March 18, 2016

19   165   Admission Report of                          90
           June 15, 2017
20
     173   Admission Report of                          90
21         September 21, 2016

22   183   Admission Report of                          91
           January 23, 2017
23
     193   Admission Report of                          91
24         August 14, 2017

25
```

*Deborah D. Parker, U.S. Court Reporter*

01:58:33  1    had maybe four or five e-mails that went back and forth.

2            THE COURT:  Okay.  Just a moment.

3            You had four or five e-mails.  Is that sufficient

4    from your perspective?  In other words, you told me about --

01:58:48  5    here's what you're presenting yourself to me as, and that's

6    as a very confident person who really is involved with me as

7    an owner of a service dog or any dog.  You've told me about

8    your extraordinary hours, your professionalism.  You told me

9    that you're there until 8:00 o'clock at night, willing to

01:59:10  10   talk to me.  And you've also told me that after the

11   training, I need refreshment, I as the owner, let alone the

12   dog.

13           I'm assuming the e-mails don't do that.  I'm

14   assuming that this has to be a conversation or some

01:59:24  15   observation in this period of time to give you a comfort

16   level in terms of my ability to keep my service dog as a

17   service dog.

18           THE WITNESS:  Yes.

19           THE COURT:  I want to know about that personal

01:59:36  20   contact first.

21           THE WITNESS:  So I know that I -- I believe I had

22   a phone call with her.  But other than that, I did not have

23   a conversation with her.

24           THE COURT:  I want to be very careful.  Please,

01:59:49  25   pardon me.  I want to get this right from one of these

29

```
01:59:54   1        parties.
           2               Did you observe the dog, let's say, between the
           3        time of the first seminar in 2014 and up to the time that
           4        you had contact with the dog -- I think 2019?
02:00:07   5               THE WITNESS:  Yes.  In June.
           6               THE COURT:  Did you observe the dog during that
           7        period of time?
           8               THE WITNESS:  Not at all.
           9               THE COURT:  Did you have a personal contact --
02:00:17  10        we'll get to the phone call in a moment -- with C.L. in that
          11        period of time?
          12               THE WITNESS:  No.
          13               THE COURT:  Did you receive a phone call or phone
          14        calls in that four- or five-year period of time?
02:00:30  15               THE WITNESS:  No.
          16               THE COURT:  Did you receive e-mails in that four-
          17        to five-year period of time?  In other words, not up to
          18        the -- 2019 is here, and you may have had subsequent calls,
          19        after 2019, after you saw the dog.
02:00:44  20               THE WITNESS:  Uh-huh.
          21               THE COURT:  And I put up with that, because I find
          22        you extraordinarily competent.
          23               In that five-year period of time, were e-mails
          24        coming in to you every month?  Every six months?
02:00:54  25               THE WITNESS:  No.
```

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 02:00:55 | 1 | THE COURT:  A year?  Any contact at all? |
| | 2 | THE WITNESS:  No. |
| | 3 | THE COURT:  So between 2014 and 2019, there was |
| | 4 | none of that confidence that I'm hearing that you would like |
| 02:01:10 | 5 | to have in terms of either personal contact with the owner, |
| | 6 | the dog, in person or by e-mail, or by phone calls; is that |
| | 7 | correct? |
| | 8 | THE WITNESS:  That's correct. |
| | 9 | THE COURT:  So when you saw the dog in 2019, after |
| 02:01:25 | 10 | that, is that when you had a series of e-mails? |
| | 11 | THE WITNESS:  Yes -- well, no, not e-mail; but I |
| | 12 | just -- |
| | 13 | THE COURT:  A phone call? |
| | 14 | THE WITNESS:  I met her over -- when I was |
| 02:01:34 | 15 | evaluating and discussing it with her.  Just the one time in |
| | 16 | June. |
| | 17 | THE COURT:  Okay.  Now, you've referred to some |
| | 18 | e-mails. |
| | 19 | Tell me about those. |
| 02:01:46 | 20 | THE WITNESS:  The e-mails came in, probably, not |
| | 21 | after 2014.  It was a brief period of time after the seminar |
| | 22 | when she was trying to figure out what to do. |
| | 23 | THE COURT:  So after Seminar 1 and then they |
| | 24 | cease, let's say, in that -- every two months, you're |
| 02:02:04 | 25 | supposed to have a seminar.  There's Seminar 1; two months, |

02:17:27  1    away."

          2          So she, apparently, barks -- would that indicate

          3    to you that she's barking, demanding to play?

          4    A    It looks like it.

02:17:43  5    Q    Is that an appropriate service dog behavior?

          6          MR. KNAUF:  Objection.  Vague and ambiguous.

          7          THE COURT:  Overruled.

          8          THE WITNESS:  We encourage our dogs to be nonvocal

          9    in public, but they do bark, and they'll bark for things

02:18:01  10   like to get attention.  But we're trying to curb that

          11   behavior in general.

          12   BY MS. BRENNAN:

          13   Q    On the next item, Item No. 7 on that page, C.L. says,

          14   "Aspen is nervous around people she does not know."

02:18:24  15         Is that one of the areas of concern that might

          16   preclude her from being a service dog at this stage of her

          17   training?

          18   A    "At this stage of her training," at that point?

          19   Q    That's when she's answering the question.  So, as of

02:18:41  20   the date of this document, which is 6/10/2014, I believe --

          21   yes -- and C.L. is answering these questions, she says,

          22   "Aspen is nervous around people she does not know."

          23         Is that outside the standards from what you would

          24   expect for a service dog?

02:19:00  25         MR. KNAUF:  I'm going to object, because it's not

02:19:02  1    the complete answer.  That's the first line of the answer,

2    and it needs to be read in context.

3              THE COURT:  Overruled.

4              THE WITNESS:  I would expect to have a lot of

02:19:11  5    problems like this coming in on a maintenance report.  And

6    it allows me to address them for behavior modification at

7    that point.

8    BY MS. BRENNAN:

9    Q    However, would that preclude her from meeting the

02:19:35 10    standards set forth by ADI, with respect to certifying a

11    service dog?

12             MR. KNAUF:  Vague and ambiguous.

13             THE COURT:  Overruled.

14             THE WITNESS:  If we are at the point where we are

02:19:49 15    certifying a dog, where the owner says, *My dog is done with*

16    *training, will you verify that for me?,* if I had a dog that

17    was displaying behaviors where I thought it was a risk to

18    people, I would not certify that dog.  But the dog being

19    nervous around people in the beginning stages of training is

02:20:09 20    extremely common, especially for the breed.

21    BY MS. BRENNAN:

22    Q    Before you as of June 10th, 2014, would Aspen have met

23    the standards as set forth by the ADI for a service dog when

24    she's barking and nervous around people?  Would she meet

02:20:32 25    those standards?

43

02:20:33  1    A    So on the maintenance report, she mentions that, but I

2    did not see that in the evaluation.  And the maintenance

3    report is the dog still in training.

4    Q    So at the time this maintenance report was completed

02:20:58  5    and submitted to you, the dog was still in training?

6            MR. KNAUF:  Objection.  Foundation.  Assumes

7    facts.

8            THE COURT:  Overruled.

9            THE WITNESS:  I thought so, yes.

02:21:07 10   BY MS. BRENNAN:

11   Q    Also on Exhibit 38, under "Training Standards," this

12   document indicates:

13            "The service dog should demonstrate

14            basic obedience skills by responding to

02:21:25 15            voice and/or hand signals for sitting,

16            staying in place, lying down, walking in

17            a controlled position near the client

18            and coming to the client when called."

19            So as of the day of this maintenance report, Aspen

02:21:40 20   was not coming when called, correct?

21            MR. KNAUF:  Objection.  Assumes facts.

22            THE COURT:  Overruled.

23            THE WITNESS:  I believe she said she was having

24   trouble with the re-call.  Not in those words.  Those are

02:21:53 25   mine.

44

| | | |
|---|---|---|
| 02:21:54 | 1 | BY MS. BRENNAN: |
| | 2 | Q    And on Exhibit 8, same page, P0233, Item No. 8, wherein |
| | 3 | it asks how Aspen performs on leash around other animals, |
| | 4 | C.L.'s answer was that "Aspen wants to play with other dogs. |
| 02:22:21 | 5 | She often stands on her hind legs or jumps in excitement." |
| | 6 | Is that behavior that you would consider meets the |
| | 7 | standards for a service dog? |
| | 8 | MR. KNAUF:  Foundation. |
| | 9 | THE COURT:  Overruled. |
| 02:22:35 | 10 | MR. KNAUF:  Vague and ambiguous. |
| | 11 | THE COURT:  Overruled. |
| | 12 | THE WITNESS:  On certification testing, if a dog |
| | 13 | was not paying attention to its handler because it was |
| | 14 | trying to get to another dog, that would be an issue.  But |
| 02:22:47 | 15 | in context of the maintenance report, I would expect a dog |
| | 16 | in training to have these issues. |
| | 17 | Q    Under the same standards on Exhibit 38, Item 4, it |
| | 18 | says: |
| | 19 | "The service dog must be trained to |
| 02:23:17 | 20 | perform at least three tasks to mitigate |
| | 21 | the client's disability." |
| | 22 | Is that something you test for under those |
| | 23 | standards? |
| | 24 | A    Yes. |
| 02:23:27 | 25 | Q    When you met with C.L. and Aspen in June of 2019, how |

02:23:35   1    many tasks did you actually observe Aspen performing?

2    A      Two.

3    Q      And on Exhibit 38, under "Training Standards,"

4    Item No. 6, it says:

02:23:53   5           "The assistance dog program must

6           document monthly follow-ups with client

7           for the first six months following

8           placement."

9           So even under the section, starting on page 9 and

02:24:10  10    going on to page 10 of the same Exhibit 38, Item No. 12 says

11    the same thing.  So that standard applies to whether you're

12    doing the training and then releasing the dog to someone or

13    if the person is training their own service dog, correct?

14    A      Correct.

02:24:28  15    Q      And C.L. followed up with four to five e-mails

16    immediately after the May 2014 session one class and then

17    did not have further contact with you, correct?

18    A      Those are the only e-mails that I could find.

19    Q      When you observed C.L. and Aspen in June of 2019, what

02:25:09  20    tasks did you observe Aspen performing?

21    A      Dynamic pressure and corner.

22    Q      How did she demonstrate dynamic pressure?

23    A      "Dynamic pressure" is where the dog lays calmly on her

24    lap, and I saw that happen in two different areas during our

02:25:31  25    meeting.

02:25:34    1    Q    Did Aspen jump on her lap on command?  How did that

            2    come about?

            3    A    No.  When I asked her to do it the first time, we were

            4    in an area where it would have been impossible, because the

02:25:47    5    dog was underneath the dining table.  And the dog wouldn't

            6    be able to jump on her lap with that over her lap.  And the

            7    next time it was on a bench, and she picked the dog up.

            8    Q    On the first occasion, she also picked the dog up?

            9    A    Yes, I'm sorry.  On both occasions, she picked the dog

02:26:09   10    up and put her on her lap and the dog turned -- it looked

           11    intentional to turn and face forward -- and laid down in the

           12    way that I would train a dog to do that.

           13    Q    How long did Aspen remain on C.L.'s lap on each of

           14    those occasions?

02:26:29   15    A    Until I said, "Let's go do something else."  And I

           16    believe the first time was close to -- could have been five

           17    minutes and the second time maybe two to three minutes.

           18    Q    So you've never observed Aspen performing dynamic

           19    pressure test in response to C.L. having an episode like

02:27:02   20    anxiety, or panic attack, or something to that effect?

           21    A    Correct.

           22    Q    And the other task you observed was cornering?

           23    A    Yes.

           24    Q    Can you explain what you observed there?

02:27:14   25    A    Sure.  So I saw the corner.  And I said, *Why don't you*

*Deborah D. Parker, U.S. Court Reporter*

02:27:18  1    *have her demonstrate this task for me.*  And as C.L.

2    approached the corner, I saw that Aspen left her side to

3    make a wide berth around the corner, so that she could see

4    around the corner before C.L. got there, and they walked

02:27:39  5    around the corner.

6    Q    Did Aspen do anything -- what is Aspen supposed to do,

7    if there is something threatening around the corner?

8    A    If there is a person on the other side, then Aspen

9    would stop.

02:27:56  10   Q    Did you observe Aspen stop because the person was

11   coming around the other side?

12   A    There was not a person on the other side so, no.

13   Q    So Aspen just kept walking around the corner and you

14   and C.L. followed, correct?

02:28:08  15   A    Correct.  Well, I didn't.  I was watching.

16   Q    And those are the only times you've observed Aspen at

17   all, correct?

18   A    Yeah.

19   Q    Do you know if Aspen has a command to perform dynamic

02:28:41  20   pressure?

21   A    I don't.

22   Q    So one of the tasks for psychiatric service dogs is

23   counterbalance or bracing the handler who's having a dizzy

24   spell from medication.

02:29:10  25          Is that accurate?

*Deborah D. Parker, U.S. Court Reporter*

```
02:29:12    1    A    Can you rephrase or just say that again?  I think I
            2    missed the first couple of words.  Sorry.
            3    Q    Okay.  One task a psychiatric service dog can perform
            4    is counterbalance or bracing for a handler who's dizzy from
02:29:25    5    medication.  Is that true?
            6    A    Yes.
            7    Q    Does Aspen do that behavior?
            8    A    No.
            9    Q    Another one is waking a handler on the sound of an
02:29:37   10    alarm because someone tends to sleep through alarms or a
           11    medication alarm.  Is that a service dog test?
           12    A    It is.
           13    Q    Does Aspen perform that test?
           14    A    I don't know.  I don't remember that.
02:29:50   15    Q    Does Aspen perform room searches?
           16    A    I don't remember what.
           17              THE COURT:  Perform what?
           18              MS. BRENNAN:  Room searches.
           19              THE COURT:  Room searches.
02:30:02   20    BY MS. BRENNAN:
           21    Q    Can you explain what a room search is for a service
           22    dog?
           23    A    Absolutely.  So it has to be nonviolent protection.  So
           24    what's happening is the dog it is asked to go inside a room,
02:30:15   25    see if someone else is in the room and come back and tell
```

02:30:21 | 1 | the person, which is very valuable for someone that has a

2 | psychiatric disability, like PTSD, because they would be

3 | worried to go into the room.

4 | Q    Does Aspen perform that task for C.L.?

02:30:38 | 5 | A    I don't know.

6 | Q    Is another service dog task to interrupt a

7 | disassociative episode wherein a person is going to wander

8 | into traffic or somehow injure themselves in that matter?

9 | Is that a service dog task?

02:31:10 | 10 | MR. KNAUF:  Relevance.

11 | THE COURT:  Overruled.

12 | THE WITNESS:  It is, though we don't train that in

13 | that exact situation when it comes to traffic.

14 | BY MS. BRENNAN:

02:31:21 | 15 | Q    Does Aspen perform that task?

16 | A    I don't know.

17 | Q    Is leading a disoriented handler to a specific place a

18 | service dog task?

19 | A    Yes.

02:31:39 | 20 | Q    Does Aspen perform that task?

21 | A    I don't know.

22 | Q    So do you know if Aspen was a fully trained service dog

23 | at the time C.L. was admitted to Del Amo Hospital in 2014?

24 | MR. KNAUF:  Objection.  Vague and ambiguous as to

02:32:11 | 25 | "fully trained."

*Deborah D. Parker, U.S. Court Reporter*

50

| | | |
|---|---|---|
| 02:32:13 | 1 | THE COURT:  Overruled. |
| | 2 | THE WITNESS:  I don't know. |
| | 3 | BY MS. BRENNAN: |
| | 4 | Q    Do you know if Aspen was a fully trained service dog in |
| 02:32:20 | 5 | 2015? |
| | 6 | MR. KNAUF:  Same objection. |
| | 7 | THE COURT:  Overruled. |
| | 8 | THE WITNESS:  I do not. |
| | 9 | BY MS. BRENNAN: |
| 02:32:25 | 10 | Q    Do you know if Aspen was a fully trained service dog in |
| | 11 | 2016? |
| | 12 | MR. KNAUF:  Same objection. |
| | 13 | THE COURT:  Overruled. |
| | 14 | THE WITNESS:  I do not. |
| 02:32:33 | 15 | BY MS. BRENNAN: |
| | 16 | Q    Do you know if Aspen was a fully trained service dog in |
| | 17 | 2015? |
| | 18 | MR. KNAUF:  Same objection. |
| | 19 | THE COURT:  Overruled. |
| 02:32:41 | 20 | THE WITNESS:  I do not. |
| | 21 | BY MS. BRENNAN: |
| | 22 | Q    And do you know if Aspen was a fully trained service |
| | 23 | dog in 2018? |
| | 24 | MR. KNAUF:  Same objection. |
| 02:32:50 | 25 | THE COURT:  Overruled. |

*Deborah D. Parker, U.S. Court Reporter*

02:32:50  1              THE WITNESS:  I do not.

       2              THE COURT:  Counsel for both of you, I'm going to

       3   ask if Aspen was a fully trained service dog now.  I'll

       4   leave that to the adversarial process, but eventually I want

02:33:07  5   to get that opinion, if this is a fully trained service dog

       6   and you're certifying or not.

       7              So I'll let them ask first.

       8   BY MS. BRENNAN:

       9   Q     Is Aspen a fully trained service dog in 2019?

02:33:19 10   A     Yes.

      11   Q     And you base that upon what?

      12   A     Upon what I observed and my experience.

      13   Q     How long was your meeting and observations with C.L. in

      14   June of 2019?

02:33:33 15   A     Approximately an hour and a half.

      16   Q     How long do you typically, when you're doing a

      17   certification test for one of your service dogs, how long

      18   does that field test take?

      19   A     Three hours.

02:33:50 20   Q     With respect to boarding a dog -- and you had talked

      21   about disrupting the bond between the handler and the dog

      22   earlier.

      23              Do you remember that testimony?

      24   A     Yes, I do.

02:34:02 25   Q     Would it make a difference on the effect upon the dog,

*Deborah D. Parker, U.S. Court Reporter*

64

```
03:14:05   1    patience.  Any delay has been the Court's responsibility and
           2    fault.
           3              So if you'd be kind enough to raise your right
           4    hand.
03:14:12   5         PETER HIRSCH, M.D., DEFENDANT'S WITNESS, SWORN
           6              THE WITNESS:  I do.
           7              THE COURT:  Sir, if you would, please, be seated
           8    here in the witness box.  And the entrance to the witness
           9    box is closest to the wall.  It's not this little door.
03:14:34  10              MR. KLATTE:  Dr. Hirsch, would you like a bottle
          11    of water?
          12              THE WITNESS:  I would love the water.
          13              THE COURT:  This doesn't have wheels on it.
          14              Please, have a seat.
03:14:45  15              And after you're seated, sir, would you state your
          16    full name and, please, spell your last name.
          17              THE WITNESS:  Peter Hirsch, H-I-R-S-C-H.
          18              THE COURT:  Thank you very much.
          19              And this will be direct examination by the
03:15:02  20    defense.
          21                        DIRECT EXAMINATION
          22    BY MR. KLATTE:
          23    Q    Good afternoon, Dr. Hirsch.
          24    A    Good afternoon.
03:15:08  25    Q    Would you, please, share with us, briefly, your
```

03:17:22   1    hospital.

           2    Q    And, sir, can you tell us what your responsibilities

           3    were as the medical director of the National Treatment

           4    Center program?

03:17:35   5    A    It was really to oversee the activities and monitoring

           6    the activities of the attending physicians, to monitor their

           7    charts, make sure they were adhering to policies and the

           8    bylaws of the hospital.

           9    Q    And during that period of time, were you also serving

03:17:54  10    as an attending psychiatrist for the program?

          11    A    Yes, I was.

          12    Q    And were you on occasion serving as an admitting

          13    psychiatrist for the program?

          14    A    The words are used interchangeably, but, yes.

03:18:08  15    Q    I see.  All right.  Thank you.

          16         Could you tell us a little bit in your own words

          17    about the National Treatment Center program at Del Amo,

          18    during the time you were there?

          19    A    The National Treatment Center went through a number of

03:18:23  20    changes at times consisting also of treating eating

          21    disorders, at times treating and including people with

          22    sexual dependency issues.  But from the start, predominantly

          23    treating people with Post-Traumatic Stress Disorder.

          24    Q    And is there a typical length of stay for patients who

03:18:51  25    are admitted to the NTC program?

*Deborah D. Parker, U.S. Court Reporter*

74

| | |
|---|---|
| 03:28:12 | 1   therapy going along, as well as group therapy? |
| | 2               THE WITNESS:  I believe so.  Yeah. |
| | 3               THE COURT:  All right. |
| | 4   BY MR. KLATTE: |
| 03:28:20 | 5   Q   Thank you. |
| | 6               Dr. Hirsch, is there a treatment team that is |
| | 7   assigned for each patient who is hospitalized in the NTC |
| | 8   program? |
| | 9   A   That has changed as well.  Initially, it was the |
| 03:28:46 | 10  attending psychiatrist who would head up the team composed |
| | 11  of social worker, member of the nursing staff, another |
| | 12  adjunct personnel.  The treatment team would meet usually on |
| | 13  a weekly basis in a more formal way to discuss the progress |
| | 14  of the treatment for that individual.  That has transitioned |
| 03:29:18 | 15  into -- and really over the past three to four years of -- |
| | 16  the treatment team consists of the personnel in total |
| | 17  available on the unit, again, consisting of the program |
| | 18  coordinator, members of the nursing staff, social service |
| | 19  staff and adjunct team as well. |
| 03:29:46 | 20  Q   When you say "adjunct team," could you explain -- |
| | 21  A   Individuals -- adjunct therapy, yeah. |
| | 22  Q   All right.  Am I correct then -- would I be correct to |
| | 23  conclude that the team has gotten bigger over time? |
| | 24  A   I think -- this is a generalization, but I think that |
| 03:30:13 | 25  the team has gotten more -- first of all, consistent in |

03:30:20   1   terms of who usually attends.  The constituency of the team

           2   is not determined by which patient is being discussed.

           3   Members and those members of the team that were involved in

           4   those team meetings would discuss all the patients.

03:30:45   5   Q    I see.  All right.  And it's called the "treatment

           6   team."  I -- we may know the answer to this question, but I

           7   do need to ask you:  What is the function and purpose of the

           8   treatment team?

           9   A    That has changed as well.  Initially, it was very

03:31:07  10   individually focused in setting up very specific treatment

          11   goals, accessing what the assets of the individuals were,

          12   setting up coordinating discharge plans and discussing also

          13   with the attending psychiatrist what the plans were with

          14   medication.

03:31:31  15            THE COURT:  Could you give me -- Counsel, could

          16   one of you ask, either for the plaintiff or the defense,

          17   what the composition of this team would look like; in other

          18   words, obviously, a psychiatrist.  But, generally speaking,

          19   in this period of time, who else was involved in this

03:31:46  20   treatment team?

          21            I don't have a clear indication.  For instance, a

          22   hospital administrator, were they included?

          23            MR. KLATTE:  I think we will hear about that, but

          24   I believe the program coordinator who will testify later is

03:31:59  25   on the treatment team.  She is a licensed clinical social

*Deborah D. Parker, U.S. Court Reporter*

```
03:32:02    1    worker.  I think the --
            2                THE COURT:  You don't have to explain it to me
            3    now, but Dr. Hirsch is qualified.  He'd know.
            4                MR. KLATTE:  Okay.  Oh, I'm sorry.  I thought you
03:32:09    5    were asking me.
            6                MS. McGUINNESS:  It would be good to have the
            7    witness' testimony.
            8                THE COURT:  What is the competition --
            9    competition.  What does the composition look like?  In other
03:32:19   10    words --
           11                THE WITNESS:  Sure.  At the time of my last
           12    presence on the unit, a typical team meeting -- and there
           13    would be several of these during the week, because you had
           14    quite a few patients to discuss and it was oftentimes a
03:32:39   15    balance between trying to -- individualized discussion about
           16    the patient versus filling out a tremendous volume of forms
           17    that were required by such.
           18                But in terms of the composition itself, it was
           19    usually led by the program director.  It was usually a LCSW.
03:33:02   20                THE COURT:  A who?
           21                THE WITNESS:  A licensed clinical social worker.
           22                THE COURT:  Okay.
           23                THE WITNESS:  You then had a member of the nursing
           24    staff.
03:33:11   25                THE COURT:  Great.
```

```
03:33:14    1            THE WITNESS:  You then had a member from the
            2    social service department.
            3            THE COURT:  Okay.
            4            THE WITNESS:  And over the past years, rather than
03:33:27    5    the on-site presence of the psychiatrist, a conference call
            6    would be placed to the psychiatrist, who would participate
            7    telephonically.
            8            THE COURT:  Did you have a hospital administrator
            9    also?  The only reason I am asking that is I've got some
03:33:43   10    familiarity through UCI and other hospitals with billing and
           11    oftentimes billing became not a qualifier but a concern to
           12    the hospital.  It didn't change the modality or the
           13    treatment or the professionalism but oftentimes in the past,
           14    I've heard that a hospital administrator would be involved.
03:34:04   15            Was a hospital administrator involved in this
           16    team?
           17            THE WITNESS:  The hospital administrator --
           18            THE COURT:  No, not "the."  "A."
           19            THE WITNESS:  As much as the program director is a
03:34:17   20    representative of hospital administration.
           21            THE COURT:  Okay.
           22            Counsel.
           23    BY MR. KLATTE:
           24    Q    Dr. Hirsch, was one of the purposes of the treatment
03:34:26   25    team to discuss and determine treatment protocols for
```

*Deborah D. Parker, U.S. Court Reporter*

03:34:31  1    patients who were hospitalized?

        2    A    Yes.

        3    Q    Now -- and that would include discussions of different

        4    therapies that were ongoing or different treatment that was

03:34:44  5    ongoing, whether it was effective and whether it needed to

        6    be changed?

        7    A    Yes.

        8    Q    All right.  I'd like to turn now, specifically, to --

        9    to plaintiff's treatment.  And, Doctor, as I indicated to

03:35:01 10    you before, for purposes of privacy, we're referring to

       11    plaintiff as "C.L." in this case.  So you could refer to her

       12    either as the plaintiff or as "C.L."  Is that acceptable,

       13    sir?

       14    A    That's fine.

03:35:15 15         THE COURT:  And if you make a mistake, I'll get a

       16    stipulation from both counsel, that if you use the last

       17    name, to correct that, okay?  Don't be so concerned.  We'll

       18    clean up that record to maintain privacy.

       19    BY MR. KLATTE:

03:35:25 20    Q    And, Dr. Hirsch, there's been testimony in this case

       21    that plaintiff has been hospitalized in the NTC program on

       22    nine separate occasions from April 2014 through August 2017,

       23    during the time that you were the medical director of the

       24    NTC program.

03:35:49 25         Did you provide psychiatric treatment to C.L.

*Deborah D. Parker, U.S. Court Reporter*

| | |
|---|---|
| 03:35:53 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 03:36:05 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 03:36:18 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 03:36:44 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 03:37:04 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 03:37:32 | 25 |

1    during those hospitalizations, to the best of your

2    recollection?

3    A    To the best of my recollection, although I do believe

4    there was one time I was on vacation.

5    Q    And so what I'd like to do -- and I don't want to spend

6    a lot of time on this, but it is important that we get these

7    into evidence, or at least seek to admit them --

8            MR. KLATTE:  I'd like to bring up Exhibit 122,

9    please.

10           *(The document was published in open court.)*

11   BY MR. KLATTE:

12   Q    And, Dr. Hirsch, you can only see on your screen a part

13   of that document.  It's actually a three-page document.

14           Could we go to the third page of the document?

15           And let me just ask you, Dr. Hirsch, if that

16   appears to be your signature on Exhibit 122?

17   A    It's one of my signatures, yes.

18   Q    And let me go now to the first page of the document.

19   That is entitled "Admission Report."  And I'd like you, sir,

20   if you could, to just tell us about the purpose of this

21   document, the purpose of an admission report?

22   A    The purpose of an admission report is to document the

23   reasons why the patient is being admitted to give a synopsis

24   of the symptoms and history that support the need for

25   psychiatric care, the need for treatment in an inpatient

03:58:01  1    that hospital staff had declined the plaintiff's request to

2    bring her dog with her during a hospitalization?

3    A    Yes.

4    Q    Do you recall when that was?

03:58:15  5    A    No.

6    Q    And from a psychiatric and clinical perspective, did

7    you agree with that decision?

8              MS. McGUINNESS:  We object, Your Honor.  This is

9    an expert opinion.  There's no foundation laid.

03:58:29  10             THE COURT:  Overruled.  Before I get your opinion,

11   I want to know who you understood declined the admission?

12   In other words, was this the admission team?  The program

13   director?  How did you receive information that there was a

14   declination for C.L.'s dog?

03:58:56  15             THE WITNESS:  I don't recall how I was informed.

16   What I do recall was that I was informed on the unit, after

17   the individual was admitted.

18             THE COURT:  I see.

19             THE WITNESS:  That I was informed -- I don't know

03:59:24  20   who the staff informed me.  But to the best of my recall, it

21   was a decision that came out of the -- what's referred to as

22   the morning meeting.

23             THE COURT:  And what's the morning meeting?

24             THE WITNESS:  The morning meeting is held Monday

03:59:46  25   through Friday, first thing in the morning.

*Deborah D. Parker, U.S. Court Reporter*

| | | |
|---|---|---|
| 03:59:48 | 1 | THE COURT:  Who's part of the morning meeting? |
| | 2 | THE WITNESS:  Sure.  There's usually a |
| | 3 | representative, the CEO of the hospital, frequently there; |
| | 4 | head of the departments.  So head of nursing, head of social |
| 04:00:02 | 5 | service, the admissions department, maintenance, medical |
| | 6 | records, head of every department in the hospital. |
| | 7 | THE COURT:  Okay.  Thank you. |
| | 8 | And then the question was, Counsel? |
| | 9 | MR. KLATTE:  Yes. |
| 04:00:18 | 10 | BY MR. KLATTE: |
| | 11 | Q    From a psychiatric and clinical perspective, |
| | 12 | Dr. Hirsch, did you agree with that decision? |
| | 13 | MS. McGUINNESS:  Same objection. |
| | 14 | And could we just make the standing objection, |
| 04:00:29 | 15 | please? |
| | 16 | THE COURT:  Absolutely. |
| | 17 | MS. McGUINNESS:  Thank you. |
| | 18 | THE COURT:  Overruled. |
| | 19 | You can answer, sir. |
| 04:00:35 | 20 | THE WITNESS:  Can you repeat the question, please? |
| | 21 | BY MR. KLATTE: |
| | 22 | Q    Sure.  And you may have answered it.  But from a |
| | 23 | psychiatric and clinical perspective, did you agree with |
| | 24 | that decision? |
| 04:00:47 | 25 | A    I agreed with the decision.  I don't recall whether the |

*Deborah D. Parker, U.S. Court Reporter*

04:00:50  1    details, what went into that decision were shared with me.

       2    Q    Right.  And I'm not -- I think you made that clear that

       3    you were not part of that decision, so -- but in terms of

       4    your agreement of that decision from a standpoint of the

04:01:09  5    attending psychiatrist, why did you agree that plaintiff's

       6    dog should be excluded during her hospital stay?

       7    A    My thinking about that at the time, which remains the

       8    same today, is that the intent of the program, as I had

       9    earlier stated, is to help individuals learn, gain and

04:01:46 10    utilize healthy methods of coping and functioning in life

      11    and that in my opinion the use of an animal, like many other

      12    activities or endeavors that people may engage in,

      13    interfered with the therapeutic attempt and treatment on the

      14    unit.

04:02:40 15    Q    And was this view specific to the period of

      16    hospitalization?  In other words, you weren't -- if I

      17    understood you correctly, you were saying interfered with

      18    the therapeutic treatment.  You weren't forming an opinion

      19    as to whether or not C.L. could or should use a service

04:02:59 20    animal outside the hospital environment; am I correct?

      21    A    That's correct.

      22    Q    And how -- so why did you think that having a dog with

      23    her would interfere with the treatment?

      24            MS. McGUINNESS:  No -- the question really

04:03:20 25    misstates the testimony.  Maybe it needs to be clarified,

04:03:24  1    because Counsel is using the term "dog" and the question

       2    here is a service dog.

       3              THE COURT:  Overruled.

       4              You can answer, sir.

04:03:38  5              MR. KLATTE:  Repeat the question, please.

       6    BY MR. KLATTE:

       7    Q    Sure.  Why did you feel that having -- if C.L. had her

       8    animal with her, that it would interfere with the

       9    therapeutic process?

04:03:53 10   A    The treatment of many psychiatric disorders but

      11    especially ones that are based on a history of

      12    Post-Traumatic Stress Disorder or trauma is directed at

      13    helping the individuals become more tolerant of frequently

      14    very uncomfortable feeling states.  Not just to find ways to

04:04:27 15   tolerant those emotional states but coming to understand

      16    where they emanant from, where they come from.

      17    Q    And -- pardon me.  Go ahead.

      18    A    A lot of the individuals that came for treatment over

      19    the years had tried to cope with such emotional difficulty

04:04:58 20   through various means, whether it be use of alcohol, use of

      21    drugs, other maladaptive ways of functioning, that those

      22    methods that judge from the outside are maladaptive to the

      23    individual they experienced as soothing, as quieting those

      24    emotional states down.

04:05:25 25            The therapeutic process requires that the patient

| | | |
|---|---|---|
| 04:05:32 | 1 | have a clear experience of what those basic emotional states |
| | 2 | are that have caused such difficulty over a period of time. |
| | 3 | My understanding of a dog is that it would provide comfort, |
| | 4 | a movement away from experiencing the full volume or |
| 04:05:59 | 5 | intensity of those emotional states from which they were |
| | 6 | seeking treatment to begin with and what's the intent of the |
| | 7 | program. |
| | 8 | Q    And I would like to refer you, if I could now, to |
| | 9 | Exhibit 154, which has been previously admitted into |
| 04:06:24 | 10 | evidence. |
| | 11 | (The document was published in open court.) |
| | 12 | BY MR. KLATTE: |
| | 13 | Q    And if I could, we'll do the same thing.  If I could |
| | 14 | direct your attention to the second page of Exhibit 154, and |
| 04:06:37 | 15 | if you could look at that and tell us if that is your |
| | 16 | signature. |
| | 17 | A    Yes, it is. |
| | 18 | Q    And so, I'd like to have you look at the second page of |
| | 19 | Exhibit 154.  So let's start on the first page under |
| 04:06:57 | 20 | "Current Diagnosis." |
| | 21 | Do you see that? |
| | 22 | A    Yes. |
| | 23 | Q    Psychiatric.  And it lists four items.  And now I'd |
| | 24 | like to continue it on the second -- the top of the second |
| 04:07:11 | 25 | page. |

04:07:11   1          And you see where it says "Borderline Personality

           2    Disorder"?

           3    A    Yes.

           4    Q    And I think you previously, if I understood correctly,

04:07:25   5    you talked about an Axis II diagnosis of personality

           6    disorders, and I think it was deferred in 2014?

           7    A    I don't recall saying that.

           8    Q    Okay.  All right.  Do you remember talking about an

           9    Axis II, personality disorders?

04:07:43  10    A    Yes.

          11    Q    Okay.  At some point in time, did you diagnose C.L.

          12    with borderline personality disorder?

          13    A    I don't know whether I was the one that initially made

          14    that determination, but I concurred with it.

04:08:00  15    Q    All right.  And would you explain for us what a

          16    "borderline personality disorder" is?

          17    A    "Borderline personality disorder" also frequently

          18    describes an individual whose emotional boundaries are

          19    rather porous, where events in life can precipitate certain

04:08:41  20    emotional states that can be overwhelming so that the

          21    regulation of those emotional states really becomes a

          22    challenge.

          23    Q    And you said you concurred in that diagnosis.  Why did

          24    you concur -- what is it that you observed of C.L. that led

04:09:07  25    you to concur with that diagnosis?

98

04:09:12   1   A    Based upon -- I'm assuming at this point.  I don't
            2   recall, you know, what's going through my mind at the time
            3   that I dictated this report.  But I'm assuming that it was
            4   based upon observation, talking with the patient, as well as
04:09:27   5   my prior experience with the patient as well.
            6   Q    And, Doctor, you're right.  In fairness, why don't we
            7   turn to the first page of the exhibit.  I want to give you
            8   an opportunity to look at it to the extent you would like to
            9   do so.
04:09:49  10   A    It's a bit blurry up here.
           11   Q    I see.
           12   A    Thank you.
           13   Q    Is that clear, Doctor?
           14   A    That's better.
04:10:27  15   Q    Have you had an opportunity to view page 1 of
           16   Exhibit 154?
           17   A    Yes.
           18   Q    Could we turn to page 2, please?
           19   A    (Witness so complies.)
04:10:43  20   Q    And let me know after you've had an opportunity to look
           21   at that as well, Doctor.
           22   A    (Witness so complies.)  Yes.
           23   Q    All right.  And I'm not sure if that provides any
           24   information or not, but I'm going to ask you the question,
04:11:11  25   again, as to why you concurred with the diagnosis that C.L.

*Deborah D. Parker, U.S. Court Reporter*

99

04:11:17   1    had a borderline personality disorder?

2    A    I assume that based upon my meeting with the patient,

3    as well as my past familiarity and her history, that it was

4    consistent with that diagnosis.

04:11:41   5    Q    And, Dr. Hirsch, would your diagnosis or would the

6    diagnosis in March of 2016 of a borderline personality

7    disorder change your opinion concerning whether C.L. should

8    be accompanied by her dog during her hospitalizations?

9    A    No.

04:12:14   10   Q    And why not?

11   A    Referring back to my prior statement, I feel strongly

12   that one of the important things in treatment, whether it be

13   inpatient or otherwise, is for individuals to have a clear

14   awareness of what their emotional states are during that

04:12:42   15   course of treatment.

16   Q    Dr. Hirsch, there's been testimony from C.L. in this

17   case to the effect that in 2018, she was suffering from

18   suicidal ideation but chose not to seek admission to the NTC

19   program, because she felt the negative effects of being

04:13:07   20   without her service dog would offset or outweigh whatever

21   positive benefits she would otherwise gain from

22   hospitalization.

23        How would you assess that request as the attending

24   physician?

04:13:27   25        MS. McGUINNESS:  I'm sorry.  That question is

*Deborah D. Parker, U.S. Court Reporter*

04:13:29   1   vague.

           2           THE COURT:  Overruled.

           3   BY MR. KLATTE:

           4   Q    Let me ask you this.  Let me ask you a more specific

04:13:36   5   question:  Would that cause you to change your opinion about

           6   whether C.L. should be accompanied by her dog during her

           7   hospitalization?

           8           MS. McGUINNESS:  I'm sorry, Counsel.  I need

           9   clarification.  Would the patient's opinion?  Is that what

04:13:48  10   you're asking?

          11           MR. KLATTE:  Well, presented a scenario that I

          12   think is responsive to the testimony in this case that

          13   plaintiff decided not to seek hospital at NTC, because she

          14   felt that the negative effects of being without her dog

04:14:05  15   outweighed the positive effects of the program.

          16           THE COURT:  Are you having a nice conversation?

          17           MR. KLATTE:  Pardon me, Your Honor.

          18           THE COURT:  Ask the question.

          19   BY MR. KLATTE:

04:14:12  20   Q    So, Dr. Hirsch, would that -- would that scenario,

          21   would that cause you to change your opinion about whether or

          22   not C.L. should be accompanied by her dog?

          23   A    No.

          24   Q    And why or why not?

04:14:29  25   A    People have a choice of the different therapies that

*Deborah D. Parker, U.S. Court Reporter*

101

04:14:33  1  ==are available in different facilities with other clinicians==

2  ==and professionals.  The treatment at Del Amo Hospital was==

3  ==very specific with certain goals and methodology.  How to==

4  ==reach those goals and having a dog would not fit in with==

04:14:55  5  ==that==.

6  Q    In your opinion, Dr. Hirsch, as an attending

7  psychiatrist during the hospital -- C.L.'s hospitalizations,

8  did plaintiff receive benefits from the National Treatment

9  Center hospitalization program?

04:15:17 10  A    I believe she did.

11  Q    And one final question, Doctor.  One final -- couple

12  final questions:  This may take you back a while, but when

13  you're -- were in medical school, was there a ceremony in

14  which you were given your white jacket, so to speak, at some

04:15:40 15  sort of cloaking ceremony, or something like that?

16  A    Yes.

17  Q    And what was that -- what was that called?

18  A    It was called the Hippocratic oath ceremony.

19  Q    And did you at that time take the Hippocratic oath?

04:15:59 20  A    Yes.

21  Q    I'm not asking you to recall verbatim the Hippocratic

22  oath.  But in taking that oath, what was your understanding

23  that you were committing to as a physician?

24  A    Dedicating a vocational, as well as spiritual life

04:16:17 25  towards enhancing, welfare of individuals.

*Deborah D. Parker, U.S. Court Reporter*

Exhibit D

1

2

3                    UNITED STATES DISTRICT COURT

4                    CENTRAL DISTRICT OF CALIFORNIA
                          SOUTHERN DIVISION

5

6

7    C.L.,                          )
                                    )
8                                   )
                PLAINTIFF,          )
9                                   )
                V.                  )
10                                  )
                                    )
11   DEL AMO HOSPITAL, INC.,        )
     ET AL.,                        )
12                                  )   SA CV 18-0475-DOC(DFMX)
                DEFENDANTS.         )   JULY 25, 2019
13                                  )   SANTA ANA, CALIFORNIA
     ───────────────────────────── )   (8:03 P.M. TO 10:06 P.M.)
14

15                  COURT TRIAL – DAY 3, VOLUME III

16             BEFORE THE HONORABLE DAVID O. CARTER
                  UNITED STATES DISTRICT JUDGE

17

18   APPEARANCES:               SEE NEXT PAGE

19   COURT REPORTER:            RECORDED; COURTSMART

20   COURTROOM DEPUTY:          DEBORAH LEWMAN

21   TRANSCRIBER:               DOROTHY BABYKIN
                                COURTHOUSE SERVICES
22                              1218 VALEBROOK PLACE
                                GLENDORA, CALIFORNIA  91740
23                              (626) 963-0566

24
     PROCEEDINGS RECORDED BY ELECTRONIC SOUND RECORDING;
25   TRANSCRIPT PRODUCED BY TRANSCRIPTION SERVICE.

3

1                          I N D E X
     SA CV 18-0475-DOC(DFMX)                      JULY 25, 2019
2
     PROCEEDINGS:  DAY 3, VOLUME III
3
     KRISTI YAHNIAN, DEFENSE WITNESS:                 PAGE
4
         DIRECT EXAMINATION BY MS. BRENNAN              7
5        CROSS-EXAMINATION BY MS. MC GUINNESS          25
         REDIRECT EXAMINATION BY MS. BRENNAN           89
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9

```
 1   HOSPITAL?

 2   A    YES, IT DOES.

 3   Q    HOW IS IT DIFFERENT?

 4   A    WE HAVE THERAPY.  WE WORK WITH TRAUMA PATIENTS WHO HAVE

 5   PTSD AND TRAUMA.  WE HAVE -- IT'S A VERY STRUCTURED UNIT.  AND

 6   WE WORK SPECIFICALLY WITH COPING SKILLS TO HELP PEOPLE WITH

 7   TRAUMA.  THEY ACTUALLY COME IN TO WORK ON THE TRAUMA.

 8   Q    WHAT DIFFERENT TREATMENT MODALITIES ARE THERE TO WORK WITH

 9   THE PATIENTS IN TREATING THEIR TRAUMA?

10   A    WE DO C.B. -- COGNITIVE BEHAVIORAL, BEHAVIORAL

11   MODIFICATION.  WE HAVE TRAUMA THERAPY, TALK THERAPY,

12   MINDFULNESS, GROUNDING.  LET ME SEE.  THERE'S A LOT OF -- GRIEF

13   AND LOSS, SAFETY, CONTAINMENT.

14   Q    IS THERE BOTH GROUP AND INDIVIDUAL THERAPIES?

15   A    YES, THERE IS.

16   Q    DO YOU RUN ANY OF THE GROUP THERAPIES YOURSELF.

17   A    YES.  I DO ABOUT 10 GROUPS PER WEEK, PLUS ORIENTATION FIVE

18   GROUPS PER WEEK.  SO, I DO ABOUT 15 GROUPS.

19   Q    WHAT IS YOUR ROLE AS THE THERAPIST RUNNING THE GROUP?  HOW

20   DO YOU FACILITATE THAT?

21   A    I RUN MOST -- I DON'T RUN THE TRAUMA GROUP, BUT I

22   FACILITATE THE GROUPS.  I DO A LOT OF EDUCATION MINDFULNESS. I

23   ALSO DO EXPERIENTIAL GROUPS.  I DO PSYCHODRAMA ROLE PLAY. ANGER

24   WORKSHOP.  MANY DIFFERENT GROUPS.

25            SO, I FACILITATE AND HELP TO PROCESS THE PATIENTS IN
```

10

1    THE GROUP WITH THE EDUCATION AND WHAT WE PROCESS IN GROUP.

2    Q    OKAY.  WHAT DOES IT MEAN TO PROCESS IN GROUP?

3    A    PROCESS IS WE MIGHT HAVE A TOPIC.  AND WHAT WE DO IS OPEN

4    UP TO HOW PATIENTS RELATE, HOW THEY FEEL, HOW THEY RELATE TO IT

5    AND THE FEELINGS THAT COME UP FOR THEM.

6    Q    DO PATIENTS ASSIST EACH OTHER IN THE TREATMENT PROCESS?

7    A    YES, THEY DO BY SUPPORTING PATIENTS HAVE NOT BEEN HEARD.

8    AND THEY HAVE BEEN VERY ALONE WHEN THEY COME IN THERE.  AND,

9    SO, PART OF HOW THEY SUPPORT EACH OTHER IS TO LISTEN AND GIVE

10   SUPPORTIVE FEEDBACK AND I STATEMENTS RELATING TO WHAT CAME UP

11   AND THE FEELINGS BEHIND WHAT THEY PROCESSED.

12   Q    SO, HOW IMPORTANT IS IT FOR PATIENTS TO INTERACT WITH EACH

13   OTHER DURING THE TREATMENT PROCESS IN THE NTC PROGRAM?

14   A    VERY IMPORTANT.  WE EVEN HAVE LUNCH AND ALL MEALS ARE

15   GROUP TIMES.  IT'S PART OF COMMUNICATING AND CONNECTING WITH

16   PEOPLE WHICH THEY HAVEN'T DONE FOR A LONG TIME BECAUSE IT

17   HASN'T BEEN AVAILABLE TO THEM OUTSIDE -- JUST FOR SAFETY

18   REASONS.

19   Q    ARE THE STAFF AVAILABLE TO PATIENTS TO INTERACT ON A

20   ONE-ON-ONE BASIS?

21   A    YES, THEY ARE.

22   Q    OKAY.  HOW FREQUENTLY ARE STAFF AVAILABLE TO INTERACT WITH

23   PATIENTS ON A ONE-ON-ONE BASIS?

24   A    THEY'RE -- THEY ARE ALL DAY LONG.  THERE'S ALWAYS A STAFF

25   ON THE FLOOR.  WE DO 15-MINUTE ROUNDS CHECKING ON THE PATIENTS.

19

1   ME ABOUT -- SHOULD I COME IN TO THE HOSPITAL, WHAT DO YOU

2   THINK.  I WOULD HELP HER LOOK AT HER GROUNDING SKILLS.  I WOULD

3   TELL HER I CAN'T MAKE THAT DECISION.  BUT I WOULD ALSO INSTRUCT

4   HER TO CALL HER THERAPIST ON THE OUTSIDE TO HAVE HIM BE IN WITH

5   THE DECISION.  I WOULD TRY TO REINFORCE MAYBE YOU CAN USE YOUR

6   COPING SKILLS.  TRY THEM AT HOME.  AND SOMETIMES IT WOULD WORK

7   AND SHE WOULD POSTPONE OR NOT COME TO THE UNIT.

8   BY MS. BRENNAN:

9   Q    DID SHE EVER CONTACT YOU ABOUT BRINGING IN HER SERVICE DOG

10  ASPEN?

11  A    YES.

12  Q    DO YOU RECALL WHEN SHE CONTACTED YOU ABOUT BRINGING IN HER

13  DOG?

14  A    IT WAS ABOUT RIGHT WHEN SHE GOT THE DOG.  SHE HAD TOLD ME

15  ABOUT THE DOG.  I'M A DOG LOVER AND SHE TOLD ME ABOUT HER DOG.

16  AND I SAID GREAT.  AND SHE DID ASK ABOUT BRINGING THE DOG IN.

17  Q    DID THAT INQUIRY OCCUR PRIOR TO HER ADMISSION OR WHILE SHE

18  WAS ALREADY IN THE HOSPITAL?

19  A    PRIOR TO THE ADMISSION.

20  Q    DO YOU RECALL WHAT SHE SAID?

21  A    THAT SHE WOULD LIKE TO BRING ASPEN IN FOR COMFORT AND TO

22  HELP HER WORK ON HER ISSUES.

23  Q    OKAY.  WHAT DID YOU DO IN RESPONSE TO THAT INQUIRY?

24  A    I TOOK IT TO THE TREATMENT TEAM, AND WE DISCUSSED AND

25  LOOKED AT THE PROS AND CONS OF THE BENEFIT OF HAVING THE DOG ON

20

1    THE UNIT.

2    Q    DID YOU MAKE ANY RECOMMENDATIONS TO THE TREATMENT TEAM?

3    A    WE DISCUSSED -- I -- I DISCUSSED AND DISCUSSED WITH THE

4    TREATMENT TEAM.  AND AS THE SERVICE DOG IS --

5              THE COURT:  NO, JUST A MINUTE.  THE QUESTION WAS, DID

6    YOU MAKE ANY RECOMMENDATION TO THE TREATMENT TEAM?

7              THE WITNESS:  YES, I DID.

8              THE COURT:  OKAY.

9    BY MS. BRENNAN:

10   Q    WHAT RECOMMENDATIONS DID YOU MAKE TO THE TREATMENT TEAM

11   REGARDING PLAINTIFF BRINGING HER DOG TO THE HOSPITAL?

12   A    THAT SHE WOULD MORE SO BENEFIT TO BE IN THE HOSPITAL.  WE

13   COULD SUPPLY A LOT OF THE NEEDS IN THE HOSPITAL, AND THAT IT

14   MIGHT INTERFERE WITH HER STRENGTH IN BEING ABLE TO BUILD

15   INTERNALLY INSIDE SAFETY BY WORKING ON CHALLENGING, WORKING ON

16   BRINGING HER FEELINGS DOWN WITH THE SELF-TALK AND TOOLS ABOUT

17   BEING ABLE TO, YOU KNOW, BE ABLE TO GROUND.

18             SO, WE -- IN THE PROGRAM THERE IN MY EXPERIENCE WE

19   DIDN'T --

20             THE COURT:  WE WANT TO KNOW WHAT YOU RECOMMENDED.

21             THE WITNESS:  OKAY.  WHAT I RECOMMENDED.

22             THE COURT:  WHAT YOU RECOMMENDED.

23             THE WITNESS:  MY FIRST TIME DOING IT.  OKAY.

24             THE COURT:  WELL, THAT'S -- WE'RE GOING --

25             THE WITNESS:  I RECOMMENDED THAT SHE NOT BRING THE

21

1   DOG IN.

2           THE COURT:  AND THE OBVIOUS QUESTION WOULD BE THEN

3   WHY?

4   BY MS. BRENNAN:

5   Q   YES, WHY?

6           THE COURT:  AND IF YOU DON'T ASK IT, COUNSEL IS GOING

7   TO ASK IT.  SO, LET'S FIND OUT WHY.

8   BY MS. BRENNAN:

9   Q   WHY DID YOU FEEL THAT IT WOULD -- WHY DID YOU MAKE THAT

10  RECOMMENDATION THAT SHE SHOULD NOT BRING THE DOG IN?

11  A   BECAUSE OF THE NEED TO BUILD -- TO HELP HERSELF TILL HELP

12  ARRIVES.  MEANING REALLY WORK STRONGLY ON INTERNALLY WORKING ON

13  CHALLENGING, THE COGNITIVE DISTORTIONS, AND BEING ABLE TO

14  GROUND IN THE GROUP BY UTILIZING -- LISTENING TO HER BODY

15  INSIDE.  PART OF GROUNDING IS BEING ABLE TO LOOK AT THE CERTAIN

16  SIGNS THAT COME UP BUT, ALSO, DOING THAT WHERE YOU HAVE THE

17  INTERNAL DIALOGUE GOING SO WHEN YOU LEAVE THE HOSPITAL -- YOU'D

18  HAVE MORE INTERNAL SAFETY TO BE ABLE TO BRING YOURSELF DOWN

19  WHEN YOU'RE GOING INTO A FLASHBACK.

20  Q   AND HOW WOULD THE DOG INTERFERE WITH THOSE PROCESSES YOU

21  JUST TALKED ABOUT?

22  A   IF YOU RELY ON THE DOG IT WOULD INTERFERE WITH -- BECAUSE

23  THE DOG CAN'T TALK.  AND PART OF TALKING, ESPECIALLY WHEN YOU

24  HAVE D.I.D., THERE'S PARTS INSIDE THEM -- PART OF TALKING IS

25  TALKING TO THE SELF AND BRINGING THE SELF DOWN.

22

1          AND, SO, YOU MIGHT RELY TOO MUCH ON THE COMFORT

2     WITHOUT INTERNALLY WORKING ON CHALLENGING THE BASIS -- WHY

3     PATIENTS GO INTO FLASH-BACKS IS THE SELF-TALK.  IT SCARES THEM

4     INTO A FLASH-BACK.  SO, THE SELF-TALK IS VERY IMPORTANT IN

5     TALKING AND BRINGING THE PATIENT BACK TO THE HERE AND NOW.

6     Q    DID YOU DISCUSS WITH C.L. THE REASONS WHY HER DOG WAS NOT

7     PERMITTED TO COME INTO THE HOSPITAL WITH HER?

8     A    YES.

9     Q    ON HOW MANY OCCASIONS?

10    A    MAYBE THE FIRST COUPLE OF TIMES.  NOT MORE THAN THAT.

11    Q    WHEN YOU SAY THE FIRST COUPLE OF TIMES, ARE YOU REFERRING

12    TO AFTER THAT INITIAL REQUEST SHE MADE TO BRING THE DOG?

13    A    WHEN THE DECISION WAS MADE I TALKED TO HER.  AND MAYBE IT

14    CAME UP AGAIN AFTER THAT.  BUT THE FREQUENT -- THE VISITS AFTER

15    THAT WE DIDN'T BRING THAT UP.

16    Q    DO YOU RECALL HER ASKING YOU AGAIN AFTER THAT INITIAL

17    REQUEST, AND AFTER YOU HAD THESE DISCUSSIONS, DO YOU RECALL

18    C.L. ASKING YOU AGAIN WHETHER SHE COULD BRING THE DOG TO THE

19    HOSPITAL?

20    A    NO.

21    Q    DURING C.L.'S ADMISSIONS -- WHICH YOU'VE BEEN A PART OF,

22    EACH ONE OF THEM --

23    A    UH-HUH.

24    Q    -- OVER THE TIME, OVER THE YEARS HAVE YOU SEEN AN OVERALL

25    IMPROVEMENT?

69

1    A    NO.

2                (PAUSE IN PROCEEDINGS.)

3                (PLAINTIFF'S COUNSEL CONFERRING.)

4    BY MS. MC GUINNESS:

5    Q    DO YOU REMEMBER TESTIFYING THAT ALTHOUGH YOU'RE ON THE

6    TREATMENT TEAM WHICH CONSIDERS WHETHER OR NOT THE DOG IS

7    BENEFICIAL AND NECESSARY TO THE -- TO THE PERSON -- TO THE

8    PATIENT COMING ON THE WARD, IT'S MS. RAHIMI THAT MAKES THE

9    FINAL DECISION?

10   A    IT WOULD HAVE BEEN KRISTEN PARKER AT THE TIME.  SHE WAS

11   THE DIRECTOR.  AND SHE -- I'M UNDER KRISTEN.  AND I DISCUSS IT

12   WITH THE PSYCHIATRISTS, THE THERAPISTS ON THE UNIT, AND MYSELF.

13   AND THEN IT GOES TO KRISTEN.   AND THEN IT GOES BEYOND THAT.

14   Q    OKAY.  WELL, THAT WAS BACK WHEN KRISTEN WAS THE --

15   A    YES.

16   Q    WAS -- ALL RIGHT.

17                AND, SO, YOUR -- YOUR TESTIMONY IS THAT YOU WOULD

18   DISCUSS IT WITH THE ATTENDING PSYCHIATRIST AMONG OTHERS?

19   A    YES.

20   Q    AND THAT WOULD HAVE BEEN DR. HIRSCH?

21   A    YES.

22   Q    AND YOU WOULD HAVE SOUGHT HIS OPINION BEFORE MAKING A

23   RECOMMENDATION TO MS. PARKER?

24   A    YES.

25   Q    AND THAT'S WHAT YOU DID IS YOU ASKED HIS OPINION BEFORE

71

1   A    SHE IS MY BOSS.  AND I GO TO HER WITH MY ISSUES.  AND I

2   TURN IT TO HER.

3   Q    DOES SHE MAKE THE DECISION WHETHER OR NOT TO ALLOW A

4   SERVICE DOG ON THE UNIT?

5   A    NO.

6   Q    WHO MAKES THE DECISION?

7   A    IT GOES UP.  WE'RE A FULL-TREATMENT TEAM.  WE HAVE --

8   THERE'S NOBODY THAT MAKES A CERTAIN DECISION.  IT'S ALL

9   DISCUSSED BY THE CEO, THE INTAKE, RISK MANAGEMENT.

10  Q    I'M NOT -- OKAY.  I'M NOT TALKING ABOUT WHO DISCUSSES IT.

11  A    UH-HUH.

12  Q    I'M SAYING WHO MAKES THE FINAL DECISION?

13  A    I CAN'T ANSWER THAT.  IT'S THE WHOLE TEAM.

14  Q    OKAY.

15       DIDN'T YOU TESTIFY IN YOUR DEPOSITION THAT IT WAS

16  MS. RAHIMI WHO MADE THE DECISION?

17  A    NO.

18  Q    OKAY.

19       MS. MC GUINNESS:  LET'S HAVE PAGE 30.

20       THE WITNESS:  SHE WASN'T THERE AT THE TIME AT ALL.

21  BY MS. MC GUINNESS:

22  Q    I'M TALKING ABOUT NOW.

23       ALL RIGHT.  STARTING WITH LINE 1 TO LINE 12.

24  A    OKAY.

25       (PAUSE IN PROCEEDINGS.)

72

1              THE WITNESS:  OKAY.

2    BY MS. MC GUINNESS:

3    Q    NOW, DOES THAT REFRESH YOUR RECOLLECTION THAT YOU

4    TESTIFIED THAT MS. RAHIMI MADE THE FINAL DECISION?

5    A    THAT IS INCORRECT.  I MUST HAVE HEARD IT WRONG.  SHE DOES

6    NOT MAKE THE FINAL DECISION.

7              IT'S -- I GO TO HER.  SHE IS MY BOSS.  AND THEN IT

8    GOES TO THE REST OF THE TREATMENT TEAM.  I'M ON THE UNIT.  I

9    DON'T GO FURTHER THAN THAT.

10   Q    OKAY.  SO --

11   A    I CAN'T --

12   Q    SO THE QUESTION YOU WERE ASKED WAS WHO IS THE PERSON THAT

13   MAKES THAT DECISION OR PERSONS.

14             AND YOUR ANSWER WAS IT WOULD BE THE DIRECTOR OF THE

15   PROGRAM.

16   A    THAT'S --

17   Q    IS THAT YOUR ANSWER?

18   A    THAT WAS MY ANSWER.  IT'S NOT ACCURATE THOUGH.

19   Q    AND WHEN YOU WENT BACK AND REVIEWED YOUR TESTIMONY AND

20   MADE YOUR CORRECTIONS, YOU DIDN'T CORRECT THIS ONE?

21   A    I DIDN'T SEE THE -- I -- WHAT I READ IN THERE -- SHE --

22   Q    SO --

23   A    OKAY.

24   Q    AND NOW YOUR TESTIMONY IS YOU DON'T KNOW WHO MAKES THE

25   DECISION?

73

1    A    NO.  I CAN'T ANSWER THAT.

2              (PAUSE IN PROCEEDINGS.)

3    BY MS. MC GUINNESS:

4    Q    IS IT YOUR TESTIMONY THAT BEFORE MS. RAHIMI IT WOULD HAVE

5    BEEN MS. PARKER WHO MADE THE DECISION?

6    A    MS. PARKER WOULD HAVE HEARD -- SHE MET WITH THE TREATMENT

7    TEAM.  WE WOULD ALL MEET TOGETHER.  IT WOULDN'T BE MS. PARKER.

8    Q    OKAY.

9    A    WE WOULD ALL MEET.  AND THEN IT WOULD GO BEYOND THAT.

10             NOBODY ON THE UNIT MADE THE DECISION.

11   Q    BUT YOU DON'T KNOW WHO MADE THE DECISION?

12   A    I CAN'T ANSWER -- NO, I DON'T.

13   Q    BUT YOU CONVEYED THE DECISION TO C.L.

14   A    YEAH.  BUT I'M -- I'M HERE ON THE UNIT.  I DON'T GO UP

15   INTO THAT AREA.

16   Q    BUT WHO TOLD YOU THAT C.L. COULDN'T HAVE HER DOG?

17   A    I DON'T RECALL.

18   Q    AND YOU DIDN'T WRITE IT DOWN?

19   A    NO.

20             (PAUSE IN PROCEEDINGS.)

21   BY MS. MC GUINNESS:

22   Q    DO YOU REMEMBER TESTIFYING THAT YOU RECALL HER -- C.L.

23   ASKING MULTIPLE TIMES FOR HER SERVICE DOG.

24             AND WE'VE BEEN OVER THIS, RIGHT?

25   A    YES.

74

1    Q    OKAY.

2              AND -- AND YOU ALSO RECALL TESTIFYING THAT EACH TIME

3    SHE CAME IN AFTER HER FIRST REQUEST, YOU DISCUSSED WITH DR.

4    HIRSCH WHETHER TO ALLOW HER SERVICE DOG EACH TIME SHE CAME IN?

5              DO YOU RECALL THAT TESTIMONY?

6    A    YES.  WE DO FOR EVERY CASE.

7    Q    SO, EACH TIME SHE CAME IN FOR EACH OF HER ADMISSIONS, YOU

8    TALKED ABOUT IT WITH DR. HIRSCH?

9    A    IT WOULD GO THROUGH INTAKE.

10   Q    NO.

11             MY QUESTION IS FOR EACH OF HER ADMISSIONS AFTER THE

12   FIRST TIME, YOU HAD AN ACTIVE DISCUSSION WITH DR. HIRSCH ABOUT

13   WHETHER TO ADMIT HER SERVICE DOG?

14   A    YES.

15   Q    SO, IT WAS A -- IT WAS A QUESTION YOU CONSIDERED EACH TIME

16   SHE WAS ADMITTED?

17   A    YES.

18   Q    DID YOU EVER INFORM MS. RAHIMI THAT C.L. WAS ASKING TO

19   BRING HER SERVICE DOG IN IN THE PERIOD 2016 TO 2018?

20   A    YES.

21   Q    YOU TOLD HER EACH TIME?

22   A    YES.

23   Q    DID YOU WRITE THAT DOWN?

24   A    NO.

25             (PAUSE IN PROCEEDINGS.)

86

1    THAT SHE MADE A REQUEST ON THE FIRST ADMISSION AND MAYBE A

2    SECOND ADMISSION IN 2014.

3             HOLD ON.

4             THE WITNESS:  OKAY.

5             THE COURT:  AND I MAY BE WRONG, BUT I'VE BEEN MAKING

6    AN ASSUMPTION THAT THIS CONVERSATION WITH C.L. TOOK PLACE ON

7    THE FIRST ADMISSION IN 2014 -- WHICH FROM MY RECORD WOULD BE

8    EXHIBIT 125 ON JULY 30TH, 2014.

9             NOW, IF MY SUPPOSITION IS CORRECT, AND YOU HAD THE

10   OPINION THAT IT WAS GOING TO BE A HINDRANCE, AND YOU HAD WORKED

11   WITH HER BEFORE.

12            WHEN HAD YOU WORKED WITH HER BEFORE JULY 30TH, 2014?

13            THE WITNESS:  MANY TIMES.

14            THE COURT:  MANY -- SO, BEFORE 2014, YOU'D HAD AN

15   EXPERIENCE --

16            THE WITNESS:  YES.

17            THE COURT:  NOW, HOLD ON.

18            NOW, I'M GOING TO GO BACK TO ANOTHER INTAKE FORM.

19            AND THERE'S AN INTAKE FORM WHICH IS EXHIBIT NUMBER

20   145.  STRIKE THAT.

21            EXHIBIT 153.  AND IF I LOOK AT THAT, I SHOULD SEE AN

22   INTAKE FORM AND PROJECTED ADMISSION OF MARCH 17TH, 2014.

23            DID YOU ALSO HAVE EXPERIENCES WITH HER BEFORE MARCH

24   OF 2014? -- LIKE IN 2013?

25            THE WITNESS:  I THINK SHE WAS THERE.  I -- I CAN'T

1    RECALL.  IT'S BEEN SO LONG.  I CAN'T GIVE THE EXACT DATE.

2              THE COURT:  OKAY.

3              THE WITNESS:  BUT I KNOW I HAD WORKED --

4              THE COURT:  AND --

5              THE WITNESS:  -- WITH C.L. FOR MANY TIMES BEFORE THE

6    REQUEST WITH THE DOG.

7              THE COURT:  AND I'M NOT BEARING DOWN ON YOU.

8              MS. MC GUINNESS:  IF I --

9              THE COURT:  I'LL LET BOTH COUNSEL DO THIS.

10             BUT LET ME GO BACK AGAIN.  I WANT TO HEAR ONE MORE

11   TIME WHAT THE PRIOR EXPERIENCE YOU HAD HAD WITH C.L. THAT WOULD

12   CAUSE YOU TO BELIEVE THE DOG WAS GOING TO BE A HINDRANCE IF

13   YOU'RE NOT BASING THAT ON THE POODLE AND THE DECOMPENSATION.

14             THE WITNESS:  OKAY.

15             THE COURT:  OKAY.

16             THE WITNESS:  OKAY.

17             THE COURT:  WHAT -- IT COULD BE INTUITIVE.  IT COULD

18   JUST BE YOU FELT THIS.  IT COULD BE A BASIS.

19             BUT I'M CURIOUS.  WHY?

20             THE WITNESS:  SHE HAD VERY POOR -- C.L. WAS VERY

21   FRAGILE INSIDE.  SHE HAD VERY POOR STABILITY TO STAND ON HER

22   OWN.  AND PART OF IT IS --

23             THE COURT:  WELL, HOLD ON.

24             BUT SHE'S WITH THE DOG.

25             THE WITNESS:  BUT THE DOG'S NOT COMMUNICATING.

88

1            THE COURT:  NO, NO, NO, NO.

2            THE WITNESS:  THE DOG --

3            THE COURT:  HOLD ON.  I'M NOT -- BUT LET ME DO THIS

4    WITH YOU.

5            SHE'S HERE WITH THE DOG.  I MEAN, SHE'S LITERALLY

6    STANDING THERE.  BUT YOU'RE ALMOST IMMEDIATELY REJECTING THAT

7    DOG.  AND YOU HAVE A FEELING THAT THIS DOG IS GOING TO BE A

8    HINDRANCE.

9            AND I'M JUST ASKING WHY.  BECAUSE YOU -- UNLESS YOU'D

10   WORKED WITH HER BEFORE THAT DATE.

11           THE WITNESS:  WAY BEFORE THAT.

12           THE COURT:  WAY BEFORE THE FIRST ADMISSION THAT I'VE

13   GOT IN 2000- --

14           THE WITNESS:  WITH THE DOG, YES.  SHE HAD BEEN HERE

15   BEFORE PRIOR TO THAT --

16           THE COURT:  OKAY.

17           THE WITNESS:  -- THAT I'D WORKED WITH HER.

18           THE COURT:  OKAY.

19           WELL, I'LL LET COUNSEL CLEAR THAT UP FOR ME.

20           THE WITNESS:  OKAY.

21           THE COURT:  BUT THANK YOU.

22           THE WITNESS:  OKAY.

23           THE COURT:  OKAY.

24           ALL RIGHT.  COUNSEL, REDIRECT.  AND I MAY HAVE

25   MUDDLED THAT UP, BUT I --

1          MS. BRENNAN:  WELL, JUST TO CLARIFY WHAT YOU HAD BEEN

2    ASKING.

3                    REDIRECT EXAMINATION

4    BY MS. BRENNAN:

5    Q    CAN YOU STATE APPROXIMATELY HOW MANY ADMISSIONS XXXXXXX --

6    C.L. HAD HAD PRIOR TO ASKING TO BRING THE DOG IN IN APRIL 2014.

7          HOW MANY ADMISSIONS TO DEL AMO HOSPITAL DID SHE HAVE

8    BEFORE THAT?

9    A    IT'S BEEN SIX YEARS.  I CAN'T REMEMBER, BUT I KNOW SHE HAD

10   BEEN THERE OR I WOULD HAVE NEVER MADE THAT --

11               THE COURT:  NOW -- NOW, LET ME STOP FOR JUST A

12   MOMENT.

13               THE WITNESS:  OKAY.

14               THE COURT:  HERE'S WHAT I'M CONFUSED ABOUT, WHICH

15   BOTH OF YOU CAN HELP ME WITH.

16          OKAY.

17          (PAUSE IN PROCEEDINGS.)

18               THE COURT:  I HAVE THE FEELING THAT THERE WERE PRIOR

19   DISCUSSIONS, BUT I DON'T HAVE A CLEAR RECORD OF THAT.

20               THE FIRST ADMISSION I HAVE IS EXHIBIT NUMBER 122.

21               IT'S AN ADMISSION REPORT OF APRIL 16TH, 2014.  SO, I

22   CAN MAKE TWO ASSUMPTIONS.

23               THE FIRST IS THAT THAT'S THE FIRST DIALOGUE THAT'S

24   OCCURRED BETWEEN C.L. AND THIS WITNESS.

25               I HAVE ANOTHER ADMISSION OF JULY 30TH, 2014.

Exhibit E

1          **UNITED STATES DISTRICT COURT**

2          **CENTRAL DISTRICT OF CALIFORNIA**

3        **HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

4                   - - - - - - -

5   C.L., an individual,          )
                                  )        **CERTIFIED**
6            Plaintiff,           )
                                  )
7        vs.                      ) No. 8:18-CV-0475-DOC
                                  )    Day 3, Volume III
8   DEL AMO HOSPITAL, INC., *a*   )
    *California corporation*,      )
9                                 )
             Defendants.          )
10  _____)

11

12

13

14        REPORTER'S TRANSCRIPT OF PROCEEDINGS

15                  Court Trial

16            Santa Ana, California

17           Thursday, July 25, 2019

18

19

20

21

22  Debbie Gale, CSR 9472, RPR, CCRR
    Federal Official Court Reporter
23  United States District Court
    411 West 4th Street, Room 1-053
24  Santa Ana, California 92701
    (714) 558-8141
25

Case 8:18-cv-00475-DOC-DFM   Document 233-1   Filed 07/01/21   Page 88 of 102 Page ID #:5965
8:18-CV-0475-DOC - 7/25/2019 - Day 3, Volume III

3

```
1                          I N D E X

2      PROCEEDINGS                                        PAGE

3      Court Trial - Day 3, Volume III

4      HIRSCH, Peter (continued)                          5

5      RAHIMI, Maryam (called)                            25

6

7                          WITNESSES

8      WITNESSES              DIRECT   CROSS   REDIRECT   RECROSS

9      HIRSCH, Peter

10     By Ms. McGuinness               5                    18

11     By Mr. Klatte                          17

12
       RAHIMI, Maryam
13
       By Mr. Klatte          26              98
14
       By Ms. McGuinness               54                  103
15

16

17

18                          EXHIBITS

19     EXHIBIT NO./DESCRIPTION      IDENTIFICATION   IN EVIDENCE

20      57    Service dog policy prior   60              62
              to September 2014
21

22      117   Service Dog policies and                    53
              procedures
23
        118   NTC patient handbook                        32
24
        138   Intake form dated                           41
25            9/3/2015
```

Certified for Dummit Buchholz & Trapp
Debbie Gale, CSR 9472, RPR, CCRR
Federal Official Court Reporter

Case 8:18-cv-00475-DOC-DFM    Document 233-1    Filed 07/01/21    Page 89 of 102
Page ID #:5966
8:18-CV-0475-DOC - 7/25/2019 - Day 3, Volume III

33

                1    come to the trauma unit.

05:57           2    Q.    And in performing the social work and assessment

                3    functions, would I be correct to, uh -- to conclude that

                4    you're still involved in some clinical aspects of the

                5    program?

05:57           6    A.    Yes.

05:57           7    Q.    And do those clinical decisions involving the treatment

                8    of individual patients?

05:57           9    A.    Yes.  I do participate in treatment team planning as

               10    well.

05:57          11    Q.    All right.  And so lemme just use that as an

               12    opportunity'a ask you about the treatment team.  We've had

               13    some testimony about that.

05:57          14          As Program Director, are you a member of the treatment

               15    team?

05:57          16    A.    I am.

05:57          17    Q.    And what's your role, as you see it, as a member of the

               18    treatment team?

05:58          19    A.    It's a multidisciplinary treatment team, so we have

               20    different disciplines.  And as the clinical dir- -- I'm

               21    sorry -- as the Program Director, I contribute clinically,

               22    as well as the therapists and program coordinator.

05:58          23    Q.    All right.  And during the three years that you've been

               24    the program director, have you been a member of the

               25    treatment team?

8:18-CV-0475-DOC - 7/25/2019 - Day 3, Volume III

102

| | | |
|---|---|---|
| 07:39 | 1 | THE COURT:  Now, you can answer that question. |
| 07:39 | 2 | Do you understand it?  I wanna make sure. |
| 07:39 | 3 | THE WITNESS:  Yes. |
| 07:39 | 4 | THE COURT:  Now, when it's broken down, I do too. |
| 07:39 | 5 | All right.  Answer the question. |
| 07:39 | 6 | MS. McGUINNESS:  I object.  Incomplete |
| | 7 | hypothetical. |
| 07:39 | 8 | THE COURT:  Overruled. |
| 07:39 | 9 | THE WITNESS:  So I would have a conversation with |
| | 10 | the patient to inquire about the symptoms. |
| 07:39 | 11 | And so I wanna clarify your question:  Are you |
| | 12 | asking me to look at the summary here and answer, or you |
| | 13 | mean, in general? |
| 07:39 | 14 | BY MR. KLATTE: |
| 07:39 | 15 | Q.   In general. |
| 07:40 | 16 | A.   In general I would have a conversation to find out more |
| | 17 | what the symptoms of PTSD are and what tasks the dog does. |
| 07:40 | 18 | So let's say she does say, *The dog helps me ground, or* |
| | 19 | *helps me with my anxiety.*  In that instance, I would say |
| | 20 | that it would be detrimental to her treatment. |
| 07:40 | 21 | MR. KLATTE:  No further questions. |
| 07:40 | 22 | THE COURT:  And recross? |
| 07:40 | 23 | MS. McGUINNESS:  Yes. |
| | 24 | |
| | 25 | |

Case 8:18-cv-00475-DOC-DFM   Document 233-1   Filed 07/01/21   Page 91 of 102
Page ID #:5968
8:18-CV-0475-DOC - 7/25/2019 - Day 3, Volume III

103

```
07:40    1              RECROSS-EXAMINATION

07:40    2    BY MS. McGUINNESS:

07:40    3    Q.   And on what basis would you determine that a "dog

         4    performs a grounding task" (verbatim) is detrimental to a

         5    person with a ser -- with PTSD?

07:40    6    A.   In this situation she is calling, asking to come

         7    inpatient.  So she has the dog at home.  That tells me that

         8    that's not sufficient.  That's not enough.  She's asking for

         9    more treatment.

07:40   10         So coming into our program, the whole point is for us

        11    to teach her those skills.

07:41   12    Q.   So you're saying because she has a service dog at home

        13    and she has to come in for treatment, that's evidence to you

        14    that the dog's not working?

07:41   15    A.   Not necessarily.

07:41   16    Q.   Okay.

07:41   17    A.   But she's asking for additional support.  She's asking

        18    to come in.  She's saying, I'm suicidal.  She needs higher

        19    level of care.

07:41   20    Q.   Understand.

07:41   21         How is it that the dog is not beneficial?  You said --

        22    all you said is it means that she needs more.

07:41   23    A.   Uh-huh.

07:41   24    Q.   How is the dog a detriment at that point, if she comes

        25    in and has the dog "plus"?  (Verbatim.)
```

Case 8:18-cv-00475-DOC-DFM    Document 233-1    Filed 07/01/21    Page 92 of 102
Page ID #:5969
8:18-CV-0475-DOC - 7/25/2019 - Day 3, Volume III

104

```
07:41    1   A.    So if she's saying, It's helping me ground and helping
         2   me with anxiety, those are the exact skills that we would be
         3   teaching her.  So if she's relying on a service animal while
         4   in the program, she won't be able to fully benefit from the
         5   program and the skills that we are here to teach.
07:41    6   Q.    Do you have any empirical basis for that opinion?
07:42    7   A.    Empirical basis?
07:42    8   Q.    Do you know what "empirical basis" means?
07:42    9   A.    Yes.
07:42   10   Q.    It means data, observable, verifiable.
07:42   11   A.    No.  But that would be based on my clinical judgment
        12   and the treatment team.
07:42   13   Q.    What is -- do you have any clinical basis for your
        14   clinic -- sorry.  Do you have any empirical basis for your
        15   clinical judgment?
07:42   16   A.    My experience and my education.
07:42   17   Q.    In your education did you ever study psychiatric
        18   service dogs?
07:42   19   A.    No.
07:42   20   Q.    Did you ever study the tasks that psychiatric service
        21   dogs do?
07:42   22   A.    No.
07:42   23   Q.    Did you ever read any research on the role of
        24   psychiatric service dogs?
07:42   25   A.    No, but even if you were to --
```

Exhibit F

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE DAVID O. CARTER, JUDGE PRESIDING**

**CERTIFIED TRANSCRIPT**

| | |
|---|---|
| C.L., an individual, | ) |
| | ) |
| PLAINTIFF, | ) |
| | ) |
| vs. | ) SACV NO. 18-0475-DOC |
| | ) Day 4, Volume I |
| DEL AMO HOSPITAL, INC., a | ) |
| California corporation, | ) |
| | ) |
| DEFENDANT. | ) |
| _____ | ) |

COURT TRIAL

REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

FRIDAY, JULY 26, 2019

9:29 A.M.

**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**

*Deborah D. Parker, U.S. Court Reporter*

4

```
 1                     I N D E X

 2

 3   DEFENDANT'S WITNESSES:   DIRECT  CROSS  REDIRECT  RECROSS

 4    ANNA SOLT, M.D.            6      29
                                       78
 5

 6

 7                   E X H I B I T S

 8   PLAINTIFF'S EXHIBITS:              IDENTIFICATION  EVIDENCE

 9    20, 51 Declaration of Lisa Montes                   34
             and Declaration of Kristie
10           Yahnian

11    55    Article: "Preliminary          102
            Efficacy of Service Dogs as
12          Complementary Treatment for
            Post-Traumatic Stress
13          Disorder in Military
            Members and Veterans"
14
      59    Frequently Asked Questions                    34
15          About Service Animals and
            the ADA
16

17

18                   E X H I B I T S

19   DEFENDANT'S EXHIBITS:              IDENTIFICATION  EVIDENCE

20    110   Curriculum Vitae of Anna         6
            Solt, M.D.
21

22

23

24

25
```

*Deborah D. Parker, U.S. Court Reporter*

7

09:31:56  1         *identification.)*

          2    BY MR. KLATTE:

          3    Q    And Dr. Solt, if you would take a moment and review

          4    Exhibit 110 and tell us if that is a copy of your curriculum

09:32:20  5    vitae?

          6    A    Yes, that is.

          7    Q    All right.  And so, where were you born?

          8    A    In Canada.  Toronto, Canada.

          9    Q    And where did you grow up?

09:32:33 10    A    I grew up -- I lived in Canada for the first year.

         11    Then, because of my of parent's studying, I lived in Boston

         12    for a while; in Chicago, Illinois and then I moved to Mexico

         13    at age of eight.

         14    Q    At the age of eight?

09:32:49 15    A    Yeah.

         16    Q    And where did you attend law school -- pardon me,

         17    medical school?

         18    A    In Mexico City where I grew up.

         19    Q    All right.  After attending medical school, did you

09:32:59 20    take a residency?

         21    A    Yes.  I studied psychiatry.

         22    Q    And where did you take your residency?

         23    A    At Harvard South Shore, psychiatry residency program,

         24    affiliated with Harvard Medical School and the Boston

09:33:22 25    Veterans Administration.

*Deborah D. Parker, U.S. Court Reporter*

8

| | | |
|---|---|---|
| 09:33:23 | 1 | Q    And did you also have a fellowship that you took there? |
| | 2 | A    After I completed psychiatry, I had a fellowship in |
| | 3 | what is now called Consultation Liaison Psychiatry. |
| | 4 | THE COURT:  Just a little slower.  Just a little |
| 09:33:39 | 5 | slower. |
| | 6 | I have realtime.  And what it's doing is keeping |
| | 7 | track of what you say.  And when I see a flatline, it means |
| | 8 | my realtime died.  It's kind of like a flatline. |
| | 9 | THE WITNESS:  Okay. |
| 09:33:52 | 10 | THE COURT:  Okay? |
| | 11 | THE WITNESS:  Sorry. |
| | 12 | THE COURT:  And it's kind of like a flatline. |
| | 13 | All right.  Counsel? |
| | 14 | BY MR. KLATTE: |
| 09:33:53 | 15 | Q    And I'm sure you say the word "psychiatry" very often, |
| | 16 | but it is a long word.  In the midst of a sentence, it can |
| | 17 | be hard to get into the record. |
| | 18 | A    I understand. |
| | 19 | Q    Don't worry. |
| 09:34:04 | 20 | THE COURT:  You just speak and we'll slow you |
| | 21 | down, if we need to. |
| | 22 | THE WITNESS:  Okay. |
| | 23 | BY MR. KLATTE: |
| | 24 | Q    Dr. Solt, did you have any board certifications? |
| 09:34:12 | 25 | A    Yes.  I also wanted to mention that while I was doing |

*Deborah D. Parker, U.S. Court Reporter*

9

```
09:34:15    1    my residency, I completed a fellowship in psychoanalytic
            2    psychotherapy.
            3               THE COURT:  Now, stop.
            4               Question.
09:34:27    5    BY MR. KLATTE:
            6    Q    Do you have a board certification in psychiatry?
            7    A    I do.
            8    Q    When did you --
            9               THE COURT:  Stop.
09:34:36   10               Question.
           11    BY MR. KLATTE:
           12    Q    When did you receive that?
           13    A    2009.
           14               THE COURT:  Stop.
09:34:44   15               Question.
           16    BY MR. KLATTE:
           17    Q    Do you have any other board certifications?
           18    A    Yes.  I am board certified in psychosomatic medicine,
           19    which is now called Consultation Liaison psychiatry.
09:35:03   20               THE COURT:  Stop.
           21               Question.  If I slow the attorney down, that will
           22    slow you down.
           23               MR. KLATTE:  I'm trying to watch your court
           24    reporter, Your Honor, as well.
09:35:12   25               THE COURT:  If she stands up, you're in trouble.
```

12

| | |
|---|---|
| 09:39:05 | 1 |

hospitalizations?

A    So inpatient hospitalizations, it has probably been hundreds of patients.

Q    And in -- in connection with that, have you made clinical assessments of their psychiatric conditions?

A    Yes.

Q    Have you also made clinical decisions regarding the treatments that they should receive?

A    Yes.

Q    In connection with -- were -- were you retained in this case by Del Almo Hospital?

A    Correct.

Q    And what were you asked to do with respect to that retainer?

A    I was asked to voice my opinion -- my expert opinion on whether -- on how the admittance of a service animal would impact C.L.'s treatment within this trauma program.

Q    All right.  And just yes or no at this point in time, have you formed opinions in connection with that assessment?

A    Yes.

Q    Now -- and with respect to the degree of certainty, can you tell us with what degree of certainty you formed your opinions?

A    Within a reasonable degree of medical certainty.

Q    And it's set forth in your declaration, but can you

22

| | | |
|---|---|---|
| 09:52:57 | 1 | just doesn't want to misstate the standard.  That's all. |
| | 2 | *(Pause.)* |
| | 3 | BY MR. KLATTE: |
| | 4 | Q    All right.  Dr. Solt, I'm trying to remember exactly |
| 09:54:13 | 5 | where we left off.  I think you had stated an opinion to the |
| | 6 | effect concerning the service dog? |
| | 7 | A    Correct. |
| | 8 | Q    Did you make any determination of whether or not the |
| | 9 | determination about the -- |
| 09:54:31 | 10 | Well, did you make any determination concerning |
| | 11 | or -- did you form any opinion whether the presence of the |
| | 12 | service dog would have interfered with her clinical care? |
| | 13 | A    Yes.  It's my opinion that it would have interfered. |
| | 14 | Q    And can you explain for us why you believe that to be |
| 09:54:51 | 15 | true? |
| | 16 | A    C.L. has a service dog that is reportedly there to help |
| | 17 | her with psychiatric symptoms.  And the National Treatment |
| | 18 | Center program is there to do exactly that:  To help her |
| | 19 | develop coping skills, behaviors to be able to deal with the |
| 09:55:19 | 20 | symptoms of Post-Traumatic Stress Disorder.  So having the |
| | 21 | service dog there would -- it would be too tempting for her |
| | 22 | to try to utilize the service dog instead of implementing |
| | 23 | tools that are taught within the program. |
| | 24 | Q    Thank you. |
| 09:55:41 | 25 | Are you familiar with a -- with a technique or |

*Deborah D. Parker, U.S. Court Reporter*

28

| | |
|---|---|
| 10:04:28 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 10:04:48 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 10:05:10 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 10:05:33 | 15 |

1  versus outpatient treatment that someone with a mental -- a

2  need for mental treatment might encounter?

3  A    So people usually go into inpatient treatment when

4  there's an acute problem that cannot be safely handled as an

5  outpatient.  Outpatient treatment is less intensive, usually

6  lasts a couple of hours or an hour.  She was under

7  outpatient treatment with Dr. Foust, and I believe a

8  psychiatrist.

9          So people go to inpatient treatment when they are

10  under acute stress.

11  Q    And so what are the goals of inpatient treatment versus

12  outpatient treatment then?

13  A    So in this case, it's to provide some structure, to

14  receive intensive psychotherapy in the form of individual

15  therapy, group therapy, developing coping skills, such as

16  enhancing people's ability to do the deep breathing and the

17  imagery within the program.  They also address substance

18  use.  They develop plans for when they do -- they are under

19  stress on the outside.  I think she had a safety plan, a 911

20  card.

21          So, basically, this program is preparing them for

22  when they have symptoms in the real world.

23  Q    And based on your review of the medical records and

24  other information in this case, did you find any indication

25  that the length or efficacy of C.L.'s treatment at Del Almo

*Deborah D. Parker, U.S. Court Reporter*

29

10:06:34    1    was diminished by the absence of her service dog?

2    A    No, it was not diminished.    It was actually enhanced by

3    Aspen not being there.

4    Q    And did you -- did you make -- in terms of the

10:06:56    5    treatment that was received, did you make any determination

6    whether C.L. benefited from the treatment at Del Almo in

7    terms of her being functional and more stable upon

8    discharge?

9    A    It appears that she did benefit.    There was -- there

10:07:17   10    were e-mails where she commented on the use of techniques

11    that she had learned within the program to her psychologist.

12    I mean, between one of the admissions and the other, it was

13    almost a year -- a period of a year.

14    Q    And --

10:07:36   15    A    So she didn't have suicide attempts.    I think her last

16    suicide attempt was reported to be in 2007.

17    Q    2007 or '17?

18    A    I believe it was 2007.    The last suicide attempt, if I

19    recall correctly.

10:07:51   20         MR. KLATTE:    All right.    I have no further

21    questions, Your Honor.

22         THE COURT:    Cross-examination.

23         MS. McGUINNESS:    Yes.    Thank you.

24    ////

25    ////

*Deborah D. Parker, U.S. Court Reporter*