JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| C.L.,<br><br>  Plaintiff,<br><br>  vs.<br><br>DEL AMO HOSPITAL,<br><br>  Defendant. | CASE NO. SA CV 18-0475-DOC (DFMx)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I. INTRODUCTION

This action arises out of a dispute regarding admission of Plaintiff C.L.[1] to National Treatment Center Program ("NTC Program") at Defendant Del Amo Hospital ("Hospital" or "Del Amo"). Plaintiff has been voluntarily admitted to the NTC program at Del Amo on numerous occasions due to persistent mental health conditions including post-traumatic stress disorder ("PTSD") and dissociative identity disorder ("DID"). On at least seven occasions, Plaintiff sought to bring her dog, Aspen, with her during her inpatient stay at the Hospital. On each occasion, Del Amo did not permit Plaintiff to bring Aspen into the facility with her. Plaintiff alleges that this refusal violates state and federal law. Plaintiff argues that at all relevant times, Aspen was a "service animal" as that term is defined by the Americans with Disabilities Act ("ADA"). Del Amo maintains that Aspen is not a service animal, and even if Aspen is a service animal, that the facility was not required to allow the dog into the Hospital because doing so would fundamentally alter the Hospital's service.

A bench trial on this matter was held on July 23–26, 2019, after which the Court concluded that Plaintiff had failed to establish that Aspen qualified as a service dog under the ADA (Dkt. 199) and entered final judgment in favor of the Defendant on September 9, 2019 (Dkt. 200). On September 11, 2019, Plaintiff appealed from the Court's entry of final judgment and on March 30, 2021, the Ninth Circuit vacated and remanded (Dkt. 218). Specifically, the Ninth Circuit instructed the Court to reconsider two issues on remand: whether Aspen was a qualified service dog at the time of trial, and if Aspen is a service dog, whether Del Amo has proved its affirmative defense of fundamental alteration (Dkt. 218).

On May 3, 2021, the Court held a status conference with the parties (Dkt. 227). Defendant Del Amo filed its brief regarding the Status Conference (Dkt. 228) and Plaintiff

---

[1] Plaintiff's name is not disclosed for confidentiality purposes; Plaintiff will be referred to as "C.L." throughout the Court's Findings of Fact and Conclusions of Law.

C.L. filed her brief (Dkt. 229) on May 28, 2021. An additional status conference was held on June 3, 2021 (Dkt. 230). Defendant submitted to the Court a supplemental brief (Dkt. 233) and Plaintiff submitted a supplemental brief (Dkt. 234) on July 1, 2021.

Having read and considered the parties' briefing on remand and all of the testimony adduced at trial, the Court issues the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52. To the extent that any findings of fact are included in the Conclusions of Law section, they shall be deemed findings of fact, and to the extent that any conclusions of law are included in the Findings of Fact section, they shall be deemed conclusions of law.

## II. FINDINGS OF FACT

### A. Background

1. Plaintiff C.L. has a Master's degree in speech-language pathology and holds a Ph.D. in Education with an emphasis in disability studies. Until 2011, when her mental health issues began preventing her from working, C.L. was a full-time public school speech-language pathologist. Trial Transcript, July 23, 2019 ("Transcript Day 1"), Vol. I (Dkt. 174) at 56:1–59:15.

2. Plaintiff C.L. has been diagnosed with Complex Post-Traumatic Stress Disorder ("PTSD") and Dissociative Identity Disorder ("DID") due to a childhood history of severe trauma, including physical, sexual, and emotional abuse. C.L. also has major depressive disorder and anxiety, though these disorders may be symptoms of PTSD. Transcript Day 1, Vol. I at 48:18–21, 54:10–55:23.

3. As a result of her mental health conditions, C.L. experiences hypervigilance, anxiety, flashbacks, intense nightmares, self-harming behaviors, dissociation, and suicidal ideation. Transcript Day 1, Vol. I at 50:10–51:18; Trial Transcript, July 24, 2019 ("Transcript Day 2"), Vol. II at 10: 4–10; Transcript Day 2, Vol. I at 20:23–21:13.

4. C.L. described hypervigilance as a heightened awareness of what is going on around her, which she can experience when she is away from her home. Transcript Day I,

Vol. I at 51–52.

5. C.L.'s disabling conditions negatively affect her functioning; for instance, C.L. finds it anxiety-producing to undress or shower, and finds it difficult to go into public places such as grocery stores to shop. Transcript Day 2, Vol. I at 10:14–12:11.

6. Del Amo is a psychiatric hospital located at 23700 Camino Del Sol in Torrance, California. Answer (Dkt. 33) ¶ 6.

7. The NTC Program at Del Amo is a specialized inpatient program designed to provide and promote trauma stabilization and resolution. Trial Transcript July 25, 2109 ("Transcript Day 3"), Vol. III at 32:4–12; Exhibit 118, National Treatment Center for Trauma Recovery Program Patient Handbook.

8. Dr. Michael Foust is C.L.'s treating, outpatient psychologist. Exhibit 60, Deposition of Michael Foust, at 10:8–16. Dr. Foust recommended that C.L. go to Del Amo due to its NTC treatment program. Exhibit 60 at 33–34.

9. The NTC Program involves programming all day, whereas C.L.'s sessions with Dr. Foust occur for one hour, twice per week. Transcript Day 2, Vol. I at 73:20–74:2.

10. Plaintiff voluntarily checked into the NTC Program on seven occasions from September 2015 through August 2017. On each occasion, Del Amo did not permit Plaintiff to bring her dog, Aspen, into the facility with her. Order Denying Defendant's Motion for Summary Judgment, Granting in Part and Denying in Part Plaintiff's Partial Motion for Summary Judgment ("MSJ Order") (Dkt. 80) at 2.

**B. C.L.'s Dog, Aspen**

11. C.L. began to consider getting a service dog in January 2012. Transcript Day 2, Vol. I at 18:9–21.

12. C.L. considered purchasing a trained service dog through an agency, but the lowest price she could find was $15,000, which she could not afford. Transcript Day 2, Vol. I at 23:22–24:12.

13. In an email to C.L. in early August 2013, Dr. Foust indicated that he believed a

companion dog would be sufficient for her needs. Transcript Day 2, Vol. II at 11:14–24.

14. C.L. took ownership of her dog, Aspen, in August 2013, when Aspen was eight weeks old. Transcript Day 2, Vol. I at 31:10–19.

### C. Training of Aspen

15. When Aspen was three months old, Plaintiff attended a puppy class at Wags and Wiggles. Transcript Day 2, Vol. I at 32:12–18. Wags and Wiggles does not conduct training specific to service dogs, and is not certified in service dog training. Transcript Day 2, Vol. II at 18:21–19:10.

16. Plaintiff then took a basic obedience class at Wags and Wiggles. Transcript Day 2, Vol. II at 19:23–20:3.

17. In April 2014, Plaintiff contacted Little Angels Service Dogs ("Little Angels"), a service dog training nonprofit organization, about self-training Aspen to be a service dog. Transcript Day 2, Vol. I at 52:25; Transcript Day 2, Vol. II at 36:20–37:7.

18. Katie Gonzalez is the owner of Little Angels. Exhibit 2, Email from Katie Gonzalez to C.L. dated April 28, 2014, at 1. Little Angels is a nonprofit organization that breeds and trains service dogs, and teaches people with disabilities how to train their own service dogs. Exhibit 2. Little Angels is a candidate member of Assistance Dogs International, a worldwide organization focused on assistance dog training. Transcript Day 3, Vol. II at 33:1–34:5.

19. Gonzalez, the founder and director of Little Angels, has trained service dogs, including psychiatric service dogs, for twenty years and has published books on service dog training. Gonz. Test. Tr. 3 Vol. 1 at 24:15-25:6, 26:20-22, 59:22-61:20; Exs. 37, 38, 105.

20. Gonzalez testified as an expert in the training of service dogs, the use of service dogs for psychiatric disabilities, and the laws and regulations for service dogs as applied to the work service dogs perform. *C. L. v. Del Amo Hosp., Inc.*, 992 F.3d 901, 908 (9th

Cir. 2021).

21. After Plaintiff contacted Gonzalez in April 2014, Gonzalez informed Plaintiff that Little Angels offers a series of three weekend seminars designed to instruct those who wish to train their own service dog to assist them. Exhibit 2, Email from Katie Gonzalez to C.L. dated April 28, 2014, at 1. Gonzalez informed Plaintiff that certification by Little Angels is granted to the handler/dog teams who attend all 3 seminars, over a period of 6 months or longer, and successfully pass the written test and field test demonstrating their ability to work safely in a public setting, with the dog mitigating the disabilities of the handler/recipient. Exhibit 2 at 1. Gonzalez's email to Plaintiff included locations, dates, and pricing of upcoming seminars. Exhibit 2 at 3. The seminar titles and fees were listed as follows:

   a. Service Dog Training 101 (Seminar 1). Fee: $235.00.
   b. Advanced Obedience and Assistance Tasks (Seminar 2). Fee: $310.00.
   c. Public Access (Seminar 3). Fee: $385. 00. Exhibit 2 at 3.

22. To be certified by Little Angels, in addition to attending all three seminars, the dog's owner/handler must communicate with Little Angels once a month during training. Transcript Day 3, Vol. I at 49:1–13. Additionally, Gonzalez/Little Angels must see the dog in question perform service tasks before approving the dog for certification. Transcript Day 3, Vol. I at 49:18–51:13.

23. Little Angels Seminar 3 includes a field test referred to as the Public Access Certification Test ("PACT"), designed by Assistance Dogs International. Transcript Day 3, Vol. II at 37:17–38:7. The test includes making sure that the dog in question responds the first time 90% of the time to cues, and responds to commands in different public locations. *Id. See also* Exhibit 38, Little Angels Service Dogs Seminar Booklet.

24. Plaintiff registered for, and attended, Service Dog Training 101 (Seminar 1) on May

6

24, 2014 and May 25, 2014. Exhibit 4, Email from Katie Gonzalez to C.L. date May 21, 2014; Exhibit 5, Email Chain between Katie Gonzalez and C.L. date May 25, 2014 to July 10, 2014; Transcript Day 2, Vol. II at 38:4–25. Aspen did not attend this class with Plaintiff, as Seminar 1 is designed for instruction without the dog being present and a great deal of the material covered is concentrated on determining which dog will be suitable. Exhibit 2 at 1; Transcript Day 2, Vol. I at 54:9–55:18.

25. Plaintiff did not attend Seminar 2 or Seminar 3, and accordingly, Aspen and Plaintiff did not receive certification from Little Angels as a service dog/handler team. Transcript Day 2, Vol. I at 58:7–59:8; Transcript Day 2, Vol. II at 40:22–41:10.

26. Plaintiff alleges that she trained Aspen to perform a cornering task, an about-face task, and a boundary task in 2014. Transcript Day 2, Vol. I at 62:21–63:23. Plaintiff also alleges that she trained Aspen to perform a medical alert and a task to help her stay alert while driving in 2015. Transcript Day 2, Vol. I at 63:23–65:4, 67:5–16. Plaintiff further alleges that she taught Aspen to perform the tasks of grounding, interruption of self-harm, and sitting guard outside of the shower. Transcript Day 2, Vol. I. at 40:10–43:25, 47:19–48:12; Transcript Day 2, Vol. I at 48:13–22.

### D. C.L.'s Hospitalizations at Del Amo

#### 1. Hospitalizations Prior to Seven Relevant Admissions

27. In addition to the seven hospitalizations relevant here, Plaintiff was voluntarily hospitalized at Del Amo prior to 2015. C.L. made her first request to bring Aspen into Del Amo Hospital in April 2014. Transcript Day 3, Vol. IV at 91:24–92:7. The parties do not dispute that C.L. was admitted on each occasion without her service dog. *See generally* Defendant MSJ (Dkt. 46), Plaintiff MSJ (Dkt. 49).

28. Plaintiff alleges Aspen could perform the following tasks by the time of this admission: deep pressure to provide grounding, task mastered by the end of 2013, Transcript Day 2, Vol. I at 40:10–22; alerting for hypervigilance, *Id.* at 44:21–46:20; alerting for anxiety spikes, *Id.*; and waking C.L. from nightmares, *Id.* at 34:3–8,

35:3–9.

29. The Del Amo Hospital NTC Program was overseen by a treatment team. Dkt 184, RT D3 V3, 33:9-22; Dkt 176, RT D3 V2, 74:6-19.

30. The treatment team consisted of the NTC Program Director who is a licensed clinical social worker, the NTC Program Coordinator, who is also a licensed clinical social worker, members of the nursing staff, and a psychiatrist. Dkt. 176, RT D3 V2 76:8-77:21; Dkt 184, RT D3 V3, 33:9-22.

31. Program Coordinator Kristie Yahnian testified that C.L. was well known to the NTC Program and the treatment team, as C.L. had been hospitalized three times prior to entering the program. Dkt. 180, RT D3 V4, 86:9-87:6, 88:9-17, 89:7-10. As such, the treatment team was familiar with C.L.'s pathologies and treatment needs during her hospital admissions wherein she sought admission with Aspen. Dkt. 180, RT D3 V4, 86:9-87:6, 88:9-17, 89:7-10.

32. Treatment within the NTC Program was individualized, highly structured, and intensive. Treatment modalities within the program included cognitive behavioral therapy, behavioral modification, trauma therapy, talk therapy, mindfulness, grounding, grief and loss therapy, and safety and containment. Dkt. 180, RT D3 V4 9:3-15.

33. Patients are expected to support each other by listening and giving supportive feedback. Interaction among patients is an integral part of the therapeutic process. Dkt. 180, RT D3 V4 10:6-18.

34. Plaintiff contacted Del Amo Hospital prior to her April 2014 admission to ask about bringing her dog Aspen with her. Dkt. 180, RT D3 V4, 19:9-16. Plaintiff told Yahnian that she would like to bring her dog with her for comfort and to help her work on her issues. Dkt. 180, RT D3 V4, 19:17-22.

35. Yahnian took Plaintiff's request to the NTC Treatment Team, and the team discussed the pros and cons of allowing plaintiff to bring her dog. Dkt. 180, RT D3 V4, 19:23-

20:1, 21:9-25, 69:5-21.

36. Yahnian believed that the dog would interfere with Plaintiff's treatment, because Plaintiff would rely on the dog rather than working on other grounding techniques such as developing an internal dialogue to deal with her symptoms. Dkt. 180, RT D3 V4 19:20-22:5, 65:12-66:8. Mariam Rahimi, the Program Director, concurred that the dog would interfere with treatment. Dkt 184, RT D3 V3, 102:16-20, 104:1-12. After discussing Plaintiff's request, the treatment team decided that the dog's presence would interfere with Plaintiff's treatment. Dkt. 180, RT D3 V4 19:24- 20:1, 71:3-12. Dkt. 176, RT D3 V2 92:12-93:6.

37. Dr. Hirsch, the NTC Medical Director and Plaintiff's attending psychiatrist, was the attending psychiatrist for each of Plaintiff's admissions to Del Amo and was the admitting psychiatrist for all but one of Plaintiff's admissions. Dkt. 176, RT D3 V2 78:20-79:4; trial exhibits 113, 114, 122, 125, 132, 139, 154, 165, 173, 183, 193, Admission Reports.

38. Dr. Hirsch agreed with the decision to exclude Plaintiff's dog during Plaintiff's hospitalizations. Dkt. 176, RT D3 V2 93:22-94:1, 94:7-14.

39. In Dr. Hirsh's opinion, C.L.'s use of a psychiatric service dog to mitigate the symptoms for which she was being treated would not fit in with the methodology used in treatment. Dkt. 176, RT D3 V2 100:20-101:5.

40. In Dr. Hirsch's opinion, the presence of C.L.'s dog would interfere with her therapeutic treatment on the unit because the purpose of the NTC Program was to help patients learn, gain, and utilize healthy methods of coping and functioning. Dkt. 176, RT D3 V2 94:7-14, 95:7-96:7.

41. Dr. Hirsch believed that consistent with the reasoning of C.L.'s team, C.L. having her dog with her would interfere with the therapeutic process because the treatment of psychiatric disorders such as PTSD is directed at helping the individual become more tolerant of very uncomfortable feelings both to understand where those

|   |   |
|---|---|
| 1 | uncomfortable feelings come from and to tolerate them better. Dkt. 176, RT D3 V2 95:7-96:7, 99:11-15. |
| 42. | In Dr. Hirsch's opinion, the therapeutic process during hospitalization required that the patient have a clear experience of the emotional states that are causing the patient difficulty, and the presence of a psychiatric service dog that would mitigate the full volume or intensity of those emotional states would interfere with that process. Dkt. 176, RT D3 V2 95:25-96:7, 99:11-15. |
| 43. | Anna Solt, M.D. was called as an expert by Del Amo at trial. Dr. Solt is a Board Certified Psychiatrist who completed her residency at Harvard South Shore, psychiatry residency program affiliated with Harvard Medical School and the Boston Veterans Administration. Dkt. 177, RT D4 V1 7:22-25, 8:25-9:2, 9:6-19. |
| 44. | Dr. Solt expressed the opinion with a reasonable degree of medical certainty that the presence of the service dog would have interfered in Plaintiff's clinical care. Dkt. 177, RT D4 V1 12:15-24, 22:10-23. |
| 45. | Dr. Solt opined that it would be too tempting for Plaintiff to try to utilize the service dog instead of implementing tools that are taught within the program. Dkt. 177, RT D4 V1 22:16-23. |
| 46. | During Plaintiff's July 2014 admission to Del Amo, C.L. brought Aspen to the hospital with her. Del Amo informed Plaintiff that Aspen would not be permitted to remain in the hospital with her. Transcript Day 2, Vol. I at 82:8–84:22. |
| 47. | Del Amo did not allow Plaintiff to bring Aspen into the facility with her during her April 2014 admission. Transcript Day 2, Vol. I at 86:14–87; Transcript Day 2, Vol. II at 61:20–22, 63:21–64:14. |

**2. Seven Relevant Hospital Admissions**

48. During C.L.'s seven relevant admissions to Del Amo's NTC Program, from September 2015 through August 2017, Plaintiff was not permitted to bring Aspen with her into the voluntary inpatient psychiatric program. Exhibits 139, 145, 154,

165, 173, 183, 193.

49. In addition to the tasks C.L. alleges that Aspen performed prior to her 2014 hospitalization, C.L. contends that Aspen was trained to perform the following tasks by mid-2015, *see* Plaintiff's Revised Proposed Memorandum of Contentions of Fact and Law ("Plaintiff's Revised FOFCOL") (Dkt. 190) ¶ 57: a cornering task, an about-face task, and a boundary task *see supra* ¶ 23; a medical alert task, *see supra* ¶ 23; interruption of self-harm, *see supra* ¶ 23; and sitting guard outside of the shower, *see supra* ¶ 23.

50. Upon each admission, C.L. was assessed by the admitting psychiatrist and was hospitalized in a locked, closed unit. Exhibits 139, 145, 154, 165, 173, 183, 193.

51. The goals articulated by Del Amo staff for C.L.'s admissions included alleviation of suicidal risk, decrease in symptoms of depression and anxiety, improved level of cognitive functioning, decreased susceptibility to PTSD with concurrent decrease in frequency of dissociation, and achievement of a level of psychosocial functioning such that C.L.'s treatment could continue in a less acute setting. *See, e.g.*, Exhibit 165.

**E. 2019 Evaluation of Aspen by Katie Gonzalez**

52. Gonzalez observed C.L. and Aspen together in June 2019. Transcript Day 3, Vol. II at 28:19–30:16.

53. After C.L. attended Little Angels Seminar 1 in May 2014, Gonzalez and C.L. exchanged emails for a brief period of time. Transcript Day 3, Vol. II at 30:20–22.

54. Gonzalez and Plaintiff had no contact between 2015 and 2019. Transcript Day 3, Vol. II at 30:3–9. Gonzalez is not able to certify dog handlers without frequent communication with them, as outlined in the Little Angels service dog training program. *Id.* at 31:20–24.

55. Gonzalez and Little Angels adhere to the standards of Assistance Dogs International when training service dogs. Transcript Day 3, Vol. II at 33:21–34:5.

11

56. As Gonzalez did not observe C.L. with Aspen in 2014, 2015, 2016, 2017, or 2018, Gonzalez could not state whether Aspen was a fully trained service dog during those years. Transcript Day 3, Vol. II at 49:22–51:1.
57. Gonzalez concluded that Aspen was a service dog at the time of trial in 2019. Transcript Day 3, Vol. II at 51:9–12.
58. Gonzalez's opinion is based on her firsthand observation of Aspen and evaluation of C.L.'s training techniques. Transcript Day 3, Vol. II at 51:13–15. Gonzalez observed Aspen and C.L. as a dog-handler unit in June 2019. She observed them at two locations, a restaurant and a shopping center, where C.L. demonstrated two of Aspen's trained tasks and Gonzalez evaluated whether Aspen's training and behavior in public was appropriate. Tr. 3 Vol. 1 at 69:24-71:18.
59. Gonzalez also evaluated Aspen's breed and size to evaluate appropriateness for the tasks Aspen was trained to perform. *Id*. at 71:19-72:2-17.
60. Gonzalez interviewed C.L. about the methods by which C.L. trained Aspen. *Id*. at 70:13-16; Id. Tr. 3 Vol. 2 at 10:15-20, 12:5-11.
61. Gonzalez testified that the techniques C.L. described having used to train Aspen are the same techniques that she and Little Angels' trainers teach in the seminars and in her book *Training Your Own Psychiatric Service Dog*. *Id*. Tr. 3 Vol. 1 at 72:18-23; *Id*. Tr. 3 Vol. 2 at 10:15-12:17.
62. Gonzalez concluded that Aspen's tasks were trained tasks, rather than mere behaviors. *Id*. Tr. 3 Vol. 2 at 12:12-14.
63. Gonzalez testified that all of Aspen's tasks are common psychiatric service dog tasks that she routinely trains handlers and service dogs to perform, and in her opinion Aspen had been trained to perform those tasks.[2]

---

[2] Gonz. Test. Tr. 3 Vol 1 at 66:10-68:7; Tr. 3 Vol. 2 at 13:10-17, 45:19- 46:17; Ex. 37 at 85-87; Ex. 38 at 61 (grounding); Id. at 66:3-15, 69:14-16; Ex. 37 at 81-82; Ex. 38 at 62-63 (boundary control); Id. at 66:3-13, 69:2-23; Tr. 3 Vol. 2 at 13:18-23; Ex. 38 at 66(about-face); Id. at 66:3-23; (footnote continued)

64. Although Gonzalez testified that Aspen qualified at the time of trial as a service dog, Little Angels has not certified Aspen as a service dog because C.L. did not complete the program established by Assistance Dogs International as followed by Little Angels. Transcript Day 3, Vol. II at 53:12–54:7.

## III. CONCLUSIONS OF LAW

65. Plaintiff C.L. seeks injunctive relief against Defendant Del Amo for alleged violations of the American with Disabilities Act ("ADA") and the Unruh Civil Rights Act ("Unruh Act"). For the reasons that follow, the Court concludes that Plaintiff is not entitled to such relief.

### A. Americans with Disabilities Act Claim

66. Under Title III of the ADA, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Discrimination under Title III includes, on the basis of disability, the denial of "the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation . . . ." and the denial of an "accommodation that is different or separate from that provided to other individuals, unless such action is necessary to provide the individual or class of individuals with a[n]. . . accommodation, or other opportunity that is as effective as that provided to others." 42 U.S.C. § 12182(b)(1)(A)(ii)–(iii).

67. To prevail on a discrimination claim under Title III of the ADA, a plaintiff must

---

Ex. 37. (standing guard); Id. at 66:7-9, 71:7-18; Ex. 37 at 87-88; Ex. 38 at 64-65; Id. at 45:19-21, 46:22-47:9 (cornering); Id. Tr 3 Vol 1 at 66:3-6, 68:11-18; Tr 3 Vol 2 at 13:7-9, 59:21-25; Ex. 37 at 82-85; Ex. 38 at 31-34 (waking from nightmares); Id. at 5:18-25; Ex. 37. (interrupting self-injury); Id. Tr. 3 Vol. 1 at 68:8-25; Ex. 37 at 82-85; Ex. 38 at 31- 34 (alert for medication).

13

1  show that: "(1) she is disabled within the meaning of the ADA; (2) the defendant is a
2  private entity that owns, leases, or operates a place of public accommodation; and (3)
3  the plaintiff was denied public accommodation by the defendant because of her
4  disability." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007) (citing 42
5  U.S.C. §§ 12183(a)–(b)).

68. Further, "individuals with disabilities shall be permitted to be accompanied by their service animals in all areas of a public entity's facilities where members of the public, participants in services, programs or activities, or invitees, as relevant, are allowed to go." 28 C.F.R. § 35.136(g). A place of "public accommodation shall modify policies, practices, or procedures to permit the use of service animals to persons with a disability." 28 C.F.R. § 36.302.

69. A hospital is a place of public accommodation. 42 U.S.C. § 12182(7)(F). A hospital thus improperly discriminates if it "fails to make reasonable accommodations for a person with a service animal." *Tamara v. El Camino Hospital*, 964 F. Supp. 2d 1077, 1083 (N.D. Cal. 2013).

70. A hospital does not discriminate, however, if either of the following are true: "(1) the accommodation would fundamentally alter the nature of the facility or service it provides, [under] 42 U.S.C. § 12182(b)(2)(A)(ii); or (2) based upon an individual assessment the hospital determines that the service animal poses a substantial and direct threat to health or safety which cannot be mitigated by reasonable accommodations, [under] 28 C.F.R. § 36.208." *Tamara*, 964 F. Supp. 2d at 1083. If an accommodation fundamentally alters a service or facility, that is an affirmative defense to an action for disability discrimination. *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 845 (9th Cir. 2004). "[W]hether an accommodation causes a fundamental alteration is 'an intensively fact-based inquiry.'" *Id.* (quoting *Martin v. PGA Tour, Inc.*, 204 F.3d 993, 999 (9th Cir. 2000)).

71. A service animal is defined as "any dog that is individually trained to do work or

perform tasks for the benefit of an individual with a disability. . . The work or tasks performed by a service animal must be directly related to the individual's disability." 28 C.F.R. § 35.104; 28 C.F.R. § 36.104. Tasks of a service animal may include "helping persons with psychiatric and neurological disabilities by preventing or interrupting impulsive or destructive behaviors." *Id.* On the other hand, "the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition." *Id.*

72. The definition of a service animal centers on "the outcome of training—what the dog is capable of doing to ameliorate an individual's disability." *C. L.*, 992 F.3d at 911. "There must be some evidence of individual training to distinguish the service animal from the ordinary pet. For example, a dog may naturally jump up in its owner's lap, which would constitute a behavior—however, if the owner trains the dog to sit in her lap in a particular position and only in response to certain triggers related to the owner's disability, then the dog has been trained and has ceased to merely behave in a way that dogs naturally do." *Id.*

73. Guidance regarding Section 36.104 indicates that "many individuals with PTSD may benefit by using a service animal," and the tasks performed by such a service animal "could include actively cuing the individual by nudging or pawing the individual to alert to the onset of an episode and removing the individual from the anxiety-provoking environment." 28 C.F.R. § Pt. 36. App. A. In addition, the Department of Justice has clarified that "an animal that is trained to 'ground' a person with a psychiatric disorder does work or performs a task that would qualify it as a service animal. . . [f]or example, if a service animal senses that a person is about to have a psychiatric episode and it is trained to respond, for example, by nudging, barking, or removing the individual to a safe location until the episode subsides, then the animal has indeed performed a task or done work on behalf of the individual with the disability, as opposed to merely sensing an event." *Id.*

74. Plaintiff C.L. is an individual with a disability within the meaning of the ADA, due to her diagnoses of PTSD and dissociative identity disorder. Transcript Day 1, Vol. I at 48:16–21.

75. Del Amo Hospital is a place of public accommodation. 42 U.S.C. § 12182(7)(F). *See* Order Denying Defendant's Motion for Summary Judgment and Granting in Part and Denying in Part Plaintiff's Motion for Summary Judgment ("Summary Judgment Order") (Dkt. 80) at 17–18.

76. C.L.'s testimony describing Aspen's training, corroborated by Gonzalez's expert evaluation, established that Aspen was more likely than not a qualified service dog at the time of trial. *See Sanchez v. Monumental Life Ins. Co.*, 102 F.3d 398, 404 (9th Cir. 1996). Based on Gonzalez's in-person physical evaluation of Aspen and the training methods that C.L. employed, Gonzalez concluded that Aspen's tasks were trained tasks, rather than mere natural behaviors. Tr. 3 Vol. 2 at 12:12-14.

77. At the time of trial, Aspen was trained to perform eight tasks that mitigate C.L.'s disability: (1) Grounding, C.L. Test. Tr. 2 Vol. 1 at 40:10-44:20; Tr. 2 Vol. 2 at 49:23-52:20; (2) Cornering, Tr. 2 Vol. 1 at 60:19-63:1, 67:24-68:8; (3) Interrupting nightmares, Tr. 2 Vol. 1 at 34:3-38:3, 38:16-40:7; (4) Interrupting self-harm, Tr. 2 Vol. 1 at 47:9- 48:22; (5) Boundary Control, Tr. 2 Vol. 1 at 63:4-22; (6) About Face, Tr. 2 Vol. 1 at 59:19-60:7; (7) Standing Guard, Tr. 2 Vol. 1 at 11:25-12:24, 65:5-66:3; and (8) Alerting for medication, Tr. 2 Vol. 1 at 63:23-65:4.

78. Gonzalez testified that all of Aspen's tasks are common psychiatric service dog tasks she routinely trains handlers and service dogs to perform, and that she concluded based on her physical assessment that Aspen had been trained to perform those tasks to ameliorate C.L.'s disability. This testimony supports a finding that Aspen was more likely than not a service animal at the time of trial. Further, ADA regulations expressly identify grounding, interrupting self-harm, and nonviolent protection (such as boundary control, about-face, and standing guard) as common psychiatric service

|   |   |   |
|---|---|---|
| 1 |   | dog tasks. 28 C.F.R. § 36.104; 28 C.F.R. Part 36, Appx. A, "service animal." |
| 2 |   | Accordingly, the Court finds that Plaintiff has met her burden to show by a |
| 3 |   | preponderance of the evidence that Aspen was a trained service dog at the time of |
| 4 |   | trial in 2019. |
| 5 | 79. | However, the Court concludes that Del Amo did not discriminate against C.L. |
| 6 |   | because her requested accommodation would have fundamentally altered the nature |
| 7 |   | of the service that Del Amo provides. |
| 8 | 80. | The NTC treatment team, Program Director Marian Rahimi, and Program |
| 9 |   | Coordinator Kristie Yahnian, each determined that allowing Aspen to accompany |
| 10 |   | C.L. as a service animal would interfere with C.L.'s treatment because C.L. would |
| 11 |   | likely rely on the dog rather than developing other grounding techniques, such as |
| 12 |   | developing an internal dialogue to deal with her symptoms. Dkt. 180, RT D3 V4 |
| 13 |   | 19:20-22:5, 65:12-66:8; Dkt 184, RT D3 V3, 102:16-20, 104:1-12; Dkt. 180, RT D3 |
| 14 |   | V4 19:24- 20:1, 71:3-12; Dkt. 176, RT D3 V2 92:12-93:6. |
| 15 | 81. | NTC Medical Director and Plaintiff's attending psychiatrist, Dr. Hirsch, found that |
| 16 |   | the presence of C.L.'s dog would interfere with her therapeutic treatment in the unit |
| 17 |   | because the purpose of the NTC Program was to assist patients in learning and |
| 18 |   | gaining healthy methods of coping and functioning. Dkt. 176, RT D3 V2 94:7-14, |
| 19 |   | 95:7-96:7. In Dr. Hirsch's clinical opinion, the therapeutic process during |
| 20 |   | hospitalization required that the patient have a clear experience of the emotional |
| 21 |   | states that are causing the patient difficulty, and the presence of a psychiatric service |
| 22 |   | dog that would mitigate the full volume or intensity of those emotional states would |
| 23 |   | interfere with that process. Dkt. 176, RT D3 V2 95:25-96:7, 99:11-15. Expert Dr. |
| 24 |   | Solt expressed the opinion with a reasonable degree of medical certainty that the |
| 25 |   | presence of the service dog would have interfered in Plaintiff's clinical care. Dkt. |
| 26 |   | 177, RT D4 V1 12:15-24, 22:10-23. Dr. Solt opined that it would be too tempting for |
| 27 |   | Plaintiff to try to utilize the service dog instead of implementing tools that are taught |
| 28 |   |   |

within the program. Dkt. 177, RT D4 V1 22:16-23.

82. During C.L.'s seven relevant admissions to Del Amo's NTC Program, from September 2015 through August 2017, Plaintiff was consistently not permitted to bring Aspen with her into the voluntary inpatient psychiatric program. Exhibits, 139, 145, 154, 165, 173, 183, 193.

83. In *Lentini*, the Ninth Circuit affirmed a district court judgment for a quadriplegic patron who sued a concert hall owner and staff, alleging the patron was denied admission with a service animal in violation of the ADA and California law. 370 F.3d at 851. The Circuit reasoned that modification of a concert hall's policies to allow a patron to attend performances with a service animal that may have made disruptive noises at past performances was a necessary and reasonable accommodation under the ADA if such behavior would have been acceptable if engaged in by humans. *Id*. at 844. Further, but for the modification, the patron would have been excluded from performances at the concert hall. *Id*. Accordingly, the modification of the concert hall's policies did not fundamentally alter the service that the concert hall provided. *Id*. at 846.

84. Unlike *Lentini*, where the presence of a service animal would not disrupt the service the concert hall provided—a performance, here, the presence of a service animal would fundamentally alter the service Del Amo provided because C.L. would likely have utilized the service dog instead of implementing tools taught within the program. *Cf. Lentini*, 370 F.3d at 844. The NTC Program requires that the patient clearly experience the emotional states causing the patient difficulty, and the presence of a psychiatric service dog that would mitigate the full volume or intensity of those emotional states would interfere with the immediate treatment, as well as the long-term goals of learning tools to mitigate future symptoms during emotional states. Moreover, in contrast to *Lentini*, where the patron would have been unable to attend performances at the concert hall but for a modification permitting her service

|   |   |
|---|---|
| 1 | animal, here, C.L. would not be excluded from Del Amo's services in the absence of |
| 2 | her service dog. *See Lentini*, 370 F.3d at 844. |
| 3 | 85. The Court finds that allowing Aspen to accompany C.L. during treatment would fundamentally alter the manner in which Del Amo provides psychiatric services to C.L. Because Del Amo showed that the accommodation fundamentally alters its service, Del Amo prevails on its affirmative defense of fundamental alteration. |

**B. Unruh Civil Rights Act Claim**

86. The Unruh Act, Cal. Civ. Code § 51(b) provides: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, disability, medical condition, genetic information, marital status, sexual orientation, citizenship, primary language, or immigration status are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code § 51(b).

87. The Unruh Act further provides that "a violation of the right of any individual under the [ADA] shall also constitute a violation of this section." Cal. Civ. Code § 51(f).

88. A plaintiff may prevail on an Unruh Act claim by establishing that the defendant violated the ADA. *See Lentini*, 370 F.3d at 846–47.

89. As noted above, Defendant did not discriminate against Plaintiff because the requested accommodation—allowing C.L.'s dog, Aspen, to accompany her into psychiatric care—would fundamentally alter the nature of the facility or service the Hospital provides. Because C.L.'s Unruh Act claim is dependent upon her ADA claim, C.L.'s Unruh Act claim also fails.

## IV. CONCLUSION

After considering the parties' arguments, for the reasons explained above, the Court HOLDS that Plaintiff has met her burden to show by a preponderance of the evidence that Aspen was a trained service dog at the time of trial in 2019. However, Defendant Del Amo has established its affirmative defense of fundamental alteration and thus did not violate the Americans with Disabilities Act or the Unruh Civil Rights Act in relation to Plaintiff C.L.'s admissions to Del Amo's inpatient psychiatric facility. Defendant shall submit a proposed judgment in accordance with this Court's ruling **on or before September 17, 2021.**

DATED: September 3, 2021

*David O. Carter*

DAVID O. CARTER

UNITED STATES DISTRICT JUDGE